Terri Wood
730 Van Buren Street
Eugene, Oregon 97402
(541) 484-4171
twood@callatg.com
Attorney for Defendant

Richard L .Fredericks
750 Lawrence Street
Eugene, Oregon 97401
(541) 343-6118
Attorney for Defendant

FILED'06 JUL 21 16:24USDC-ORE



## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR:** 06-60078-1-AA |
| **Plaintiff,** | **PETITION TO ENTER PLEA OF** |
| | **GUILTY, CERTIFICATE OF COUNSEL** |
| **vs.** | **AND ORDER ENTERING PLEA** |
| **STANISLAS GREGORY MEYERHOFF,** | |
| **Defendant.** | |

The defendant represents to the Court:

1.     My name is Stanislas Gregory Meyerhoff.  I am 29 years old.  I have 14 years of education.  I request that all proceedings against me be in my true name.

2.     My attorneys are Terri Wood and Richard Fredericks.

**Page 1 - Petition to Enter Plea of Guilty, Certificate of Counsel, And Order Entering Plea**

3.     My attorneys and I have discussed my case fully. I have received a copy of the Indictment or Information. I have read the Indictment or Information, or it has been read to me, and I have discussed it with my attorneys. My attorneys have counseled and advised me concerning the nature of each charge, any lesser-included offenses, and the possible defenses that I might have in this case. I have been advised and understand that the elements of the charges alleged against me to which I am pleading "GUILTY" are as follows:

**Count 1:**

     – Between October 1996 and October 2001;
     – in Oregon;
     – willfully and knowingly;
     – conspired and agreed with others to;

          – maliciously damage or destroy, or attempt to damage or destroy;
          – by means of fire or explosive;
          – a building, vehicle, or other real or personal property;
          – owned, possessed or leased to United States.
          18 USC Section 844(f)(1).

          and

          – to maliciously damage or destroy;
          – by means of fire or explosive;
          – any building, vehicle or other real or personal property;
          – used in, or affecting, interstate commerce.
          18 USC Section 844(I).

          and

          – to knowingly and willfully damage, or attempt to damage;
          – an energy facility of the United States;
          – involved in transmission and distribution of electricity;

– in an amount exceeding $100,000.
18 USC Section 1366(a).

**Count 4:**

– On Dec. 30, 1999;
– in Oregon;
– knowingly and willfully damaged;
– an energy facility of the United States;
– in an amount exceeding $100,000.
18 USC Section 1366(a).

**The remaining counts in the Information are arsons. They have the following common elements:**

– In Oregon;
– unlawfully and maliciously caused;
– or aided and abetted and procured;
– the malicious damaging and destroying;
– by means of fire or explosive;
– real or personal property;
– used in, or affecting, interstate commerce.
18 USC 844(I) and 2.

**Count 2:**

– May 9, 1999;
– Childers Meat Co., Eugene.

**Count 3:**

– December 25, 1999;
– Bosie Cascade Office, Monmouth.

**Count 5:**

        – September 6, 2000;
        – Eugene Police Dept., Public Safety Station, Eugene.

**Count 6:**

        – January 2, 2001;
        – Superior Lumber Co., Glendale.

**Counts 7 through 41 all pertain to the same arson occurring on March 30, 2001, at Romania Truck Center in Eugene:**

**Count 7:** 2001 Suburban.

**Count 8:** 2001 Tahoe.

**Count 9:** 2001 Suburban.

**Count 10:** 2001 Suburban.

**Count 11:** 2001 Suburban.

**Count 12:** 2001 Tahoe.

**Count 13:** 2001 Tahoe.

**Count 14:** 2001 Tahoe.

**Count 15:** 2001 Suburban.

**Count 16:** 2001 Tahoe.

**Count 17:** 2001 Suburban.

**Count 18:** 2001 Suburban.

**Count 19:** 2001 Tahoe.

**Count 20:** 2001 Suburban.

**Count 21:** 2001 Suburban.

**Count 22:** 2001 Suburban.

**Count 23:** 2001 Suburban.

**Count 24:** 2001 Suburban.

**Count 25:** 2001 Suburban.

**Count 26:** 2001 Tahoe.

**Count 27:** 2001 Suburban.

**Count 28:** 2001 Suburban.

**Count 29:** 2001 Suburban.

**Count 30:** 2001 Suburban.

**Count 31:** 2001 Suburban.

**Count 32:** 2001 Suburban.

**Count 33:** 2001 Tahoe.

**Count 34:** 2001 Suburban.

**Count 35:** 2001 Suburban.

**Count 36:** 2001 Tahoe.

**Count 37:** 2001 Suburban.

**Count 38:** 2001 Suburban.

**Count 39:** 2001 Suburban.

**Count 40:** 2001 Suburban.

**Count 41:** 2001 Suburban.

**Counts 42 through 54 all involve an arson at Jefferson Poplar Farm, 79114 Collins Road, Clatskanie, Oregon, occurring on May 21, 2001.**

**Count 42:** attempted arson ( elements of arson previously outlined, above ); main office building.

**Count 43:** vehicle shop and contents.

**Count 44:** shop, office building and contents.

**Count 45:** 1997 Ford truck, Or. license # VHQ 660.

**Count 46:** 1984 Ford truck.

**Count 47:** 1997 Ford truck, Or. license # VHQ 661.

**Count 48:** 1997 Ford truck, Or. license # VNS 404.

**Count 49:** 1996 Ford truck.

**Count 50:** 1990 Ford truck, Or. license # 283 ACE.

**Count 51:** 1990 Ford truck, Or. license # 282 ACE.

**Count 52:** 1990 Ford truck, Or. License # 361 ACC.

**Count 53:** 1981 GMC truck.

**Count 54:** 1989 Ford truck.

4.      I know that if I plead "GUILTY," I will have to answer any questions that the judge

asks me about the offense(s) to which I am pleading guilty. I also know that if I answer

falsely, under oath, and in the presence of my attorney, my answers could be used against

me in a prosecution for perjury or false statement.

5.      I am not under the influence of alcohol or drugs. I am not suffering from any

injury, illness or disability affecting my thinking or my ability to reason. I have not taken

any drugs or medications within the past seven (7) days.

6.      I understand that conviction of a crime can result in consequences in addition

to imprisonment. Such consequences include deportation, or removal from the United

States, or denial of naturalization, if I am not a United States citizen; loss of eligibility to

receive federal benefits; loss of certain civil rights (which may be temporary or permanent

depending on applicable state or federal law), such as the right to vote, to hold public office,

and to possess a firearm; and loss of the privilege to engage in certain occupations licensed

by the state or federal government.

7.      I know that I may plead "NOT GUILTY" to any crime charged against me and

that I may persist in that plea if it has already been made. I know that if I plead "NOT

GUILTY" the Constitution guarantees me:

a. The right to a speedy and public trial by jury, during which I will be presumed to be innocent unless and until I am proven guilty by the government beyond a reasonable doubt and by the unanimous vote of twelve jurors;

b. The right to have the assistance of an attorney at all stages of the proceedings;

c. The right to use the power and process of the court to compel the production of evidence, including the attendance of witnesses in my favor;

d. The right to see, hear, confront, and cross-examine all witnesses called to testify against me;

e. The right to decide for myself whether to take the witness stand and testify, and if I decide not to take the witness stand, I understand that no inference of guilt may be drawn from this decision; and

f. The right not to be compelled to incriminate myself.

8. I know that if I plead "GUILTY" there will be no trial before either a judge or a jury.

9. In this case I am pleading "GUILTY" under **Rule 11(c)(1)(B)**. My attorneys has explained the effect of my plea under Rule 11(c)(1)(B) to be as follows:

I plead guilty under Rule 11(c)(1)(B); therefore, although the judge will consider the recommendations and agreements of

**Page 8 - Petition to Enter Plea of Guilty, Certificate of Counsel, And Order Entering Plea**

both the prosecution and the defense attorneys concerning sentencing, the judge is not obligated to follow those recommendations or agreements. If the judge imposes a sentence different from what I expected to receive under the terms of my plea agreement with the prosecutor, I do not have a right to withdraw my plea.

10. I know the maximum punishments which can be imposed upon me for the crimes to which I am pleading guilty are:

**Count 1: 5 years imprisonment, $250,000 fine.**

**Count 4: 20 years imprisonment, $250,000 fine.**

**Counts 2, 3, 5 through 54: 20 years imprisonment, mandatory 5 years imprisonment, $250,000 fine.**

11. I know that the judge, in addition to any other penalty, will order a special assessment as provided by law in the amount of $100.00 for each count.

12. I know that if I am ordered to pay a fine, and I willfully refuse to pay that fine, I can be returned to court, where the amount of the unpaid balance owed on the fine can be substantially increased by the judge and I can be imprisoned for up to one year.

13. My attorneys have discussed with me the Federal Sentencing Guidelines. I know The Guidelines are advisory, not mandatory. I also know the sentencing judge, in determining the particular sentence to be imposed, must consider those factors set forth in Title 18, United States Code, Section 3553(a), including, but not limited to: the nature and circumstances of the offense, my own history and characteristics, the goals of sentencing (punishment, deterrence, protection, and rehabilitation), and the sentencing range established

by the advisory Guidelines. If my attorneys or any other person has calculated a guideline range for me, I know that this is only advisory, and is only one of the factors that the judge will consider in making a final decision as to what sentence will be imposed. I also know that a judge may not impose a sentence greater than the maximum sentence referred to in paragraph (10) above.

14.     I know from discussion with my attorneys that, under the Federal Sentencing Guidelines, if I am sentenced to prison I am not entitled to parole. I will have to serve the full sentence imposed except for any credit for good behavior that I earn. I can earn credit for good behavior in prison at a rate of up to 54 days for each year of imprisonment served. Credit for good behavior does not apply to a sentence of one year or less.

15.     I know that if I am sentenced to prison, the judge will impose a term of supervised release to follow the prison sentence. During my supervised release term I will be supervised by a probation officer according to terms and conditions set by the judge. In my case, a term of supervised release can be up to __3__ years. If I violate the conditions of supervised release, I may be sent back to prison for up to ~~three~~ two years.

16.     I know that in addition to or in lieu of any other penalty, the judge can order restitution payments to any victim of any offense to which I plead guilty. I am also informed that, for certain crimes of violence and crimes involving fraud or deceit, it is mandatory that the judge impose restitution in the full amount of any financial loss or harm caused by an offense. If imposed, the victim can use the order of restitution to obtain a civil judgment

lien. A restitution order can be enforced by the United States for up to twenty (20) years from the date of my release from imprisonment, or, if I am not imprisoned, twenty (20) years from the date of the entry of judgment. If I willfully refuse to pay restitution as ordered, a judge may resentence me to any sentence which could originally have been imposed.

17.    On any fine or restitution in an amount of $2,500 or more, I know that I will be required to pay interest unless that fine or restitution is paid within fifteen (15) days from the date of the entry of judgment.

18.    If I am on probation, parole, or supervised release in any other state or federal case, I know that by pleading guilty in this court my probation, parole or supervised release may be revoked and I may be required to serve time in that case, which may be consecutive, that is, in addition to any sentence imposed on me in this court.

19.    If I have another case pending in any state or federal court, I know that my Plea Petition in this case does not apply to my other case(s), and that I can be faced with consecutive sentences of imprisonment.

20.    My plea of "GUILTY" is based on a Plea Agreement that I have made with the prosecutor.

21.    No officer or agent of any branch of government (federal, state or local) or anyone else has promised or suggested that I will receive a lesser term of imprisonment, or probation, or any other form of leniency if I plead "GUILTY." I understand that I cannot rely on any promise or suggestion made to me by a government agent or officer which is not

stated in writing, or which is not presented to the Judge in my presence in open court at the time of my entry of my plea of guilty.

22.     My plea of "GUILTY" is not the result of force, threat, or intimidation.

23.     I hereby request that the judge accept my plea of "GUILTY" to the following counts: **all counts in the Information.**

24.     I know that the judge must be satisfied that a crime occurred and that I committed that crime before my plea of "GUILTY" can be accepted. With respect to the charges to which I am pleading guilty, I acknowledge that the Government can prove beyond a reasonable doubt the statement of facts as set forth in Attachment #1 to the plea letter in my case, and request that the Court accept that statement as the factual basis for my guilty plea.

25.     I offer my plea of "GUILTY" freely and voluntarily and of my own accord and with a full understanding of the allegations set forth in the Indictment or Information, and with a full understanding of the statements set forth in this Petition and in the Certificate of my attorney that is attached to this Petition.

SIGNED by me in the presence of my attorneys, after reading (or having had read to me) all of the foregoing pages and paragraphs of this Petition on this 21st day of July, 2006.

_____
Stanislas Gregory Meyerhoff
Defendant

**Page 12 - Petition to Enter Plea of Guilty, Certificate of Counsel, And Order Entering Plea**

# CERTIFICATE OF COUNSEL

The undersigned, as attorneys for defendant Stanislas Gregory Meyerhoff, hereby certify:

1.  We have fully explained to the defendant the allegations contained in the Indictment or Information in this case, any lesser-included offense(s), and the possible defenses which may apply in this case.

2.  We have personally examined the attached Petition To Enter Plea of Guilty And Order Entering Plea, explained all its provisions to the defendant, and discussed fully with the defendant all matters described and referred to in the Petition.

3.  We have explained to the defendant the maximum penalty and other consequences of entering a plea of guilty described in paragraphs (6)-(20) of the Petition, and I have also explained to the defendant the applicable Federal Sentencing Guidelines.

4.  We recommend that the Court accept the defendant's plea of "GUILTY."

SIGNED by us in the presence of the above-named defendant, and after full discussion with the defendant of the contents of the Petition To Enter Plea of Guilty on the 21st day of July, 2006.

Terri Wood
Attorney for Defendant

Richard L. Fredericks
Attorney for Defendant

## ORDER ENTERING PLEA

I find that the defendant's plea of GUILTY has been made freely and voluntarily and not out of ignorance, fear, inadvertence, or coercion. I further find the defendant has admitted facts that prove each of the necessary elements of the crime(s) to which the defendant has pled guilty.

IT IS THEREFORE ORDERED that the defendant's plea of GUILTY be accepted and entered as requested in this Petition and as recommended in the Certificate of defendant's attorney.

DATED this _21_ of July, 2006, in open court.

_____
The Honorable Ann Aiken
U.S. District Court Judge



**U.S. Department of Justice**
*Karin J. Immergut*
*United States Attorney*
*District of Oregon*
*701 High Street*                    *Office (541) 465-6771*
*Eugene, OR 97401-2798*              *Fax: (541 465-6582*

July 19, 2006

Ms. Terri Wood
Attorney at Law
730 Van Buren Street
Eugene, Oregon 97402

Mr. Richard L. Fredericks
Attorney at Law
750 Lawrence Street, Suite 2
Eugene, Oregon 97401

>           Re:    <u>United States v. Stanislas Gregory Meyerhoff</u>   Case No. CR 06-60078-1-AA
>                  Plea Agreement - **REDACTED VERSION**

Dear Counsel:

1.    **Parties/Scope**:  This plea agreement is between this United States Attorney's Office for
      the District of Oregon (USAO) and defendant, and thus does not bind any other federal,
      state, or local prosecuting, administrative, or regulatory authority except as otherwise
      identified in this agreement.   This agreement does not apply to any charges other than
      those specifically mentioned herein.

2.    **Charges and Penalties**:  Defendant agrees to plead guilty to Counts 1 through 54 of
      the Information as follows:

      **Count 1: Conspiracy to Commit Arson and Destruction of an Energy Facility of
      the United States** in violation of Title 18, United States Code, Section 371.  The
      maximum sentence is 5 years imprisonment, a fine of $250,000, a 2 to 3 year  period of
      supervised release and a mandatory $100 fee assessment.

      **Count 2: Arson – Childers Meat Company** in violation of Title 18, United States Code,
      Section 844(i).  The maximum sentence is 20 years imprisonment, a mandatory
      minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and
      a mandatory $100 fee assessment.

      **Count 3: Arson – Boise Cascade Office**, in violation of Title 18, United States Code,
      Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory

minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 4: Destruction of an Energy Facility - BPA Tower**, in violation of Title 18, United States Code, Section 1366(a). The maximum sentence is 20 years imprisonment, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 5: Arson – EPD Public Safety Station**, in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 6: Arson – Superior Lumber Company**, in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Counts 7 through 41: Arson – Romania Chevrolet Truck Center Vehicles**, in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment for each count.

**Count 42: Attempted Arson – Jefferson Poplar Farm Main Office**, in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 43 through 54: Arson – Jefferson Poplar Farm Vehicle Shop, Shop and Office and Vehicles**, in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment for each count.

Defendant agrees to pay the fee assessment applicable to each of the above counts by the time of entry of guilty plea or explain to the court why this cannot be done. Defendant will also pay mandatory restitution as ordered by the court.

3.     **Factual Basis**:   The factual basis for each count is attached hereto and by this reference incorporated herein as Attachment 1, which defendant agrees the USAO can prove beyond a reasonable doubt.

4.     **Resolution of Sentencing Issues**: In addition to waiving the right to a jury trial on the issue of guilt, defendant knowingly and voluntarily agrees that sentencing issues in this

> case need not be alleged in a grand jury indictment, proven to a trial jury, or proven beyond a reasonable doubt. Defendant also knowingly and voluntarily consents to judicial fact-finding and resolution of any and all sentencing issues. Defendant and government agree that the guidelines calculations should be derived from the United States Sentencing Commission Guidelines Manual with effective date of November 1, 2000 and further that the combined offense level for defendant requires a 5 level increase pursuant to §3D1.4 of that manual. The defendant and government understand and agree that the court will consider 18 U.S.C. §3553(a) in determining the appropriate sentence in this case.

5.  **Guideline Enhancement**: The USAO will recommend the terrorism guideline enhancement found in U.S.S.G. §3A1.4 because the felony offenses either involved or were intended to promote a federal crime of terrorism.

6.  **Loss Calculations**:  The USAO and defendant agree for purposes of guideline calculations that the total loss resulting from the charges in this case is more than $20,000,000 but not more than $40,000,000, resulting in an 18 offense level increase pursuant to U.S.S.G. (November 1, 2000 effective date) §§2K1.4(a)(4), 2B1.3(b)(1) and 2B1.1(b)(1)(S).

7.  **Aggravating Role**: The USAO will recommend that defendant receive a 3 level increase for his role as a manager in the offense under the provisions of U.S.S.G. §3B1.1(b).

8.  **Acceptance**:  The USAO agrees to recommend a 3 level reduction for acceptance of responsibility if defendant's offense level is 16 or greater; otherwise a 2 level reduction applies pursuant to U.S.S.G. §3E1.1.  The USAO reserves the right to change or omit this recommendation if defendant, between plea and sentencing, commits any new or additional violation of law, obstructs or attempts to obstruct justice or acts inconsistently with acceptance of responsibility.

9.  **Dismissal/No Prosecution in the District of Oregon**:  The USAO will move to dismiss all remaining counts at the time of sentencing.  The USAO further agrees not to bring additional charges against defendant for offenses relating to arson, conspiracy, conspiracy to commit arson, or destruction of an energy facility in which defendant may have been involved directly or indirectly up to and including December 11, 2005, which took place in the District of Oregon.

10.  **REDACTED**

11.  **District of Colorado**: The defendant agrees to the transfer of the charges pending against him in <u>United States v. Meyerhoff et al.</u>, Case No. 06-CR-00191-REB, from the District of Colorado to the District of Oregon and to plead guilty to each count of the indictment in that case.  That case charges the following:

**Count 1: Arson – Two Elk Lodge, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 2: Arson – Camp 1 Restaurant, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 3: Arson – Ski Patrol Office and Operator's Shack for Ski Lift 14, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 4: Arson – Ski Patrol Headquarters and Ski Rental Shop, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 5: Arson – Buffalo's Café building, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 6: Arson – Operator's Shack for Ski Lift 4, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 7: Arson – Operator's Shack for Ski Lift 5, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 8: Arson – Operator's Shack for Ski Lift 11, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

12. **USAO Sentence Recommendation**: The sentence to be recommended by the government in this case is based on the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the

seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide a just and fair sentence for this defendant in relation to and in comparison with all of the defendant's co-conspirators.

13. **Waiver of Appeal/Post-Conviction Relief**: Defendant knowingly and voluntarily waives the right to appeal from any aspect of the conviction and sentence on any grounds unless the sentence imposed exceeds the statutory maximum, the court imposes an upward departure pursuant to Part 5K of the Sentencing Guidelines, or the court exercises its discretion under 18 U.S.C. § 3553(a) to impose a sentence which exceeds the advisory guideline range. Should defendant seek an appeal, despite this waiver of that right, the USAO may take any position on any issue on appeal. Defendant also waives the right to file a motion pursuant to 28 U.S.C. § 2255 to set aside the conviction and sentence, except on grounds of ineffective assistance of counsel, newly discovered evidence, or a retroactive change in the applicable guidelines or statute.

14. **Court Not Bound**: The court is not bound by the recommendations of the parties or of the Presentence Report (PSR) writer. Because this agreement is made under Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, defendant may not withdraw any guilty plea or rescind this plea agreement if the court does not follow the agreements or recommendations herein.

15. **Full Disclosure/Reservation of Rights**: The USAO will fully inform the PSR writer and the court of the facts and law related to defendant's case. Except as set forth in this agreement, the parties reserve all other rights to make sentencing recommendations and to respond to motions and arguments by the opposition.

16. **Breach of Plea Agreement**: If defendant breaches the terms of this agreement, or commits any new violations of law between signing this agreement and sentencing, the USAO is relieved of its obligations under this agreement, but defendant may not withdraw any guilty plea.

17. **REDACTED**

18. **REDACTED**

19. **Total Agreement**: This letter states the full extent of the agreement between the parties. There are no other promises or agreements, express or implied. If defendant accepts this offer, please sign and attach the original of this letter to the Petition to

Enter Plea.

Sincerely,

KARIN J. IMMERGUT
United States Attorney

KIRK A. ENGDALL
Assistant U.S. Attorney

I have read this agreement carefully and reviewed every part of it with my attorney. I understand the agreement and voluntarily agree to it. I am satisfied with the legal assistance provided to me by my attorney.

_____
Date

_____
STANISLAS GREGORY MEYERHOFF
Defendant

I represent defendant as legal counsel. I have carefully reviewed every part of this agreement with defendant. To my knowledge defendant's decision to enter into this agreement is an informed and voluntary one.

_____
Date

_____
TERRI WOOD
Attorney for Defendant

_____
Date

_____
RICHARD L. FREDERICKS
Attorney for Defendant

United States vs. Stanislas Gregory Meyerhoff

## Count 1: Conspiracy to Commit Arson and Destruction of an Energy Facility of the United States:

Beginning in October 1996 and continuing through October, 2001, in the District of Oregon and elsewhere, Josephine Sunshine Overaker, Kevin Tubbs, Stanislas Gregory Meyerhoff, Daniel Gerard McGowan, Joseph Dibee, Rebecca Rubin, Chelsea Dawn Gerlach, Kendall Tankersley, Suzanne Savoie, Jonathan Christopher Mark Paul, Darren Todd Thurston, Nathan Fraser Block, Joyanna L. Zacher, Jacob Jeremiah Ferguson, Jennifer Lynn Kolar, William C. Rodgers and other persons, willfully and knowingly conspired and agreed to maliciously damage or destroy, or attempt to damage or destroy, by means of fire, buildings, vehicles and other personal and real property owned in whole or in part or possessed by, or leased to, the United States or any department or agency thereof, and or used in interstate commerce or in any activity affecting interstate commerce; and to knowingly and willfully damage and attempt to damage the property of an energy facility of the United States involved in the transmission of electricity.

The conspiracy was accomplished by the defendant and the others named above, when certain of the defendants and others joined together in a group they called the "Family." This "Family" was what is commonly known as a "cell" of groups and movements publicly named and described by certain of the defendants and others as the Earth Liberation Front (ELF), the Animal Liberation Front (ALF), and other names.

The primary purposes of the conspiracy were to influence and affect the conduct of government, commerce, private business and others in the civilian population by means of force, violence, sabotage, destruction of property, intimidation and coercion, and by similar means to retaliate against the conduct of government, commerce and private business. To achieve these purposes, some of the conspirators committed and attempted to commit acts potentially dangerous to human life and property that constituted violations of the criminal laws of the United States and of individual states.

Some of the defendants and others targeted for arson, buildings, vehicles and other real and personal property owned, possessed, and leased by the United States and its departments and agencies while others targeted for arson, buildings, vehicles and other real and personal property used in interstate commerce and in activities affecting interstate commerce; and still others targeted energy facilities of the United States for damage and destruction.

The defendant and others conducted and participated in meetings to plan arsons of the targeted sites. Several of these meetings were called "Book Club" meetings by the defendants and others and occurred at distant locations. The "Book Club" meetings covered subjects such as lock-picking, computer security, reconnaissance of targets,

and manufacture of timing devices to set off improvised incendiary devices.

Some of the defendants and others conducted research and surveillance of sites targeted for arson and discussed their actions among themselves by using code words, code names, and nicknames. The phrase "direct action" was used to include arsons and other acts of destruction.

In preparation for the actions, the conspirators designed and constructed destructive devices which functioned as incendiary devices to ignite fires and destroy the targets for arson and provided transportation to the locations of the arson targets.

During the course of the "direct actions" the defendant and others dressed in dark clothing, wore masks and gloves and otherwise disguised their appearance. Some of the conspirators acted as "lookouts" to ensure secrecy as the crimes were carried out, and some placed destructive devices and accelerants at sites targeted for arson and ignited or attempted to ignite the devices and accelerants.

In some of the arsons and attempted arsons, certain of the defendants and others painted messages on the walls of the targets, including "Earth Liberation Front," "ELF" and related names and statements concerning the purposes of the crimes.

After the arsons and attempted arsons, the defendants and others destroyed, buried, hid and otherwise disposed of physical evidence used in the commission of the crimes and thereafter publicized and promoted the results of the fires by means of written press releases and communiques which attributed the arsons to the Earth Liberation Front (ELF), the Animal Liberation Front (ALF) and related groups, and stated the purpose of the arsons.

Before, during and after the arsons, attempted arsons, and destruction of an energy facility, some of the defendants and others agreed among themselves never to reveal to law enforcement authorities or to anyone else outside "the Family" the identity of the conspirators and participants in the arsons and attempted arsons and agreed among themselves to conceal or destroy any evidence connecting them to the arsons and attempted arsons. Some of the defendants and others possessed and/or used false identification documents in order to conceal their true identities and after the arsons and attempted arsons, some of the defendants and others fled and secreted themselves in foreign countries in order to avoid detection and arrest by law enforcement authorities in the United States.

## Count 2: Arson – Childers Meat Company

Prior to May 9, 1999, Stanislas Gregory Meyerhoff, Jacob Ferguson and Josephine Sunshine Overaker performed a reconnaissance of the Childers Meat Company, 29476 Airport Road, Eugene, Oregon, in the District of Oregon. The night of the arson, on or about May 9, 1999, Meyerhoff, Ferguson, Overaker, Chelsea Gerlach and Kevin Tubbs traveled to the Childers Meat Company facility. Meyerhoff had a radio

and performed the duties of a lookout near the facility while Ferguson and others placed the incendiary devices in and around the facility. Once the devices had been placed, Meyerhoff, Ferguson, Overaker, Tubbs and Gerlach met together and left the location. The incendiary devices functioned and the Childers Meat Company facility was destroyed by fire. Childers Meat Company building and its real and personal property were involved in and affected interstate commerce.

## Count 3: Arson – Boise Cascade Office

Prior to December 25, 1999, Stanislas Gregory Meyerhoff performed several reconnaissance trips to the Boise Cascade office at 450 North Pacific Avenue, Monmouth, Polk County, Oregon, in the District of Oregon. On the night of the arson, December 25, 1999, Meyerhoff, Jacob Ferguson, Chelsea Dawn Gerlach and Josephine Sunshine Overaker traveled to Monmouth, Oregon and parked behind the Boise Cascade Office facility. Overaker and Gerlach acted as lookouts and had hand held two-way radios and monitored a police scanner to avoid being detected by law enforcement. Meyerhoff and Ferguson carried buckets of fuel and the timing devices to the office building and placed them at strategic locations. After placing the incendiary devices, Meyerhoff, Ferguson, Gerlach and Overaker returned to Eugene, Oregon. The incendiary devices functioned and the Boise Cascade Office facility was destroyed by fire. The Boise Cascade Corporation building and its real and personal property was involved in and affected interstate commerce.

## Count 4: Destruction of an Energy Facility - BPA Tower

Prior to December 30, 1999, Stanislas Gregory Meyerhoff performed research on power lines and selected a high voltage electrical transmission line to destroy. Meyerhoff wanted to destroy an electrical transmission line to start Y2K troubles and to destabilize the United States because of its perceived unjust matters involving graft, political corruption and other injustices committed by the United States government. Meyerhoff and Chelsea Dawn Gerlach traveled to a location east of Bend, Oregon to perform reconnaissance at the location of the high voltage electric transmission lines. The night of the destruction of the energy lines and after preparations had been made by Meyerhoff, Gerlach, Jacob Ferguson and Josephine Sunshine Overaker to clean their tools to avoid being detected by law enforcement, the four traveled in Gerlach's truck to a site east of Bend, Oregon. After parking on a dirt road just off the highway, Meyerhoff, Ferguson and Overaker walked to the site of the transmission tower. Gerlach remained with her vehicle and waited for the three to return. All three wore gloves to avoid leaving latent fingerprints and proceeded to loosen and remove nuts from the bolts which held two cables which held the transmission line tower erect. After two of the four cables were loosened, the tower began to fall. Meyerhoff yelled to warn Ferguson and Overaker. They grabbed their tools and ran from the area as the tower fell to the ground amidst loud crackling sounds and flashes of light. After all four were back together at the truck, they returned to Eugene, Oregon where they attended a New Year's party at the Earth First Ranch. The High Voltage transmission tower was the property of an energy facility of the Untied States of America, namely, a Bonneville

Power Administration tower, involved in the transmission and distribution of electricity near the City of Bend, Oregon, and was damaged in an amount exceeding or which would have exceeded $100,000.

## Count 5: Arson – EPD Public Safety Station

Stanislas Gregory Meyerhoff, Chelsea Dawn Gerlach and Kevin Tubbs acted together on September 9, 2000, to burn the Eugene Police Department West University Public Safety Station located at 791 East 13th Avenue, Eugene, Lane County, in the District of Oregon. Meyerhoff and Gerlach used time delayed incendiary devices, placed them next to the Public Safety Station and left the area. One of the devices functioned and caused damage to the Public Safety Station building which was real and personal property used in interstate commerce and in activities affecting interstate commerce.

## Count 6: Arson – Superior Lumber Company

Prior to January 2, 2001, Stanislas Gregory Meyerhoff performed research on the Superior Lumber Company, located at 2695 Glendale Valley Road, Glendale, Douglas County, in the District of Oregon. Meyerhoff participated in the reconnaissance of the facility while in a vehicle parked on the street near the facility and where he took note of the neighborhood lighting. Prior to the arson, Meyerhoff assembled the timing devices which were used during the arson. The night of the arson, Meyerhoff, Jacob Ferguson, Kevin Tubbs and other co-conspirators traveled to a staging area near Glendale, Oregon. At the staging area, the co-conspirators dressed in dark clothing and put on latex gloves under cotton gloves to avoid detection by law enforcement. Meyerhoff and others had two-way radios with which to communicate. From the staging area, Meyerhoff and the others traveled to the Superior Lumber Company facility. Two of the co-conspirators were dropped off and served as lookouts. Meyerhoff and Ferguson placed the incendiary devices around the building, after which they called via two-way radios to be picked up. As they all returned to Eugene, Oregon, they disposed of the dark clothing and gloves they wore during the arson. The incendiary devices functioned and caused the destruction of the building by fire. The Superior Lumber Company building and other real and personal property was used in interstate commerce and in activities affecting interstate commerce.

## Counts 7 through 41: Arson – Romania Chevrolet Truck Center Vehicles

Prior to March 30, 2001, Stanislas Gregory Meyerhoff and other co-conspirators performed several reconnaissance missions at the Joe Romania Chevrolet Truck Center, 1425 Walnut Street, Eugene, Lane County, in the District of Oregon. The truck center was selected as a target to show support for Jeffrey Luers and was to be a "statement of defiance." Meyerhoff assembled the timing devices which were used during the arson. On the night of the arson, March 30, 2001, Meyerhoff and William Rodgers, Kevin Tubbs, Nathan Block and Joyanna Zacher met at a staging area east of Eugene to transfer the fuel from gas cans to portable containers. Meyerhoff and the

others wrapped cloth sheets to be used as trailers at the arson site. One vehicle was left at the staging area while Rodgers drove the conspirators in a van and dropped Tubbs and Zacher off to be lookouts during the arson. Meyerhoff and Block placed the incendiary devices under the vehicles. After the devices were set, Rodgers, Block and Zacher returned to the staging area to retrieve their vehicle. After the arson, Meyerhoff and others authored the communique then Meyerhoff gave the communique to Daniel McGowan to send out via anonymous email. The incendiary devices functioned and the vehicles were destroyed by fire. The vehicles which were destroyed were used in interstate commerce and used in activities affecting interstate commerce.

## Counts 42 through 54: Attempted Arson and Arson – Jefferson Poplar Farm.

Prior to May 21, 2001, Stanislas Gregory Meyerhoff, Jacob Ferguson, Chelsea Gerlach and others performed more than one reconnaissance at the Jefferson Poplar Farm facility located at 79114 Collins Road, Clatskanie, Columbia County, in the District of Oregon. The arson at the Jefferson Poplar Farm was coordinated to occur on the same day as the arson at the University of Washington. Meyerhoff and others referred to these actions as the "double whammy." Meyerhoff was in charge of the team that performed the arson at Jefferson Poplar Farm. Meyerhoff's team included Daniel McGowan, Suzanne Savoie, Nathan Block and Joyanna Zacher. Meyerhoff organized the people who were assisting in the arson and assigned the duties to the participants. Meyerhoff, William Rodgers, Chelsea Gerlach, Nathan Block, Joyanna Zacher and others attended a meeting at Block and Zacher's residence in Olympia, Washington where the Jefferson Poplar Farm and the University of Washington arsons were discussed. Meyerhoff purchased rocket engine igniters from hobby stores to be used in the timing devices. Meyerhoff assembled several timing devices which were placed inside tupperware containers. The night of the arson, May 21, 2001, Meyerhoff and the others were dropped off at the Jefferson Poplar Farm main office where he placed an incendiary device near the steps of the office and another device under the window of the office. Each incendiary device consisted of two buckets of fuel, a lid on top of the buckets and the timing device was placed on the lid. After setting the incendiary devices at the office, Meyerhoff ran over to the vehicle shop and the shop and office and set the timing devices on the buckets of fuel which had already been placed by Block and McGowan. At one point, McGowan heard a noise and pushed Meyerhoff behind a container near the shop to hide from the source of the noise. In the building containing numerous trucks, the vehicle shop, Meyerhoff, Block and McGowan poured diesel fuel from the truck tanks into the back of the trucks and onto the other vehicles. The incendiary devices functioned and the buildings and vehicles at Jefferson Poplar Farm were destroyed by fire. The Jefferson Poplar Farm buildings, vehicles and other real and personal property were used in interstate commerce and in activities affecting interstate commerce.

### District of Colorado Case No. 06-CR-00191-REB

Sometime in the Fall of 1998, while the defendants Chelsea Gerlach and

Stanislas Meyerhoff were living near Fall Creek, Oregon, William Rodgers asked them to participate in the com- mission of arson at the Vail ski area in Colorado.

The ski area is located on Vail Mountain in Eagle County, Colorado, adjacent to and south of the Town of Vail. Ski lifts run from the bottom of the mountain to its top.

Meyerhoff and Gerlach agreed to join Rodgers and drove to Colorado in Gerlach's truck. Rodgers and another person drove in his truck. They bought gasoline and other supplies during the trip and spent time at a motel in Utah constructing devices that they planned to use to ignite the fires.

When they arrived in Colorado, Gerlach, Meyerhoff, Rodgers and the other person met some others who planned to assist with the arson. Gerlach, Meyerhoff, Rodgers and others drove in Gerlach's truck from the City of Vail toward the top of Vail Mountain. They brought along several containers of gasoline and diesel fuel, which they intended to use to burn buildings and other structures belonging to the ski resort at the top of the mountain. Because there was snow on the ground and the road was muddy, the truck was unable to get to the top. The group took the containers out of the truck and hid them in an area below the ridge line.

When the group returned to the bottom of the mountain, Meyerhoff quit the project, believing the arson could not be accomplished. He drove back to Oregon in Gerlach's truck. Rodgers and Gerlach were the only ones who stayed in Colorado.

Rodgers and Gerlach decided that she would drive him back to the spot near the top of the mountain where her truck earlier had become stuck in the snow so that he could set fire to buildings and other structures. After accomplishing this task, Rodgers walked down the mountain on the morning of Monday, October 19, 1998, and met Gerlach at a prearranged site in Vail. Gerlach and Rodgers then drove to Denver, Colorado.

The fires that Rodgers had set destroyed or damaged eight buildings and structures in two different locations at the ski area. The two locations, which investigators designated as Scene A and Scene B, are about 1.4 miles apart along a ridge on top of the mountain, at about 11,250 feet.

Scene A contained three burned structures:

1.   Two Elks Lodge, a building of more than 24,000 square feet, which was totally destroyed.

2.   Camp One Restaurant, a 2,900-square-foot, which also was totally destroyed.

3.   A 1,327-square-foot building known as China Bowl, which housed a ski patrol office and an operator's shack for ski lift 14. The building was

totally destroyed, but the ski lift itself received little damage.

In the area designated as Scene B, the following structures were damaged or destroyed by fire:

1.  Patrol Headquarters, a 5,390-square-foot, wood-frame building that housed the ski patrol's headquarters as well as a ski rental shop, a pro shop, a small restaurant and an apartment where each season a ski patrol member resided. (The patrol member who was scheduled to live there during the 1998-99 season was in the process of moving into the apartment at the time of the fires but was not present when the fires occurred.) This building was totally destroyed.

2.  Buffalo's Café, a 749-square-foot building, which also was totally destroyed.

3.  A structure at the top of ski lift 5, which carried skiers from a back bowl to a spot near Patrol Headquarters. This lift also provided access to the Category III expansion area. The structure was a complete loss as a result of the fire.

4.  The structure at the top of ski lift 4, which carried skiers on the front side of the mountain to the area of Patrol Headquarters. Fire caused damage to a wall and an attached wooden deck.

5.  The structure at the top of ski lift 11, which also carried skiers on the front side of the mountain. The structure sustained fire damage on its southeast corner.

A forensic chemist examined wood, soil samples and other debris taken from Scene A and Scene B and determined that several items from both scenes contained mixtures of gasoline and a heavy petroleum distillate. (Diesel fuel is a heavy petroleum distillate.) Investigators determined that the fires were the result of arson.

Vail Associates, Inc., the company that operates the ski area, estimated that the value of the real estate lost as a result of the fires was almost $15,000,000. Vail Associates received a payment of about $12,000,000 from its insurance carrier. All of these buildings and structures that were affected by the arson fires had been used in interstate commerce or in activities affecting interstate commerce.

When Gerlach and Rodgers arrived in Denver, they composed a "communique," which claimed to be from the Earth Liberation Front. On October 21, 1998, Gerlach used a computer at a library in Denver to send the "communique" to news media. It read as follows:

On behalf of the lynx, five buildings and four ski lifts at Vail

were reduced to ashes on the night of Sunday, October 18th.  Vail, Inc. is already the largest ski operation in North America and now wants to expand even further.  The 12 miles of roads and 885 acres of clear cuts will ruin the last, best lynx habitat in the state.  Putting profits before Colorado's wildlife will not be tolerated.  This action is just a warning.  We will be back if this greedy corporation continues to trespass into wild and un-roaded areas.  For your safety and convenience, we strongly advise skiers to choose other destinations until Vail cancels its inexcusable plans for expansion.

When the "communique" said the ski area "want[ed] to expand even further," it was referring to Vail Associates' proposed Category III expansion onto 2,000 acres south of the mountain's back bowls.  Environmental groups had tried to stop the project by filing a lawsuit in federal court in Denver.  The groups claimed that the U.S. Forest Service, in granting a permit for the expansion, had failed to properly analyze the environmental impact of the expansion, including its effects on the Canadian lynx population.  The lawsuit was unsuccessful, and the project was scheduled to begin the day after the fires.