FILED '07 JUL 30 12:46 USDC-ORE

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,          )
                                        )
4              Plaintiff,               )  No. 06-CR-60078-1-AA
                                        )  No. 06-CR-60122-2-AA
5      v.                               )
                                        )  May 22, 2007
6    STANISLAS GREGORY MEYERHOFF,       )
                                        )  Eugene, Oregon
7              Defendant.               )

8

9              TRANSCRIPT OF PROCEEDINGS

10          BEFORE THE HONORABLE ANN AIKEN

11       UNITED STATES DISTRICT COURT JUDGE

12         P.M. Session - Pages 173 - 229

13                    -:-

14

15

16

17

18

19

20

21

22

23              Deborah Wilhelm, CSR, RPR
                     Court Reporter
24                   P.O. Box 1504
                  Eugene, OR  97440
25                  (541) 431-4113



```
 1                    APPEARANCES OF COUNSEL

 2     FOR THE PLAINTIFF:      KIRK A. ENGDALL
                               JOHN C. RAY
 3                             United States Attorney's Office
                               405 E. 8th Avenue
 4                             Suite 2400
                               Eugene, OR  97401
 5                             (541) 465-6771

 6                             STEPHEN E. PEIFER
                               United States Attorney's Office
 7                             1000 SW Third Avenue, Suite 600
                               Portland, OR  97204
 8                             (503) 727-1012

 9     FOR THE DEFENDANT:      TERRI WOOD
       (Mr. Meyerhoff)         Law Office of Terri Wood, PC
10                             730 Van Buren Street
                               Eugene, OR  97402
11                             (541) 484-4171

12                             RICHARD L. FREDERICKS
                               Attorney at Law
13                             750 Lawrence Street
                               Suite 2
14                             Eugene, OR 97401 (541) 343-6118

15     INTERESTED PARTIES:     CRAIG E. WEINERMAN
                               Office of the Federal Public
16                             Defender
                               151 W. 7th, Suite 510
17                             Eugene, OR  97401
                               (541) 465-6937
18
                               AMANDA E. LEE
19                             Schroeter, Goldmark & Bender
                               810 Third Avenue, Suite 500
20                             Seattle, WA  98104
                               (206) 622-8000
21
                               MARC D. BLACKMAN
22                             Ransom Blackman LLP
                               1001 SW Fifth Avenue
23                             Suite 1400
                               Portland, OR  97204
24                             (503) 228-0487

25
```

```
 1    INTERESTED PARTIES:        JOHN JOSEPH KOLEGO
      (Continued)               John J. Kolego, P.C.
 2                              804 Pearl Street
                                Eugene, OR  97401
 3                              (541) 484-1066

 4                              MARC P. FRIEDMAN
                                Attorney at Law
 5                              245 West 13th Avenue
                                P.O. Box 11167
 6                              Eugene, OR  97440
                                (541) 686-4890
 7
                                JOHN E. STORKEL
 8                              John E. Storkel, PC
                                1415 Liberty Street, SE
 9                              Salem, OR  97302
                                (503) 363-6625
10
                                WILLIAM R. SHARP
11                              Attorney at Law
                                1342 High Street, 2nd Floor
12                              Eugene, OR  97401
                                (541) 345-2002
13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX OF EXAMINATIONS

| FOR THE DEFENDANT: | Direct | Cross | ReD | ReX |
|---|---|---|---|---|
| Robert Stanulis | 177 | 200 | | |

INDEX OF STATEMENTS

| Bruce Emerson | 203 |
|---|---|
| John Givot | 208 |
| France Meyerhoff | 212 |
| Zelda Ziegler | 216 |

1       (Afternoon session, Tuesday, May 22, 2007; 3:16 p.m.)

2                     P R O C E E D I N G S

3               THE COURT:  Call your next.

4               MS. WOOD:  Defense calls Dr. Robert Stanulis.

5               (The witness was sworn.)

6               THE CLERK:  Please be seated.  And state your

7       name, spelling your last name.

8               THE WITNESS:  Robert Gerald Stanulis,

9       S-T-A-N-U-L-I-S.

10              MS. WOOD:  Your Honor, we provided the court

11      and counsel with Dr. Stanulis's CV.  And without

12      objection, we would offer him as an expert in the field

13      of neuropsychology.

14              MR. ENGDALL:  No objection.

15              MS. WOOD:  Actually, forensic neuropsychology.

16                     DIRECT EXAMINATION

17      BY MS. WOOD:

18         Q.   Dr. Stanulis, you conducted an evaluation of

19      Mr. Meyerhoff at defense request.  And you prepared a

20      five-page report of your findings, which has been

21      attached to the PSR, correct?

22         A.   Yes.

23         Q.   What was the purpose of your evaluation?

24         A.   The purpose of my evaluation was severalfold.

25      One was to look at who Mr. Meyerhoff was and to explain

1    his involvement in the crimes for which he admitted

2    guilt to.

3              And also to look at future management to look

4    at issues about whether he posed a future danger, to

5    look at personality characteristics that might need

6    managing in a prison setting, and to look at risk of

7    future criminal behavior.

8        Q.    Okay.  We also asked that you determine whether

9    Mr. Meyerhoff possessed any of the personality traits

10   that psychological studies associated with persons who

11   assume leadership of groups, correct?

12       A.    Yes.  That was part of the -- trying to

13   understand what his role would and would not be within

14   the group called The Family.

15       Q.    Okay.  Can you tell us first what are those

16   traits that are associated, through your field of

17   science, with leadership?

18       A.    With leadership, you see people who have

19   charisma, who have social skills, who have a need to be

20   dominant, who want to direct others, who get their need

21   for attention met that way.  They tend to be more

22   extroverted than introverted.  But, again, it's a need

23   to desire to get anointed as a leader and then to direct

24   others.

25       Q.    How does Mr. Meyerhoff score on that list?

1    A.    Quite poorly.  He's, in fact, the opposite.

2    His early upbringing, he's very socially isolated.  He

3    doesn't even watch TV, as the presentence investigation

4    points out.  He's very introverted.  And he is very

5    dependent on others, and tends rather than place himself

6    in the leadership position, his personality is more one

7    of being self-abasing, demeaning, and being submissive.

8           He's also an individual who is uncomfortable

9    with what is culturally described as masculine behavior

10   being the leader.

11   Q.    Does Mr. Meyerhoff have personality traits that

12   make him more of a natural born follower than a group

13   leader?

14   A.    Yes.

15   Q.    The same ones you just discussed?

16   A.    The same ones I just mentioned; the need --

17   his -- he has more of a need for affiliation.  And when

18   you are a leader, you always run the risk of not being

19   accepted.  So his entrance into the group was in the

20   service of his dependent needs, his need for affiliation

21   with individuals and with groups.

22   Q.    And do we know whether he had these personality

23   traits that you described, self-abasing, submissive,

24   need for affiliation, do we know whether he had those

25   traits at the time he was involved in this group, which

1    was approximately ages 21 to 24?

2        A.    Yes.   We have, from his description, and

3    everyone seems to agree, starting at 16 when he really

4    becomes involved with Ms. Gerlach, that he -- and from

5    the mother's description and the PSI, that he's an

6    individual that has always wanted to fit in, never did

7    fit in, and these developed into the personality traits

8    that we see as a young adult.

9        Q.    In terms of the history of this particular

10   group of defendants, as recounted in all of the

11   materials that you reviewed about this case, do you have

12   an opinion as to if Mr. Meyerhoff functioned as a leader

13   of this group?

14       A.    Yes.

15       Q.    Could you tell us your opinion and explain it.

16       A.    He wasn't a leader.  He is a very competent

17   individual, who wanted very much to be liked and to be

18   accepted.  So tasks that he would be assigned, he would

19   do very well.  He's a very bright man.  But it's not in

20   the leadership, it's in a sense like being a technical

21   wonk, somebody who would advise leadership, who would

22   very much want acceptance from leaders, be a follower,

23   be self-abasing, seek out tasks to please the leader.

24   That's his personality profile.  And that would -- could

25   tend to have him look like a leader, because what he

1   does he's going to do very well, but that's not the same

2   as a leadership position.

3      Q.    Do you find it significant at all in your

4   opinion that when this group started to fragment and

5   disintegrate over interpersonal squabbles, as described

6   by the government, that Mr. Meyerhoff did not assume a

7   leadership role at that point?

8      A.    He didn't assume one, nor did the group anoint

9   him a leader, and say, "Mr. Rodgers is leaving under a

10  cloud, but we want to re-coalesce around you,

11  Mr. Meyerhoff."  In fact, they rejected him.  He went

12  off, and he did not become a leader.  He did not ascend

13  when Mr. Rodgers' star, if you like, fell within the

14  group.

15     Q.    Isn't the fact that Mr. Meyerhoff served as an

16  instructor, someone who taught others how to build these

17  timing devices and how to conduct arsons, doesn't that

18  demonstrate leadership traits?

19     A.    That demonstrates technical skill, and, you

20  know, he might take some lead in the sense of passing on

21  his skills, but that would be at the direction, again,

22  of others.  It would be in an effort to find a position

23  within the group.

24         With Mr. Meyerhoff, the term "the family" is

25  very psychologically apropos.  That's what he's really

1    seeking is affiliation within a family, not a leadership

2    position.  So he's more into the relationships.  And,

3    again, he will try to instruct people with what he

4    knows.  He'll take his role seriously, but his role is a

5    follower, not as a leader.

6        Q.    Is the fact that Mr. Meyerhoff never committed

7    a crime alone, all by himself, is that significant in

8    terms of his ability to function as a group leader?

9        A.    Yes, because he is not modeling.  In some

10   groups, you will see that individual crime, for example,

11   in gangs is a very important part of how you become a

12   leader; the willingness to take a personal risk, model

13   what the group should do.  So it speaks both to his lack

14   of leadership in that way and also to his future

15   criminality.

16       Q.    Another question that the defense asked you was

17   whether Mr. Meyerhoff had any personality traits that

18   the science of forensic psychology has associated with

19   individuals who commit violent acts or who have a

20   propensity towards violence.

21       A.    Yes.

22       Q.    First, can you tell us what personality traits

23   science has identified as showing a propensity to commit

24   violent acts?

25       A.    Yes.    The main personality variable we're

1    looking at is in terms of psychopathy; the absence of

2    guilt, the absence of empathy.  It will sometimes be

3    called antisocial personality disorder.  But it is the

4    individual whose internal impulse control results in

5    acting on violent thoughts rather than controlling them,

6    and whose basic orientation towards society is

7    antisocial.

8        Q.    Based on your evaluation of Mr. Meyerhoff that

9    included fairly extensive psychological testing, how

10   does he score in terms of personality traits associated

11   with the propensity to be violent?

12       A.    Very low.  It's exactly the opposite.  He does

13   not have an antisocial personality disorder.  He has

14   none of the traits associated with psychopathy.  And

15   even his stated motives were in terms of making the

16   world a better place, which is ultimately a pro-social

17   goal.

18            The methodology, he's come to accept, was a

19   criminal one that is not acceptable, but it was -- in

20   terms of his goals, they are very pro-social goals, to

21   improve the environment, make the world a better place.

22       Q.    Do any of Mr. Meyerhoff's personality traits

23   give him, in fact, the propensity towards nonviolence?

24       A.    Yes.  He's an individual who doesn't accept

25   violence.  He might -- he's somebody who could be

1    perceived as that because he's very intellectual and
2    will toy with different ideas, and did toy with the idea
3    of violence, but ultimately rejected it, in the same way
4    as he toyed with the idea of using guns as self-
5    protection at the end of the millennium, but ultimately,
6    while acquiring guns, never uses them.

7           So he will toy with ideas, and that's both him
8    and the developmental age he was at when he first became
9    involved with this.

10   Q.    Dr. Stanulis, if Mr. Meyerhoff -- well, let me
11   backtrack.  Do you know whether he had these personality
12   traits that give him a propensity towards nonviolence,
13   did he have those traits at that time that he was
14   involved in this group, approximately ages 21 to 24?

15   A.    Yes, he did have those.  He was not violently
16   oriented.  He wasn't antisocial.

17   Q.    How do you know that from testing that you do
18   now in 2006, 2007?

19   A.    Because the tests I tried to use are the ones
20   that look at the persuasive elements of personality that
21   don't change.  We try to distinguish between what are
22   called Axis I, which are diagnoses that might change,
23   levels of depression and anxiety; and personality,
24   which, by definition, is the enduring traits across
25   time, across situations.

1    Q.     If Mr. Meyerhoff had all of these personality
2    traits associated with being a passive, nonviolent
3    individual, how is it that he could participate in all
4    of these arsons and these other crimes that destroyed
5    property?  Doesn't that prove that at least during that
6    period he was a violent individual?

7    A.     It proved that he could rationalize that the
8    ends justify the means in a group that -- before he
9    starts, remember, at age 16, he becomes involved with
10   Ms. Gerlach, who has newspaper articles celebrating her
11   arrest for trespassing.  This is -- becomes the
12   seduction into the ends meets -- the ends justify the
13   means.

14        Over time, he rationalizes this, that this is
15   an act of civil disobedience, that these are acts
16   designed to make the world a better place; and
17   concentrates on that rather than on the criminality of
18   the actions that are being used.

19        He's in a group that supports that transition.
20   And he's doing that at a time when his brain isn't
21   developed to understand the long-term consequences, and
22   at a time when those kind of ideas are typically tossed
23   around, but there is no voice of reason in The Family
24   that says, "maybe this isn't a good idea."

25   Q.     Does the code of the ELF that requires people

1    to take great precautions to avoid injury to humans or
2    animal life in conducting any actions, is that something
3    that would help a person like Mr. Meyerhoff rationalize
4    engaging this type of behavior?

5         A.    Yes, because it's dehumanizing the acts.  It's
6    not directed at people.  It's directed against property.
7    It's directed against ideas.  And the goal is, again,
8    pro-social.  Who can be against a better world?  Who can
9    be against the environment being a better place?  And
10   it's justified as an act of civil disobedience.

11        Q.    Do you think that the fact that he was, for at
12   least a -- some brief period of time towards the end of
13   this group's existence, advocating escalating tactics
14   and maybe actually using violence against people,
15   doesn't that indicate that Mr. Meyerhoff was a violent
16   person?

17        A.    No, it indicates that he was contemplating, but
18   ultimately he didn't go there.

19        The problem with a group like this, or any
20   group where their tactics aren't working, is they can
21   contemplate escalating the tactics, but, in fact, there
22   is no evidence he actually escalated.  He didn't start
23   carrying a gun, none of the things that were talked
24   about were carried out into action.

25        Q.    Then you've heard the government talk about

1   Mr. Meyerhoff agreeing to drive Mr. Dibee to do a

2   reconnaissance of Jonathan Paul's property, knowing that

3   Mr. Dibee had been talking about wanting to kill

4   Mr. Paul; and, in fact, Mr. Dibee brought a gun with him

5   for protection, doesn't that show that Mr. Meyerhoff was

6   willing to take steps towards violence?

7       A.    Not necessarily. It could. But one when looks

8   at it, it's really Mr. Dibee who has the gun, who has

9   the beef, and it's Mr. Meyerhoff who aborts the mission.

10          And unlike some of the arsons, does not go back

11  and do it again. In fact, he reports being quite afraid

12  of Mr. Dibee and going along, which is consistent with

13  his personality profile of someone, when scared, who

14  will go along with, and, in fact, did try to go along,

15  but then used his skills, in that case, to say, we --

16  "law enforcement has seen us, we better back off," but

17  he never goes back.

18      Q.    Dr. Stanulis, in the court determining how long

19  of a prison sentence to impose in this case, the court

20  is required to consider the need for punishment, to

21  protect the public from future crimes by the defendant.

22  Given that factor, we've asked you to evaluate

23  Mr. Meyerhoff's risk of recidivism as he sits here

24  today, correct?

25      A.    Yes.

1    Q.    I want to ask you first, have psychologists

2    reliably identified personality traits that increase the

3    risk of recidivism?

4    A.    Yes.

5    Q.    Can you tell us what those traits are.

6    A.    We've talked about them already in terms of

7    psychopathy:  The absence of empathy, the absence of

8    guilt.  When these -- these are unique criminal

9    activities and they are not for personal gain.  These

10   are for gaining for other people.

11         As was pointed out, the living a meager

12   existence in order to better the world while committing

13   criminal acts, these are all things that argue against

14   future criminality.

15         And that he's acted on, because he went back to

16   college and was, again, acting in pro-social ways

17   consistent with that making the world a better place by

18   working in the area of biomechanical engineering, making

19   better prosthetic devices, and being interested in that,

20   microelectronic technology to better the lives of

21   disabled people.

22   Q.    Does Mr. Meyerhoff's ready admission of guilt

23   and waiver of counsel and immediate cooperation with the

24   government, does that tell us anything from a

25   psychological standpoint in terms of his risk of

1  recidivism?

2      A.    Very much.  He's not engaging in -- we always

3  talk about criminal thinking.  He's not blaming other

4  people, saying, "I made the choices."  He's coming

5  forward and accepting responsibility and operating out

6  of guilt.

7      Q.    This -- I wasn't sure, is his age a factor in

8  terms of risk of recidivism under the psychological

9  literature?

10     A.    Yes, for criminals, age -- as you get older,

11 the risk of recidivism goes down.  He's already gone

12 several years without any recidivism.  And has rejected

13 the motivation.  So he's now -- he's a little unique

14 that the work we rely on on criminals, are individuals

15 who are not politically motivated, as these activities

16 were.

17     Q.    There was some brief discussion in my

18 sentencing memorandum regarding frontal lobe development

19 and whether or not that would be correlated to

20 Mr. Meyerhoff's involvement in this group.

21           Do you have any opinion or insight on that that

22 you could share briefly with the court?

23     A.    Yes.  At the time that Mr. Meyerhoff became

24 involved, the new -- I guess I should back up.  The

25 newest development that we have is for years we've

1    known, as developmental psychologists have always

2    pointed out, that through the teenage years there is the

3    development of a new skill, the ability to anticipate

4    future consequence in a meaningful way. Any parent

5    knows that's what makes parenting of a teenager

6    difficult. They are notorious short-run creatures who

7    don't appreciate long-term consequences.

8             More recently, with the development of imaging,

9    we are able to now know that frontal lobe development is

10   not completed until age 22 to 24.

11            This science is mature enough that it was

12   relied on by the US Supreme Court in the case of *Roper*

13   *versus Simmons* as a reason why not to execute

14   individuals under 18, because, again, of the inability

15   to anticipate the decisions that one is making and the

16   potential long-term consequences.

17            It's at a period of undoubted lack of frontal

18   lobe development at age 16, with a very strong need for

19   affiliation, that he begins to be enticed into the

20   movement through his relationship with Ms. Gerlach. And

21   that is the gradual thing.

22            We also are aware that this is an explanation

23   for why risk-taking behavior is maximum between ages of

24   18 and 22, a combination of increased freedom with a

25   failure of the frontal lobes to complete their

1  development.  And it's noteworthy his lack of

2  involvement and dropping out of the movement is

3  correlated at the time when -- around 24, 25, when

4  that's the upper end of when we believe frontal lobes

5  complete the neurological development.  They are still

6  undergoing software training, if you like, but the

7  hardware of the brain is not completely wired until

8  around 22 to 24.

9      Q.    So when Mr. Meyerhoff tries to explain why it

10  was he turned away from this movement at about age 24

11  and sometimes gets at a loss for words and says, "I grew

12  up," that is actually a scientific --

13      A.    That's a neurological fact.

14      Q.    What about the saying that past behavior is the

15  best predictor of future behavior, and so given the

16  large number of crimes that Mr. Meyerhoff has committed,

17  we can predict there is a risk he will reoffend?

18      A.    Well, actually that statement is not a complete

19  one, because it comes out of the behavioral literature

20  that says we have to know what reinforcers are.

21          In fact, Mr. Meyerhoff, by quitting his

22  involvement with The Family, learned and gets reinforced

23  for affiliating not only by pro-social goals, such as

24  school, but pro-social means.  So he is getting the same

25  needs for affiliation, for making the world a better

1  place that were motivators for involving himself with

2  The Family, met through pro-social means as well as

3  pro-social goals, through the act of maturation and

4  choice.

5      Q.    Dr. Stanulis, another factor the court has to

6  consider and that the government mentioned is a factor

7  in justifying its sentencing recommendation for

8  Mr. Meyerhoff is the need for the sentence to deter

9  others from committing similar crimes in the future.

10      I want to ask whether you have an opinion,

11  based on the science in your field and your knowledge of

12  the ELF/ALF ideology from this case, as to whether a

13  long prison sentence is likely to deter future crimes by

14  members of those groups?

15      A.    Yes.

16      Q.    What is your opinion?

17      A.    It doesn't.  As even Mr. Meyerhoff and his --

18  The Family did, the arrest of Mr. Luers was a

19  motivation.

20      The problem with this it's not truly criminal

21  behavior, but it's a belief system in the righteousness

22  of the civil disobedience.  So prison sentence doesn't

23  necessarily deter.  It can serve as a motivation, in

24  fact, by creating a martyr.  The true believers are not

25  deterred by punishment.  This is one of the problems we

1    have to deal with in our society.

2       Q.    And is this just your opinion or are there

3    actual studies in your field that back this up?

4       A.    There is actual studies that are actually

5    looking at people who engage in political motivated

6    violence to look at that -- to try to classify them, so

7    that you know who you are going after.

8             And the recognition is that the true believers

9    are not the people that are going to change based on

10   punishment, but that is a motivating factor.

11            It illustrates to them the need to go forward

12   with the act of civil disobedience or criminal behavior

13   to change the corrupt society. It's a proof of their

14   own thesis. So the punishment doesn't deter. It, in

15   fact, inflames.

16      Q.    A final factor that the court needs to consider

17   in deciding the sentence is the likely impact of

18   incarceration on Mr. Meyerhoff's rehabilitation.

19            Now, you've heard us claim and present

20   testimony, in fact, that Mr. Meyerhoff is at high risk

21   for physical and sexual assault in prison.  Do you have

22   an opinion based on his psychological evaluation as to

23   whether this is correct, that he is at high risk?

24      A.    Yes, he is.  In fact, I have a slide, if we

25   could put that up, on the characteristics of individuals

1   who are raped in prison.  Yeah.  What I have up here is

2   the prison rape victim characteristics that -- there is

3   much research that came out of this because of the

4   prison reform or Prevention of Rape Act of 2003.

5        This is a compilation of the factors that the

6   research has shown to be correlated or to be risk

7   factors for being a victim.

8        I put Mr. Meyerhoff's characteristics in red.

9   And as you can see, he possesses a number of those

10  characteristics.  We heard earlier testimony about one

11  of those he also does, which is snitch.  But the small

12  size, physically weak, white, first-time offender, and

13  individuals unassertive, unaggressive, shy,

14  intellectual, and not street smart or smart, passive --

15  or passive, these are the characteristics of individuals

16  who are targeted, who are prey within the system.  These

17  are the people where their best skills simply don't

18  work.

19  Q.   Can you tell us what are the common

20  psychological injuries or damage caused by sexual

21  assault of inmates.

22  A.   Well, it's devastating because, as you heard,

23  there is no way out.  The choice is to give up freedom

24  or to continue to be assaulted.  So there is no real way

25  to gain control of it.  And the prospect is not a one-

1    time event, but an ongoing assault by a person or group
2    of people.  And the knowledge everyday you are walking
3    around the prison, you're either prey or voluntarily
4    giving up all of your freedoms, and essentially, with
5    minor variation, being treated as somebody who has been
6    acting up in prison, 23 hours a day in a cell, treated
7    as if you were the perpetrator or predator for your own
8    protection.

9       Q.    So let's talk for a minute about administrative
10   segregation, because it seems like he's destined to end
11   up in that type of a setting unless he gets a low
12   security designation.

13          Do you have an opinion, based on
14   Mr. Meyerhoff's personality traits and the psychological
15   studies of the effects of isolation, as to how very
16   restrictive isolating conditions of confinement would
17   affect Mr. Meyerhoff?

18      A.    Yes.

19      Q.    Can you tell us what your opinion is and then
20   explain the basis.

21      A.    Well, twofold.  We haven't talked that
22   Mr. Meyerhoff is -- suffers from some degree of
23   depression and anxiety.  He's prone to that.  Isolation
24   and the fact that whatever you do doesn't work is
25   actually our model for depression.  It's called learned

1  helplessness.  Whatever you do you are in trouble.  The

2  colloquial damned if you do and damned if you don't.

3         Isolation allows one to sit without anybody to

4  tell you that there is hope.  Factually, there is little

5  hope because you either choose to continue to be

6  assaulted or continue to choose isolation.  So the risk

7  of depression, the risk of suicide, increases.

8         Mr. Meyerhoff told the PSI writer he struggled

9  with suicide on a regular style of thinking.  So that's

10 the effect that we would expect to see with him.  More

11 avoidance, more isolation, leading to greater

12 depression, greater anxiety, and the risk of suicide and

13 hopelessness increasing.

14        There is also, obviously, the long-term risk of

15 changing his mind if, in a good-faith effort to pay for

16 his crimes that he freely admits and acknowledges, the

17 punishment becomes so severe that he can't tolerate

18 being alone, become so depressed, it runs the risk of

19 radicalizing him again, I suppose.

20        But certainly just from a psychological

21 perspective, we would want to be very concerned about

22 him becoming suicidally depressed or acting on that.

23 Q.     I want to go back to this, because I don't

24 think we talked about it in terms of psychological

25 damage from sexual assault.  We're used to people that

1    have been sexually assaulted in society, they go to the

2    police and get some measure of justice, suffering from

3    posttraumatic stress disorder and other type of, you

4    know, genuine psychological injury from that.  And I

5    want to ask if you can tell us, is that common with

6    inmates that are sexually assaulted?

7         A.    Yes.  That's what they struggle with is because

8    the posttraumatic stress disorder becomes adaptive in

9    that they can become hypervigilant, to be running high

10   levels of adrenaline and cortisol and elevated stress

11   levels causes physical damage.

12              In fact, we have research that indicates

13   that -- from Vietnam vets -- that posttraumatic stress

14   disorder leads to changes in the hippocampus of the

15   brain causing actual brain changes that is permanent.

16              So the risk is a permanent psychiatric disorder

17   that, again, is -- can be managed with some treatment,

18   but normally when we treat people on the street, we can

19   get them out of a dangerous situation.  We can tell them

20   that their hypervigilance is maladaptive, that they are

21   safe again, that that was a one-time event when the guy

22   came out of the bushes.

23              That's harder to say in the prison when there

24   is a group of people who are predators, who would regard

25   Mr. Meyerhoff as prey and would constantly seek him out.

1     Q.     Well, we know that, you know, many, many people
2  go to prison, and many get out everyday, without having,
3  I guess, become psychotic.  Is there anything about
4  Mr. Meyerhoff that makes him more vulnerable to lasting
5  psychological injury or damage from a lengthy
6  incarceration than the average inmate --

7     A.     Yes.

8     Q.     -- based on his psychological makeup?

9     A.     Yes.  His introversion, his tendency to think
10  funny already could become maximized and go into a
11  full-blown psychosis.  He's also an individual who is
12  not typical for a criminal.  He doesn't engage in the
13  criminal thinking errors of blaming others now.

14          And he's also -- we have the problem of the
15  delayed punishment.  This is always the troubling part
16  when -- is that he's being punished for crimes that he
17  has renounced, at a time when he, in the words of the
18  PSI writer, was a well-adjusted college student.  And
19  that's when he's being punished.  So that makes him
20  unique in the prison system, again -- because, again,
21  his crimes were not for personal gain in the typical
22  criminal sense of for the money, to get back at someone.
23  This was in the service of political ideals.

24     Q.     The type of long-term, if not permanent,
25  psychological damage that he could suffer either as a

1    result from sexual assault, isolation to protect him

2    from physical or sexual assault, or a combination of

3    those factors, on a sentence that may be almost

4    16 years, even 10 years, do you have an opinion as to

5    how that would likely affect Mr. Meyerhoff's ability to

6    become a productive member of society upon release and

7    start paying the $18 million plus restitution that is

8    another penalty in this case?

9         A.    Most will work against that.  And that's the

10   other part of this tragedy, is for whatever period of

11   time that he is sentenced, Mr. Meyerhoff is a very

12   unusual individual.  He has the highest IQ of any

13   criminal that I have ever evaluated at 140.  This is

14   genius level, top 99.6 percentile, meaning that he

15   scores higher than 99.6 of the general population, the

16   kind of individual that we would expect could succeed at

17   any academic level, so that promise isn't going to be

18   reached in a prison setting where he's running from the

19   designation as a snitch, where his very intellectual

20   abilities are a risk factor for being assaulted, are

21   not -- are maladaptive in a prison setting.

22        So all the things that helped him succeed in a

23   school setting work against him in the prison setting.

24        MS. WOOD:    That's all I have, Your Honor.

25        THE COURT:    Mr. Engdall.

1                        CROSS-EXAMINATION

2    BY MR. ENGDALL:

3        Q.    Dr. Stanulis, would you agree with me that

4    there are many characteristics which may indicate

5    leadership, one of which may be the ability to select

6    projects to be completed by a group and to recruit

7    others to complete that project?

8        A.    Again, that -- the way I distinguish that, that

9    could be a characteristic of leadership or that's a

10   characteristic of a policy wonk who's used by the group

11   for a specific area of skill, but is not a leader, but

12   is knowledgeable in one area.

13       Q.    That could be a characteristic of leadership;

14   is that correct, Doctor?

15       A.    Yes, it could.

16       Q.    Thank you.  Another characteristic of

17   leadership would be able to delegate tasks to others; is

18   that correct?

19       A.    Yes.

20       Q.    And another characteristic of leadership would

21   be able to show others how to accomplish those tasks; is

22   that correct?

23       A.    Yes.

24       Q.    Thank you.  You, I believe -- and I don't want

25   to misstate what you said, but you told us that just

1    because a person advocates the use of violence, that

2    doesn't mean that person is a violent person; is that

3    correct?

4       A.    That's correct.

5       Q.    Would you consider, and would you agree, that

6    arson and murder are violent acts?

7       A.    Well, murder certainly is.  Arson, again,

8    depends on how you direct it.  I've seen, obviously this

9    case, where there is great efforts not to hurt people.

10   And I've seen arson where the goal -- where the doors

11   were blocked and the goal was to kill people.  So arson

12   kind of is more of a definitional matter.  Murder,

13   clearly, is a crime of violence.

14      Q.    Could arson be a violent act, Doctor?

15      A.    As I said, I have seen it as a violent act --

16      Q.    The answer to the question --

17      A.    -- whose purpose was to be violent.

18      Q.    -- is yes?

19      A.    Yes.

20            THE COURT:  Okay.  Stop.  We're not going to

21   talk over the voices of one another and make the court

22   reporter work way harder than she needs to.

23            MR. ENGDALL:  Thank you, Your Honor.

24            THE COURT:  Finish the answer, then ask the

25   next question.

1  BY MR. ENGDALL:

2      Q.    Also, I believe that you said that nonviolent

3  people can commit violent acts; is that correct, Doctor?

4      A.    Sure, anyone is capable of a violent act.

5      Q.    In your opinion, Doctor, how many violent acts

6  must be an individual commit before, in your opinion,

7  they are considered violent people?

8      A.    I'm not sure how to answer that.  I think,

9  again, I consider violent to be the acting out a violent

10  thing that hurts other people.  Legal definitions can

11  vary where burglarizing an empty house would be legally

12  defined as a violent act.  Generally in the

13  psychological literature that wouldn't be considered a

14  violent act.  It would be considered a crime against

15  property.

16          So, again, it's back to that issue, and it's

17  also a matter of the situational variables, for example,

18  a prisoner who gets into a number of fights in

19  self-defense, we'd have to look at the situational

20  variables and say that person may have many, many fights

21  but not be a violent person.  Where a predator in a

22  prison may get into the same number of fights and be

23  regarded as violent because of the personality structure

24  and the initiation of it, and that their goal is to hurt

25  people.

1    Q.   If we were to use your definition of a violent

2  act, whatever that may or may not be, Doctor, how many

3  violent acts would a nonviolent person have to commit

4  before they'd be considered a violent person?

5    A.   I don't have a break line, because, again, it

6  depends on the situations, it's not just the acts, it's

7  the circumstances and the motivation.

8         MR. ENGDALL:  Thank you, Doctor.  No further

9  questions.

10        MS. WOOD:  Nothing further, Your Honor.

11        THE COURT:  May this witness be excused?

12        MS. WOOD:  Yes, Your Honor.

13        THE COURT:  Free to go.  Call your next.

14        MS. WOOD:  Your Honor, that's all the sworn

15  witnesses we have.  We do have the people that would

16  like to address the court and a short video clip.

17        THE COURT:  That's fine.  Do you want to do the

18  video clip first?

19        MS. WOOD:  Well, we're going to alternate,

20  Judge, because we'd like to first ask Dr. Bruce Emerson

21  to address the court.

22        Dr. Emerson, if you could come forward to the

23  podium, and once you get there, state your name, and

24  spell your last name for the court reporter.

25        DR. EMERSON:  My name is Bruce Emerson,

1    E-M-E-R-S-O-N.  I have a Ph.D. in physics.  And I am the
2    physics and engineering advisor and instructor at
3    Central Oregon Community College for the last 14 years.
4    In that capacity, part of what I do is evaluate my
5    students for their future careers, for their future
6    career paths, and my recommendations.  And in that
7    context, I'd like to offer my snapshot of the year and a
8    half or so that Mr. Meyerhoff was at COCC as an
9    engineering and physics student.

10             First, from an academic perspective, as a
11   previous witness said, Mr. Meyerhoff is a bright guy.
12   He's full of curiosity.  He was awarded the outstanding
13   science student award at COCC for the breadth of his
14   curiosity, not just the narrowness of his curiosity.

15             He's also been consistently successful in all
16   of his academic pursuits.  I think it's important to
17   note that in his context, one of the topics we cover in
18   the classes that he took with me is electronics and
19   electronic theory.  And in that regard, he showed normal
20   sorts of developments typical of students of mine in the
21   past who have developed their skills through personal
22   reading or through introductory high school courses, but
23   nothing beyond that.  Certainly very appropriate, but
24   not outstanding.

25             In my conversations with Mr. Meyerhoff through

1   advising meetings, through meetings in and out of class,
2   I would say my experience of him is as someone who is
3   deeply committed and passionate about his beliefs and
4   what he's trying to do both in terms of his personal
5   development and in terms of developing support for the
6   world.

7        He came to us originally -- in my first
8   conversations with him, one of the things I was very
9   stuck by was his actual sense of personal dis-
10  empowerment, his sense that, in conversations, that
11  nothing he could do would impact the world around him;
12  that he would have the motivation to do so, but the
13  world won't listen.

14        And over the course of the two years that he
15  was with us, what I saw was an actual, clear development
16  in his thinking, in terms of those conversations, to a
17  place where there was some reason to go forward, where
18  he felt like he could see a path to affect the world in
19  a positive way.

20        And, in fact, in my experience as a teacher and
21  15 years at COCC, I actually only hope to touch one or
22  two students a year who actually make changes in how
23  they think.  It's much more common that we change how --
24  what they know, but we don't change how they think.  So
25  the evolution of his thinking as a human being seems to

1   me to be very important in this context.

2         I think I'd like to comment just briefly,
3   because one of the things I get to do as a teacher is
4   watch my students in a variety of contexts where they
5   operate in small groups both in the laboratory, and in
6   homework sessions, and in other group activities that we
7   do in class, that I am routinely asked to comment on the
8   leadership potential of my students when writing
9   recommendations for engineering schools, as I did for
10  Mr. Meyerhoff.  And I have to concur with the previous
11  witness who said that in my experience, what I saw was a
12  dedicated member of the group, somebody who worked very
13  effectively on the tasks that came before the group, who
14  had a tendency to take the task off and work on it
15  individually, and then bring it back to the group, but
16  who never, in the two years that I watched him, said, "I
17  think the group should go here."

18        And in reviewing my letters that I've written
19  both to the court and to this process, I realize that I
20  have never said this is somebody who shows significant
21  leadership.  Different than saying that if I assign him
22  a task, that he won't execute the task with great
23  deliberation and commitment, that will happen always,
24  but the sense of taking hold of the reins of control and
25  taking the group someplace where it wasn't going, I

1   never observed that in my time.

2           The last thing I'd like to say, because I'm
3   trying to keep it very short because the court is busy,
4   that the issue of mitigation and the opportunity for
5   rehabilitation and returning someone to active and
6   productive life in society is part of what motivates me
7   to stand up here today, because I perceived from my
8   experiences that Mr. Meyerhoff has that potential:   He
9   has the intellectual skills, he has the thinking skills,
10  and he has the technical skills to accomplish that.

11          And in my own life, it's important to
12  acknowledge that I have sat where Mr. Meyerhoff is
13  sitting right now, having pled to a felony, and having
14  been looking at mitigation as the only way for me to
15  return to an active, useful life, and contributing to
16  society.   And I would say from my personal experience,
17  from my personal experience, that the things that were
18  critical to me in successfully negotiating that path and
19  coming back and providing 15 years of what the
20  institution clearly perceives as more than satisfactory
21  service as a teacher, indicated by my award, the
22  outstanding faculty achievement award, and other
23  significant leadership roles at the college, is, first
24  and foremost, having acknowledged responsibility for my
25  actions, which I've seen Mr. Meyerhoff do consistently

1    since his arraignment, that there is a commitment to

2    personal growth. That, for me, there was no possible

3    way of moving forward unless I was committed to change

4    in my own life. And I see that commitment in

5    Mr. Meyerhoff.

6          And, finally, that there needs to be something

7    that I can do. It's not enough to really wish to make a

8    contribution, but to actually have the skills to do so.

9    And, again, I see that Mr. Meyerhoff has those skills in

10   the technical sense to both move forward in his own life

11   and move forward and contributing back to society.

12         So thank you very much for this opportunity.

13         MS. WOOD: Your Honor, we'd like to just show a

14   short video clip from professors at the community

15   college who elected to do it that way instead of taking

16   a lot of the court's time.

17         (Video played.)

18         MR. FREDERICKS: We'll call John Givot to

19   address the court. Come on forward and state your name,

20   and spell your last.

21         MR. GIVOT: My name is John Givot, G-I-V-O-T.

22   And I lived with Stan, during the same period as all

23   these professors are speaking of him, in Bend. And I

24   met him kayaking on the river. And I remember him being

25   energetic, always had a smile. I was -- I got a

 1    chance -- I needed a place to live.  I got a chance to
 2    live with him.

 3         Actually, first, sorry, I should introduce
 4    myself.  I'm a grad student at the University of Oregon.
 5    I'm studying journalism now.

 6         So at the time I was working at Windward
 7    Performance building airplanes.  And I ended that job
 8    and was working construction when I moved in with Stan.
 9    And he got me excited again about getting back into my
10    science.  I have an undergraduate degree in physics.
11    And I started working on a project I had left off.  Just
12    seeing him so motivated, got me back into it.

13         And seeing all the professors speak, I can
14    corroborate that other students were sometimes mad at
15    him for setting the curve too high on their tests.  And
16    he was -- he was always working hard.  He drove himself.
17    He had an employer over the summer working -- building
18    fences who said he was the hardest working employee he
19    had had.  I just remember hearing that.

20         One of the professors got him to come and
21    volunteer for a science project with some high school
22    kids, and he got me to come along.

23         I moved in with Stan, he's a guitar player,
24    he's a great musician.  He won't admit to it but he
25    sings really nicely.  He was always willing to show the

1    rest of us how to play.  And he was also into learning

2    on his own outside of school.  He subscribed to

3    magazines like *The Economist*, and *The Nation*, listened

4    to NPR while he cooked breakfast.  He would bring

5    articles home.

6         I remember one was on the Green Zone.  And he

7    didn't have any judgment against the government on Iraq.

8    We were just, you know, talking about what it was like

9    in the Green Zone.

10        Let's see, Stan was also introspective like

11   other people have said.  And I just kind of jokingly

12   referred to him as wise.  He would talk about -- I was a

13   couple of years younger, and he'd talk about, oh, in a

14   couple of years, you'll figure out what you're doing,

15   and you'll go back to school.  And kind of looking at

16   his own life, he kind of knew where I would be, and he

17   was right, and with relationships in general.

18        Something Stan talked about, we used to have

19   talks, just hang out on the front porch, and Stan wanted

20   a place in the middle class.  And that was something he

21   talked about a couple of times.  And our other roommate

22   also remembers him having a discussion like wanting a

23   place in the middle class.  And engineering was how he

24   was going about that, studying in school.

25        And since then, I didn't know about his past

 1  until I read about it in the newspaper.  You know, he
 2  kind of talked about how he had had problems before and
 3  been on his own and kind of semi-homeless and kind of a
 4  floater.  And I could see a conscious change in his
 5  direction, that he was going back to school and making a
 6  purpose or had a purpose for what he was doing.  And
 7  that was a shift.  I didn't know how big a shift it was
 8  until I heard later.

 9          I've never seen Stan be violent.  I didn't know
10  him during the time he committed these crimes, but when
11  I knew him, he wasn't violent at all.

12          Something that Stan has spoken to me recently
13  about and written to me in letters is he's scared that
14  if he's in jail too long, he won't be able to come out
15  and be productive and follow the dreams that he's been
16  working towards, he says.  That's just one of his fears
17  that he shared with me.

18          Something else he shared with me, recently, in
19  jail, is that he wanted to do engineering, and work with
20  people, and poor people.  And civil engineering is one
21  of the things I remember talking about when I was living
22  with him.  And I asked him recently, and he told me that
23  he didn't -- he'd given up the environmental movement.
24  He'd had his time there.  And he wanted to work with
25  people and give back to people.

1          And, yeah, I have just seen that change in him,

2     like everybody else has talked about also.

3          MS. WOOD:  Your Honor, we would like, at this

4     time, to show a brief video of Mr. Meyerhoff's family

5     and friends that are outside of the country and outside

6     of this area.

7          I just want to note for the court that one -- I

8     think the last speaker on this tape, Dr. George Addair,

9     suffers from advanced Parkinson's disease, and was just

10    recently out of the hospital at the time he appears on

11    the video, so he appears a little stiff, but it's due to

12    medical conditions.

13          (Video played.)

14          MS. WOOD:  Your Honor, we would like to call

15    France Meyerhoff, Mr. Meyerhoff's mother.

16          Mrs. Meyerhoff, before you start -- her name is

17    spelled the same as Mr. Meyerhoff, so you are probably

18    okay just to go ahead and start.

19          THE REPORTER:  The first name, though.

20          MRS. MEYERHOFF:  France like the country,

21    France.  I'm Stan's mother.  And I live in Arizona.

22          Thank you, Your Honor, for allowing me the

23    opportunity to address the court, and to share my

24    thoughts and feelings about Stan and the situation he's

25    put himself in.

1         Again, bear with me, it's very difficult to
2  talk about this unique situation.  My mind is frozen.
3  I've actually been in a stupor since Stan's arrest.  It
4  is overwhelming because Stan is my only son.  I've been
5  a single mother since he was seven.  Actually, I did
6  take all the decisions -- made all the decision, took
7  all the responsibilities even when we were married.

8         All or most parents have a close relationship
9  with their children, but I think 29 years of hardship,
10  struggling, and striving for beauty and a better world,
11  I've created this particularly deep bond between us, the
12  bond that's still carried to today.  And even during the
13  crimes time, we were still in contact.

14         A difficult life in our family life was the
15  fact that Stan was very sick when he was young, has
16  fairly deepened our bond.  I don't mean to tell you a
17  sad story, but I just wanted to stress that for the past
18  29 years, I've had a single focus of Stan.  I've never
19  remarried.  And as poorly -- as much as I didn't back
20  him up when he needed it, because I didn't understand,
21  I've done my best to provide for him and to give him a
22  future.  We're very close.  And when you sentence him,
23  Your Honor, you sentence me as well.

24         With his incarceration, my health has been
25  jeopardized, my sanity as well.  I have become an

1   emotional wreck, as is pretty obvious.  After a couple

2   of mini strokes, much sleep deprivation, my nervous

3   system is shattered, and my mental abilities have been

4   shattered, too.  It has all transferred to my body to

5   the point where my practice, my professional activity

6   has been reduced by about half.

7        I wouldn't even be able to talk to you today if

8   I hadn't had to take some medication to control my

9   anxiety and my depression, something I've never done

10  before.

11       It's one thing to have something happen to you,

12  but it's another to have something happen to your son,

13  and there is nothing you can do.  Can you imagine the

14  horror of waking up every morning to the thought of a

15  son who can be raped, beat up, or murdered, and live the

16  whole day with this?  Can you fathom the anguish of

17  being -- listening -- hearing the phone call or not

18  call, because Stan only tells me about half of what he

19  is going through.

20       He's the one to care for me, to watch over me.

21  I've become very emotionally dependent on him.  And it

22  probably won't take very long before I get financially

23  dependent on him.

24       If Stan serves six, seven years of prison, I'll

25  be 70 by that time.  I will need him at all levels.  As

1    I said, he's my only son.  And he's the only one who
2    will take care of me.

3           Your Honor, with that said, what carries us
4    through life is a set of values, a sense of integrity, a
5    sense of participating to a group, to society, in other
6    words, to be of service.  Stan has done some terrible
7    deeds.  He's taken a big detour, a detour where he has
8    hurt many, but now he's gone out, he's taken full
9    responsibility for his act, and he's done that a long
10   time ago.  He's now on the path of giving and
11   contributing.

12          Stan couldn't have come to realize the folly of
13   his deeds, he couldn't have been the first one to come
14   out of the group, he couldn't have been the first one to
15   be -- could have been having so much remorse, that
16   people saw there was something, and there is so much
17   wealth engaged in repaying if he didn't have his heart
18   in the right place.  Long, long before his arrest, years
19   before his arrest, he chose to become the intelligent,
20   the very giving, the genuinely compassionate person that
21   everyone knows him to be.  And so he is ready to
22   contribute.  He's proven it.  And to think if nowhere
23   else, he's proven it in the past year with his behavior
24   in prison.

25          Your Honor, we know many people, many people

1    who during this time that's a hinge time, during this

2    period where you -- there is passage between child --

3    between adolescence and youth and adulthood, many people

4    have done many wrong deeds, have gotten themselves in

5    big personal trouble, only to become, once they were

6    adults, only to become brave men, people who have

7    leading us, people who have discovered all kinds of

8    things.  Stan is like that.

9           Your Honor, I beg you to show mercy on Stan and

10   on me.  His life and my life are in your hands.  Thank

11   you for listening.

12          MS. WOOD:  Your Honor, the last person to

13   address the court would be Dr. Ziegler.

14          And, Dr. Ziegler, we have a new court reporter,

15   so if you could just speak your name and spell your last

16   name.

17          DR. ZIEGLER:  My name is Zelda Ziegler.  That's

18   Z-E-L-D-A; Ziegler, Z-I-E-G-L-E-R.

19          First of all, Your Honor, I want to thank you

20   for allowing me to speak again, only this time on behalf

21   of the person that Stan is.

22          I'm here to help you understand the truly

23   remarkable person he is.  As you know from the letters,

24   I've sent lots of letters, I met Stan when he was a

25   student in one of my large courses at the community

1  college.  I quickly became aware that he was a
2  remarkable student, but I sensed that he had some very
3  unfortunate circumstances in his past.

4       I chose to be an advocate for Stan before his
5  arrest.  After his arrest, I reassessed that decision,
6  and came up with the same result:  I still believe in
7  Stan.

8       There would not be enough time to allow all the
9  people who wanted to speak in support of Stan to be here
10  today -- to speak today, yet some of them are actually
11  here.  But I am a representative of basically the tip of
12  an iceberg.

13       Some of these people are here.  You may have --
14  Karen Huck was here earlier, Dr. Huck.  Dr. Higginbotham
15  is here.  Dr. Emerson is here.  Edla Schappell
16  (phonetic), a colleague of mine, knows Stan from a
17  science fair assignment that Stan met him in.  There are
18  lots of people who couldn't be here, but their support
19  and concern is real.

20       I suspect you've already read the letters, and
21  I'm here to confirm that as of yesterday, they are still
22  behind Mr. Meyerhoff.

23       Since Stan's arrest, his former classmates,
24  people he worked with on campus jobs and internships had
25  sought me out to find out how to come to his aid.  Some

1    of them are here today.  All have written letters.  All

2    have been unflagging advocates of Stan throughout his

3    time in detention.  They do this because they all

4    understand Stan's potential and value his positive

5    qualities.

6             It is no understatement that Stan has made a

7    positive impact on a very large number of people.  He

8    continues to do that.

9             It's one thing to make a statement in court on

10   behalf of someone, but I think it's also important for

11   you to know the full extent to which I and others have

12   gone to help this man out.

13            Here is what I've done for Stan since his

14   arrest:  In one of our ongoing conversations, Stan told

15   me that he grieved the loss of the opportunity to finish

16   his degree.  He said he finally felt like he was heading

17   in the right direction, could see the path of his goal

18   of a degree in neurotechnology.  These are the

19   biomedical devices that Dr. Stanulis was talking about.

20   It's a very difficult and interdisciplinary and exciting

21   field of engineering.  He was arrested -- when he was

22   arrested, he despaired that this was never going to

23   happen.

24            I suggested that perhaps if he cannot get the

25   degree that he really wanted, but that that didn't mean

1    that he could not finish something.  I knew that he had

2    been fairly close to an associate's degree.  When I

3    learned of his being placed in 22-hour lockdown, I was

4    both relieved at his improved safety and I was also

5    concerned what the isolation would do to his mind.  I

6    was afraid of the light going out.

7         I knew that his active mind could not last

8    under such conditions.  And I made a conscious decision

9    to do my best to see to it that he was not going to be a

10   lost cause.

11        As a result of this decision, and the depth of

12   the belief I have in Stan and his potential, I have, for

13   the last ten months and probably longer than that, put

14   in about eight hours per week of my time on his behalf

15   to support his efforts to complete his first degree.  I

16   have a full-time job and I did this voluntarily.

17        I was not forced.  I wasn't coerced or tricked

18   to do any of this.  Stan and I discussed the limits of

19   what I would do.  He gratefully agreed and has honored

20   that word.

21        The help I gave included locating courses that

22   would satisfy his remaining requirements, assisting in

23   getting him registered, locating course materials,

24   securing permission to photocopy that material so that I

25   could resubmit those materials in the event he was

1   moved.  And I prepared his handwritten papers for

2   submission.  I am not much of a typist, so it was --

3   this was a fairly significant donation on my part.

4          I have assisted in coordinating exam proctors.

5   I have learned more about detention in general and his

6   detention facilities in particular.  I supply him

7   subscriptions to a weekly science news magazine and one

8   daily newspaper.

9          I have received his phone calls, and continue

10  an extensive correspondence with him about science, his

11  education, my education, and experience, analysis of

12  social interactions, and many other topics of mutual

13  interest.

14         I'm not the only one who has been instrumental

15  in this effort to assist him with finishing his degree,

16  or keeping his brain alive in his current situation.  My

17  colleagues have sent books and maintained

18  correspondence.  Through the help of the jail education

19  outreach coordinator at Lane County Adult Corrections,

20  Stan was -- and a lot of other people actually -- Stan

21  was able to take his computer competency exam and submit

22  that for grading.  This is usually done on a computer in

23  a lab someplace.  So we had to do some fairly

24  interesting gymnastics to get that to happen.

25         All that remains for him to finish now is one

1   Spanish course, which he's eager to start, course credit

2   by examination.

3        Through his sociology course that I got him

4   signed up with, he managed to impress another new

5   professor as well.  Last week I received a note from his

6   instructor in Colorado, the sociology professor,

7   thanking me for my efforts and attention to detail that

8   enabled her to get to know Stan a bit through his

9   excellent work.

10       Everyone who spends any time around Stan sees

11  his work -- or sees his work, can see that he is

12  remarkable.

13       You might wonder why I would make the choice to

14  advocate for this person knowing what he's done, and

15  I've -- I'm horrified at what he's done.  The first

16  reason is that he's bright, and it would be a tragedy to

17  discard this person.

18       My colleague in the math department, Charlie

19  Naffziger, said it best when he described the

20  interaction with Stan in his classroom this way:  "I

21  just couldn't get to him fast enough.  He cleared

22  everything else away to make his learning most

23  efficient.  He was ready to go when he got there.  He

24  just learned so fast."  I noticed that.  And others did

25  as well.

1          My colleagues and I would frequently discuss
2   Stan's questions in class and out.  We marveled at how
3   lucky we were to be involved in his education.  His
4   insight and mental connections revealed much about how
5   he was integrating the subjects within and between his
6   courses.  His questions helped me become a better
7   chemist and a better teacher.

8          His options and potential seemed limitless.
9   The only one who did not know this was Stan.

10          In lockdown, I sent him copies of book chapters
11   that we did not cover in my course.  We did have -- he
12   did not have access to a calculator.  And these were
13   calculation-intensive sorts of projects.  So I sent him
14   basically an antique tool.  It's a set of log -- tables
15   of logarithms.  And he would do calculations using log
16   tables.  And I don't think I've seen a student do that
17   since I was in high school.  So -- and he taught himself
18   in isolation with just a set of instructions that I
19   xeroxed out of a really old book.

20          The effect on him was something I was -- I was
21   predicting.  He came up with many questions that I had
22   not even considered, and sent us on another thread of
23   letters and conversations.

24          That is the real thrill of getting to work with
25   Stan.  He sees deeper into things than I've ever seen

1    anyone else do.  His connections are much more rich, and

2    then he shares the delight of his learning with others,

3    with me, I was lucky enough to benefit.

4            The second reason I chose to help him is that I

5    do know that he has managed alone for some -- for so

6    long it is high time that stopped.  Early on, I found it

7    strange that his response to even the most ordinary of

8    civilities was one of unalloyed gratitude.  It was so

9    very incongruous to see someone with so much on the ball

10   have such a powerful response to being treated with

11   respect and decency.  If he was expected -- if he -- if

12   he -- it was as if he expected no advocacy from anyone

13   who had any influence at all.

14           After his arrest, the pieces all fell into

15   place for me.  And as the indictments and accusations

16   were released, there were many reports about Stan that I

17   knew were simply misrepresentations.  This was what Stan

18   was expecting to happen to him in his interactions in

19   college.  His reflexes were hunkered into a defensive

20   mode.  Stan's history included some tough breaks and

21   falling through some cracks that were due to no fault of

22   his own.  These tough breaks blinkered his world view.

23   And his expectations for himself and the world were very

24   low.

25           Throughout my own life, I've had advocates.

1   I've had people watching me, ready to advise, or

2   intervene, or vouch.  They always seemed to appear when

3   I was in a most critical of junctures.  Some were my

4   relatives and others were just people who hated to see

5   the tragic loss of potential.  I was lucky.  My own

6   strong sense of gratitude for my own good fortune and

7   the recognition that he's in danger of being written off

8   or sacrificed is one of the reasons that makes me step

9   up and speak up for Stan.

10          Another reason I speak for Stan is this:  As I

11  mentioned in an earlier appearance in your courtroom, I

12  have a personal goal to make as many of my decisions as

13  possible be informed by real information and not just

14  anecdote.  From what I have learned of Stan's situation

15  since his arrest, I believe he was doing this, basing

16  decisions on a long-range view of the facts.  He looked

17  at the results himself and saw that what he was doing

18  was not working, that it was based on faulty logic, and

19  that it was counterproductive to his and his adopted

20  group's stated goals of motivated by a desire to protect

21  the environment.

22          My colleague, Dr. Carol Higginbotham, summed it

23  up best this way:  "I believe Stan would have done just

24  about anything if he thought it was going to help the

25  planet."

1              When he saw that it wasn't working, he actually
2    changed his approach.  The group's tactics and actions
3    divided supporters who might agree with the group's
4    motives and unified those who had opposing views.  He
5    realized that he had to leave, and he had to do it alone
6    because he had no ability to lead the entire group out
7    with him.  Again, he separated himself from a social
8    group and started over.

9              I can vouch for the fact that he never forgot
10   or stopped regretting what he had done.  And I think his
11   shame at his own powerlessness to convince the others
12   gnawed at him almost as much as the damage does.

13             Here is a man who already makes decisions based
14   on data and acts on that information even though it's
15   obvious that it will not be easy.  He's not taken the
16   easy path.

17             The final reason I speak up is that this person
18   has, again, actually achieved something that is
19   apparently very difficult to do.  He has successfully
20   removed himself from a gang.  The path out of these
21   types of organizations is a difficult one that few have
22   navigated successfully.  If you want to see this
23   movement decline, then I would hope that you'd see that
24   reinforcing his behavior in a very public way is going
25   to send a powerful message to the others who might want

1   to quit a gang but can't imagine a way out for

2   themselves.

3           I believe that you got a full confession from

4   Stan. You got 100 percent yield on everything he's ever

5   done, and I'm not so sure you are getting the same thing

6   from everyone. It is, again, this gang's stated methods

7   to do that. He has done this at great risk to himself.

8   To mete out the level of punishment that the government

9   recommends will align well with the plans that the Front

10  have in mind for him.

11          Your Honor, there are many other details that I

12  could offer, but the upshot is this: I did these things

13  for Stan, which I could just as easily have not done, I

14  could be home recuperating from a bad cold right now,

15  but I simply -- simply because I believe in Stan's

16  potential, and I knew that I could not conceive of

17  abandoning him, too.

18          Eventually, I was hoping that he'd end up being

19  a colleague of mine someday.

20          I was very concerned last week when I heard you

21  say that your recommendations to the BOP fall on deaf

22  ears, that you have a stack of letters all saying that

23  there is no room to accommodate your stipulated

24  recommendations. I see that you realize this system is

25  not working as it should. If you are considering ever

1  experimenting with creative sentencing options and were

2  looking for a test case with a good chance of success, I

3  would suggest that Mr. Meyerhoff would be an excellent

4  choice.  And I would volunteer to do whatever I could to

5  make it possible.

6           His supporters all know that he is diligent,

7  motivated, reliable and honest.  I think the testimony

8  has backed that up.  His honesty gave the government its

9  case.

10          I humbly request that the court consider

11  imposing the absolute minimum amount of prison time it

12  could possibly impose, and use community detention in

13  lieu of prison to get the greatest -- to the greatest

14  extent that it's possible.

15          He's demonstrated to me and others already that

16  he has marketable skills.  He spent a summer working on

17  a living wage job at a local technology company and they

18  wanted him to stay but he had to go to Virginia.  And

19  he's able to -- he's even begun making restitution.

20  He's useful now and can be while he finishes his

21  education.  I assure you that the world has nothing to

22  gain by institutionalizing this person, and I daresay a

23  great deal to lose by it.  Thank you for your time.

24          MS. WOOD:  Your Honor, that concludes all the

25  people we have and evidence we have to offer on

1   Mr. Meyerhoff's behalf.

2          I would ask the court, given the hour of the

3   day, that we recess until 9 o'clock tomorrow.  And I

4   will be much more succinct in being able to make the

5   legal arguments I need to make on his behalf, and point

6   out -- try and deal with all the objections to the

7   presentence report, and the objections to the

8   government's presentation, if we could do that.

9          THE COURT:  I don't have a problem with that.

10  And I would just as soon start at 10:00.  That will give

11  me some time to do some other matters.  We have set

12  aside two days for this, anyway.  We'll finish tomorrow,

13  correct?

14          MS. WOOD:  We will.

15          THE COURT:  Anything else?

16          MR. ENGDALL:  No, Your Honor, nothing from the

17  government.

18          THE COURT:  Thank you.  We're in recess.

19          (The proceedings were concluded at 4:42 p.m.)

20

21

22

23

24

25

CERTIFICATE

I, Deborah Wilhelm, Certified Shorthand Reporter for the State of Oregon, do hereby certify that I was present at and reported in machine shorthand the oral proceedings had in the above-entitled matter. I hereby certify that the foregoing is a true and correct transcript, to the best of my skill and ability, dated this 30th day of July, 2007.

Deborah Wilhelm, RPR
Certified Shorthand Reporter
Certificate No. 00-0363