CENT FILE COPY

230

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF OREGON
 3
 4        THE HON. ANN L. AIKEN, JUDGE PRESIDING
 5
 6
 7   UNITED STATES OF AMERICA,      )
                                    )
 8                  Government,     )
                                    )
 9        v.                        )  No. 06-60078
                                    )      06-60122-2
10   STANISLAS GREGORY MEYERHOFF,   )
                                    )
11                  Defendant.      )
     _____)
12
13
14        REPORTER'S TRANSCRIPT OF PROCEEDINGS
15                  EUGENE, OREGON
16                    VOLUME 2
17            WEDNESDAY, MAY 23, 2007
18               Pages 230 - 352
19
20
21                    Kristi L. Anderson
                      Official Federal Reporter
22                    United States Courthouse
                      405 East Eighth Avenue
23                    Eugene, Oregon 97401
                      (541) 431-4112
24                    Kristi_Anderson@ord.uscourts.gov
25
```



```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
                           BY:  KIRK ENGDALL, ESQ.
 4                         kirk.engdall@usdoj.gov
                           and  JOHN RAY, ESQ.
 5                         john.ray@usdoj.gov
                           405 East Eighth Avenue
 6                         Eugene, Oregon 97401
                           (541)465-6771
 7
     FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
 8                         BY:  STEPHEN PEIFER, ESQ.
                           1000 SW Third Avenue, Suite 600
 9                         Portland, Oregon 97204-2902
                           (503)727-1044
10                         steve.peifer@usdoj.gov

11   FOR THE DEFENDANT MEYERHOFF:
                           LAW OFFICE OF TERRI WOOD, P.C.
12                         BY:  TERRI WOOD, ESQ.
                           730 Van Buren Street
13                         Eugene, Oregon 97402
                           (541)484-4171
14                         twood@callatag.com

15   FOR THE DEFENDANT MEYERHOFF:
                           RICHARD L. FREDERICKS, P.C.
16                         BY:  RICHARD L. FREDERICKS, ESQ.
                           750 Lawrence, Suite 2
17                         Eugene, Oregon 97401
                           (541)683-9240
18                         rlfred@comcast.net

19
     Also present:
20
     Craig Weinerman
21

22

23

24

25
```

1    PROCEEDINGS

2    WEDNESDAY, MAY 23, 2007

3    THE CLERK: This is the time set for continuation

4    of the sentencing hearing in Criminal 06-60078 and Criminal

5    06-60122-2, United States of America versus Stanislas

6    Gregory Meyerhoff.

7    THE COURT: Ms. Wood.

8    MS. WOOD: Good morning, Your Honor. What I hope

9    to do this morning is go in the following order:

10   I have some objections to the slides that the

11   government showed during its presentation. I think that's

12   their Exhibit 1. I have objections to some of the arguments

13   that they made that they represented as facts to the court

14   during their argument. Then I have objections to the

15   presentence report in terms of what I think are -- are

16   the -- the material points that the court needs to make

17   rulings on in this case.

18   Then, Your Honor, I -- then, Your Honor, I have

19   objections to the application of the terrorism enhancement

20   to Mr. Meyerhoff based on the court's ruling -- based on the

21   court's rulings.

22   Should I switch microphones?

23   Do you want to just continue and try --

24   THE COURT: Just wait. Let Ms. Engdall take a

25   shot at it.

1    THE CLERK: Speak into yours.

2    MR. ENGDALL: Testing, testing.

3    MS. WOOD: Okay. We have power.

4    Your Honor, then I would make objections to the

5    application of the terrorism enhancement based on the

6    court's rulings on that issue and the evidence before the

7    court as to Mr. Meyerhoff.

8    Then I would like to address the defense evidence

9    as it relates to the factors under 18 U.S. Code 3353 [sic]

10   and the purposes of the sentencing that the court needs to

11   consider, and then basically conclude with our

12   recommendation for sentence and the justification for that.

13   Your Honor, I have talked briefly with Mr. Engdall

14   this morning, and the proposal was it might be most

15   expedient for me to go ahead and deliver these remarks to

16   the court and as opposed to him standing up now and

17   commenting on the defense evidence that has been presented

18   yesterday. Then he'll speak, and then if I have anything to

19   say that I don't think I have said already, I will stand up

20   in rebuttal.

21   I'm sure the court knows we see things differently

22   on a number of issues in this case, and I don't -- I don't

23   want the court to think that if I don't stand up and

24   reiterate all the things that I see differently than

25   Mr. Engdall, that if I have already touched on them in my

1  first statement that I'm waiving it. So that's the way we'd

2  like to proceed.

3          THE COURT: Fine.

4          MS. WOOD: Your Honor, I am going to use the

5  overhead projector, hopefully, and it might be -- if the

6  court would allow, there may be times I want to sit versus

7  stand.

8          THE COURT: It isn't going to bother me or offend

9  me whether you are sitting or standing, as long as you speak

10 into the microphone.

11         MS. WOOD: Okay. Thank you, Your Honor.

12         Your Honor, the first slide that we have some

13 objection to is the leadership role in the Romania arson.

14 And our objection, in terms of guidelines or use of this

15 information by the government for guideline purposes, is

16 that the information is taken, to some extent, from

17 Mr. Meyerhoff's debriefing statements, so probably a large

18 extent from Mr. Meyerhoff's debriefing statements, and that

19 that information is protected under 1B1.8 from use in

20 arriving at the advisory guideline range. Of course, the

21 court can consider that type of information for other

22 purposes, but not in calculating the guidelines.

23         Your Honor, we also, though, want to object based

24 on the representation by the government as to those being

25 the facts, that Mr. Meyerhoff selected the target and

1    recruited his team.  And my objections were made by way of
2    presentence report objection letter that's attached to that
3    report on Page 7, and what I have stated there is that
4    Mr. Rodgers was the leader and assembled the participants.
5    Mr. Meyerhoff did not select or research these targets,
6    research being part of the selection process.

7             And that -- I cite specific 302s by other
8    defendants, not Mr. Meyerhoff, that support those facts.
9    And I also, Your Honor, because I think this is important, I
10   had subpoenas issued for the defense.  I talked with
11   Mr. Purdue, and I said, I have set forth a number of
12   specific factual objections to the presentence report, and I
13   have cited reports, 302s, that were done by agents.  And if
14   you contest that I have inaccurately represented the facts
15   from those reports, then I will have the agents present and
16   we'll present testimony on that for the court's
17   consideration.

18            And as I understand Mr. Purdue's response, and
19   he's here and can correct me, he said no.  I think that you
20   have represented what was stated in those reports accurately
21   in your objection letter.  It's just that we disagree in
22   terms of the interpretation of those facts or the weight to
23   be given those facts.

24            So I don't think -- and the government has not
25   filed any type of written objections to the presentence

1   report or to any of the objections, comments made in my
2   letter, so I'm assuming the government has no way to refute
3   the fact that other cooperating defendants in this case have
4   told the government in debriefings that it was Mr. Rodgers
5   who was the leader and assembled the participants and that
6   that was not something done by Mr. Meyerhoff.

7   Your Honor, the -- the next objection I have is
8   based on the government's claim regarding the communique in
9   the Romania arson, that that was authored by Mr. Meyerhoff.
10  And that, Your Honor, is refuted by the presentence report
11  itself. Paragraph 66, Page 12 of that report, which was not
12  disputed by the defense on that -- this issue, states
13  that -- let me find it for you. It says, "The communique
14  was a group effort and was shown to Mr. McGowan, who later
15  passed that on." And I believe Mr. Meyerhoff was the member
16  of the group who passed the communique on to Mr. McGowan,
17  but he didn't author that communique.

18  Your Honor, the next objection by the defense
19  deals with the slide regarding the leadership role for
20  Jefferson Poplar Farm. We object to the characterization of
21  Mr. Meyerhoff as doing all the things that the government
22  puts there for purposes of advisory guidelines calculations
23  based on some of that information being taken from his
24  debriefing statements. So we object under Guideline 1B1.8.
25  And, again, from the same section of my objection

1   letter, Page 7, I stated and quoted references to that both
2   with the Romania arson as well as Jefferson Poplar -- or
3   Jefferson Poplar and Romania that it was Mr. Rodgers who was
4   the leader and assembled the participants, and that
5   Mr. Meyerhoff did not select or research these targets.
6   And, again, that's backed up by the statements of two other
7   cooperating defendants, and the pages are cited in my
8   objection letter.

9           Your Honor, further information concerning
10  Mr. Meyerhoff's leadership role in Jefferson Poplar, and I
11  want to talk about that a little bit more because that's one
12  of the arsons that the government spent quite a bit of time
13  focusing on yesterday, I had attached to my objection letter
14  a couple pages from a debriefing done by -- with
15  Mr. McGowan. And, of course, Mr. McGowan doesn't name
16  names. And I attached that to show in detail the way these
17  arsons were conducted as a group consensus and group
18  decision-making effort.

19          And he describes -- the agents record his
20  descriptions as talking about they deciding where to place
21  devices and they doing recons and deciding, you know, where
22  the lookout should be, discussing how they could prevent any
23  type of injury to surrounding houses, those kinds of things,
24  in terms of where they placed devices. Discussed every
25  scenario possible for the arson. And you notice he talks

1  also about how everyone in the group participated in making
2  devices and did those kind of things.

3          And then there's another statement, debriefing
4  statement by Mr. Block, who doesn't name names, but it's
5  Block 302 at 15 where he talks about two males from Eugene
6  coming up to discuss participation or recruit them for
7  participation in this Jefferson Poplar arson.

8          So the objection as to facts is that it simply
9  overstates Mr. Meyerhoff's role to call him a leader of the
10  Jefferson Poplar Farm and that the use of 1B1.8 material
11  would preclude the court from applying a role adjustment
12  under the guidelines based on that.

13          Your Honor, this is a minor objection, but it
14  deals with the -- the reference to the Monsanto -- Monsanto
15  Corporation GE destruction at Dusty, Washington.  It's down
16  near the bottom of that screen.  I am unaware of any facts
17  in terms of Mr. Meyerhoff's involvement in that.

18          THE COURT:  My screen's not on, just -- if it
19  matters.

20          MS. WOOD:  Oh.  Ours is.

21          THE COURT:  I have a blue light on.  I have the
22  blue light on.  It's that last slide that lists those
23  noncharged items?  Is that the slide?

24          MS. WOOD:  That's correct.

25          THE COURT:  Yeah.  I know which slide it is.

1    MS. WOOD: And it's just that Mr. Meyerhoff has
2    told me that he was not involved in the Monsanto Corporation
3    GE destruction, and I don't know of any authority for the
4    government to say that he was, so we just make that
5    objection.

6    Your Honor, the government has attributed
7    30,000 -- I'm sorry -- $30 million and some change to
8    Mr. Meyerhoff in terms of total loss. The objection I want
9    to make to that is simply that I don't have information to
10   support that. So the presentence report has attributed
11   about 18 million and some change to him for restitution
12   purposes. We agreed, as part of our plea agreement, that if
13   the court looked at overall conspiratorial relevant loss,
14   that it would be a certain amount, which was actually higher
15   than that. It's 40 million and something.

16   But I'm not sure if the government's stating that
17   this 30 million is to be the restitution figure in the case
18   or not. But if they are, then, you know, we object to that
19   based on the available information in the presentence
20   report.

21   Your Honor, the -- the next slide that the defense
22   takes some objection to is the portrayal of Mr. Meyerhoff as
23   the coauthor of Mr. Rodgers' manual, *Setting Fires With*
24   *Electrical Timers*. Mr. Meyerhoff did contribute some
25   sections to that and suggestions for particular sections,

1   but my main objection is to characterizing him as the
2   coauthor.  The presentence report said that he published
3   this with Mr. Rodgers, and we have made a fairly detailed
4   objection to that because Mr. Meyerhoff had absolutely
5   nothing to do with it being published, if that means
6   distributing it to other people.

7        And so, as we have pointed out in objections to --
8   under the presentence report, the discovery reveals in this
9   case that there were instructions for making these types of
10  devices widely available over the Internet and in use for
11  years before Mr. Meyerhoff got involved.  That Mr. Dibee and
12  Rodgers provided the basic designs and circuit diagrams that
13  Meyerhoff worked off to make small improvements.  That
14  Mr. Ferguson provided suggestions and ideas used by
15  Meyerhoff in experimenting and then giving information to
16  Mr. Rodgers based on this.

17       So, again, I'm not disputing that he contributed
18  information to this, and the government has a report that
19  goes on for a number of pages where he specifically, for
20  them, detailed which line and paragraph and et cetera that
21  he provided information to Mr. Rodgers for use in this
22  manual.  But the debriefing statements not only of
23  Mr. Meyerhoff but of one, two, three other cooperating
24  defendants in this case who were cited, and on Page 5 of my
25  objection letter regarding this matter, all say that they

241

1  made contributions and that they contributed to the
2  authorship of this manual.

3  Your Honor, the next point of contention deals
4  with the government's claims that Mr. Meyerhoff becomes
5  increasingly violent as the Book Club disbands. And that --
6  those topics were the topic, or caused me to write a
7  supplemental sentencing memorandum, which I'm sure the
8  court's read in this case.

9  But just briefly, I want to state that based on
10  the available 302s that this -- this discussion that
11  Mr. Meyerhoff had with Mr. Dibee about Mr. Paul, number one,
12  was not involved -- did not involve Mr. Dibee being upset
13  over something related to the movement, some dispute over a
14  vote in the environmental movement, based on the only
15  information that we have about what the dispute was over,
16  and I have laid that out in my memorandum. But it was
17  basically related to some romantic interest that Mr. Dibee
18  had and felt that Mr. Paul had interfered with in some
19  fashion.

20  Again, I want to point out that Mr. Meyerhoff did
21  not agree to help Mr. Dibee murder anybody, and that just
22  the very conduct of this trip in the middle of the night
23  with an Internet MapQuest map is just indicative, with no
24  follow-up and with abandoning it upon encounter with the
25  police, I just think is all much more supportive of this

1 being basically Mr. Dibee blowing off steam and
2 Mr. Meyerhoff going along for the ride and bailing at the
3 moment.

4 And what is also significant, if it's more serious
5 than the way I view it, the government views it as more
6 serious, what I think is most significant is that that is
7 the last contact Mr. Meyerhoff has with Mr. Dibee. That is
8 the last thing that he does in terms of any participation
9 with any conduct the government wants to link to the
10 movement. He is done at that point. And so, if nothing
11 else, it was a wake-up call for him, and it did not result
12 in any type of escalation of violence or him becoming
13 increasingly violent.

14 Regarding the discussions with Mr. Rodgers about
15 these drive-by assassinations, again, that information comes
16 from Mr. Meyerhoff's debriefings with the government,
17 telling him what Mr. Rodgers had talked to him about, not
18 anything about Mr. Meyerhoff conspiring or agreeing with
19 Mr. Rodgers to conduct drive-by assassinations.

20 I am not -- I am not saying that people that view
21 themselves as revolutionaries may not engage in political
22 debate about whether assassinations are an appropriate
23 tactic. I still think that those type of discussions, if
24 they are nothing more than discussions, are protected under
25 our constitution under the First Amendment. They are done

1    as simply voicing ideas and not to incite action to
2    violence.

3         So, again, Judge, we just think that this is an
4    overstatement, an overreachment, an attempt to portray
5    Mr. Meyerhoff as being more culpable, more involved, more of
6    a leader, more of the head guy of this conspiracy than what
7    the facts in the case support.

8         The last slide that I had some objection to was
9    this slide which the government said portrayed -- the top
10   slide showing an increasing sophistication or evolution of
11   the design of the device. Well, what we actually see is
12   implementing redundancy, because they weren't, as you can
13   see from the Jefferson Poplar presentation, having a lot of
14   luck with just using one timer or one -- you know, one
15   bucket. So -- and what they have done is they have combined
16   three buckets of fuel with two one-gallon jugs geared to
17   ignite. They have used the old-fashioned kitchen timer and
18   not the supposedly more advanced digital timer.

19        Your Honor, and then I have a few specific
20   arguments regarding things the government represented to the
21   court that I don't think they had slides attached to.  The
22   government started out its presentation by telling the court
23   that this is just a group of serial arsonists who used the
24   ELF and ALF to justify their actions. And I think the
25   purpose of that was to be able to argue that they don't

1  adhere to the code of nonviolence against humans or other

2  life forms. They are just a group of serial arsonists.

3  And I would submit, Judge, that if that's what

4  they are, serial arsonists and not terrorists, not out with

5  a political agenda, that we could use the guideline

6  calculations without the terrorism enhancement, give

7  Mr. Meyerhoff a few levels off for cooperation, and get down

8  to where the defense is recommending under the guidelines

9  alone and call it a day.

10  So I don't think the government can have it both

11  ways, Judge. I don't think they can come in and say, well,

12  they weren't really adhering to the code of nonviolence of

13  the ELF. They were just doing this because they are serial

14  arsonists and at the same time say, Judge, they were out

15  there to do these political crimes with the ELF/ALF agenda,

16  and their conduct was therefore calculated to influence

17  government, even though they targeted private businesses,

18  and therefore the terrorism enhancement applies.

19  Your Honor, another point that the government made

20  at least two times in its presentation was that there was a

21  spokesman, who I'm pretty sure it's Mr. Rosenbraugh [sic],

22  Rosenbaum [sic], something. Anyway, he's the guy that has

23  been a spokesman from time to time, I guess for the ELF.

24  He's not a member of this conspiracy, at least he's not

25  named or indicted as a member. But he's quoted by the

1   government as saying that if any actions by the ELF caused

2   injury or death, then the ELF wouldn't claim it.

3           So I guess the assumption or what the government

4   would like the court to think is that this group may have

5   been involved in arsons where someone was injured or killed,

6   but we don't know about it because they didn't claim it.

7   And I think that most telling to refute that is the very

8   large ELF spray-painted on a building at Jefferson Poplar

9   that they specifically did not try to set on fire to leave a

10   very clear calling card before they knew if anyone was

11   injured or harmed in that arson that the ELF was responsible

12   for that.

13           I also think that it pretty much defies credulity

14   that the government could debrief independently all of the

15   individuals involved in this case, and not one of them would

16   have ever mentioned being involved in an action that someone

17   was injured or killed but nobody claimed. And there's no

18   information like that.

19           So it's the government, I submit, asking the court

20   to or suggesting that we should think that this group was

21   more dangerous, more intent on harming human life than the

22   facts support. The facts, Judge. Again, I just keep coming

23   back to the facts.

24           Your Honor, the government has claimed that

25   Mr. Meyerhoff deserves a leadership role under the

1  guidelines based on his participation in the attempted arson
2  at the University police sub -- not -- the Eugene Police
3  Department Substation. I just want to object, based on
4  1B1.8, to that suggestion. I would note that the
5  presentence report does not recommend a role adjustment
6  based on Mr. Meyerhoff's conduct in connection with that
7  offense. That the government has made no objection to the
8  draft presentence report with that conclusion.

9          THE COURT: Ms. Wood, state that one again.

10         MS. WOOD: That the government argued yesterday
11 that Mr. Meyerhoff deserves a leadership or role adjustment
12 based on, among others, the Eugene Police Department arson.
13 And I'm telling the court that the presentence report did
14 not recommend any role adjustment for that offense.

15         THE COURT: And since the government didn't
16 object --

17         MS. WOOD: And the government didn't object.

18         THE COURT: -- they are foreclosed, is your
19 argument. Okay.

20              (Reporter interrupted.)

21         THE COURT: If the government didn't argue, then
22 they foreclosed.

23         MS. WOOD: There was also, Your Honor, some --
24 some argument or statement by the government that I think
25 was them trying to tell you facts that we dispute regarding

1  Mr. Meyerhoff wanting to have the propane tank at Jefferson
2  Poplar explode or BLEVE or something. And so they
3  referenced, I think -- I knew Mr. Meyerhoff hadn't said
4  anything like that. He did say in debriefings that he
5  recalled placing a device near a gas meter, which I'm
6  assuming is this regulator valve by the building six or
7  eight feet away from the tank that we have heard some
8  testimony about.

9       I went back and looked at Mr. McGowan's statement,
10 and basically says that -- doesn't identify Mr. Meyerhoff,
11 of course. It talks about some other person spotting a
12 large gas tank and that the person took the spigot out,
13 pulled the trigger, smelled like sulfur, added it to the
14 fuel, so I'm assuming that was the propane, and that it was
15 easy to dispatch gas from that tank, and the person wanted
16 to use the gas in some form.

17      So I suggest to the court that by the placement of
18 the device next to a source where that gas could emit from
19 that regulator valve that, yeah, there probably was an
20 intent to use the gas as a torch, as a flame to make fuel
21 for the fire. But that's much different than placing the
22 device in a way that would have even a likelihood of causing
23 that tank to BLEVE or explode.

24      The court's heard expert testimony, unrefuted,
25 from Mr. Smith, the arson expert, that if that regulator had

1  failed, due to heat from the device, that the fuel would
2  have come out and it would have been like a propane torch,
3  not a fireball and not an explosion.

4  The government mentioned Mr. Meyerhoff's
5  involvement in the Book Club meetings, and I believe it did
6  state somewhere in its sentencing memorandum accurately that
7  he attended about three of those and not the first few.  He
8  wasn't -- certainly there were other codefendants in this
9  case that attended all five meetings, some that I think
10  attended none, but in terms of him being somebody that
11  organized the Book Club meetings or was an active
12  participant, he went to a little more than half of those
13  meetings.

14  Your Honor, those are my comments in terms of the
15  government's presentation yesterday as to factual-type
16  objections and objections based on 1B1.8.

17  THE COURT:  Mr. Engdall, I'd like -- I'm going to
18  break, and I want you to respond to those points raised.

19  MR. ENGDALL:  Thank you, Your Honor.

20  THE COURT:  I think I have -- I counted 13.

21  MR. ENGDALL:  I'm sorry.  Did you say the court
22  was going to take a break?

23  THE COURT:  No.  I counted 13 points that I want
24  you to rebut.

25  And I would like a red pen, Ms. Engdall.

1    MR. ENGDALL: Your Honor, if I may, with regard to
2    the leadership role at Romania arson, if the court does
3    find -- that statement that he was the leader at Romania was
4    in fact from a debriefing, and the government would concede
5    that under 1B1.8 the court should not consider that when
6    it's discussing the issue of enhancement for Mr. Meyerhoff.

7            Dealing with the leadership, however, enhancement,
8    I would call the court's attention specifically to the
9    defendant's role at the Jefferson Poplar Farm and refer back
10   to the plea agreement that was agreed to by the defendant
11   and counsel, and in Paragraph 3 of that plea agreement,
12   there was a factual basis section wherein which the
13   defendant agrees that United States Attorney's Office could
14   prove each and every fact as articulated in Attachment No. 1
15   beyond a reasonable doubt.

16           And I reference -- I think it would probably be
17   easier, Your Honor, if I went through that portion of the
18   plea agreement in several instances. I want to talk about
19   the -- first of all, we'll talk about the leadership role at
20   the Jefferson Poplar Farm. And in that statement, it states
21   that, and Meyerhoff -- Mr. Meyerhoff agreed that this could
22   be proven beyond a reasonable doubt. It states that,
23   "Meyerhoff organized the people who were assisting in the
24   arson and assigned the duties of the participants." Also
25   states that, "Meyerhoff was in charge of the team that

1  performed the arson at Jefferson Poplar Farm."

2          There are other statements also in -- in -- in the

3  plea agreement that lead -- that reference -- more correctly

4  reference the application of the terrorism enhancement, and

5  I will refer to that later.

6          MS. WOOD: I'm sorry. Counsel, could you provide

7  the page or paragraph for that?

8          MR. ENGDALL: Yes. That is -- well, it's on

9  Attachment 1.

10         MS. WOOD: Okay.

11         MR. ENGDALL: Do you have that?

12         So with regard to his leadership role at Jefferson

13 Poplar Farm, we believe that that is sufficient to indicate

14 that and would support the upward departure for leadership.

15         With regard to his activities at the Monsanto

16 Corporation genetic engineering destruction, whether

17 Mr. Meyerhoff recalls that or not, that information was

18 gained from Ms. Savoie's statement to the government, as

19 well as Lacey Phillabaum's statement to the government.

20 They place Mr. Meyerhoff at that location.

21         With regard to Mr. Rosebraugh's statement about

22 the Earth Liberation Front, his statement, and the complete

23 statement is as follows, if I may read it. Now, this was a

24 quote from the *Dateline* interview on television. The

25 complete statement is that, "If an individual did an action

1   that did harm to someone or did kill someone in the most
2   severe sense and they had spray-painted the Earth Liberation
3   Front on the premises of that location, we still could not
4   consider that an ELF action.  It may have had political
5   motives.  It may have had environmental motives behind it,
6   but because of the loss of" -- "injury to life, it would not
7   be considered to be a part of the Earth Liberation Front
8   because it did not fit in with these guidelines.  That is
9   the exact quote.

10          So the fact that the ELF moniker was sprayed onto
11  the building at Jefferson Poplar Farm does not necessarily
12  preclude the fact that they considered -- before they issued
13  the communique, that they considered whether or not someone
14  was injured during the course of that fire.

15          With regard to his leadership role at the Romania
16  Chevrolet arson -- excuse me, Your Honor.  Just a moment.
17  He -- as part of his leadership role, he recruited Joyanna
18  Zacher in that particular role.  With regard to the
19  Jefferson Poplar Farm arson, he recruited Ms. Zacher.  With
20  regard -- And that came from Ms. Zacher's testimony or
21  statement to the police.  She referenced the man from
22  Eugene, who, when looking at all the 302s that referenced
23  Mr. Meyerhoff, Mr. Meyerhoff was the man from Eugene.

24          She [sic] recruited Kevin -- excuse me -- Kevin
25  Tubbs for the Eugene Police Department Substation arson.

1  That came from the 302 from Mr. Tubbs. Leadership also --
2  roles also included teaching others how to do incendiary
3  devices at the Book Club.
4           Ian Wallace advises us that Mr. Meyerhoff traveled
5  across the United States and instructed him. And, of
6  course, there was a statement -- the statement I just
7  referenced with regard to his leadership capabilities at
8  Jefferson Poplar Farm came from the plea agreement.
9           Did I cover all of them, Your Honor?
10          THE COURT: The communique regarding Romania, the
11 government offered that it was authored by Mr. Meyerhoff.
12          MR. ENGDALL: Yes. Thank you, Your Honor. Thank
13 you.
14          Again, in the -- in the plea agreement, under the
15 facts attachment, it states that, "After the arson,
16 Meyerhoff and others authored the communique." Oh, yes.
17 And then he gave it to Mr. McGowan to send out by anonymous
18 e-mail.
19          Thank you.
20          THE COURT: No. I have more.
21          MR. ENGDALL: Okay.
22          THE COURT: The restitution amount. Is it 18
23 million or is it 30 million, or how are we addressing it?
24          MR. ENGDALL: That's an estimate, and those
25 restitution amounts are gathered from the statements that

1    are given to us by the victims themselves.

2          The enhancement -- or the difference, I believe,
3    between this -- the restitution amount that was given -- or
4    that was adopted by the presentence report writer is in
5    variance with the restitution amount that I provided and
6    mentioned in my presentation yesterday, and that is based
7    upon the loss at the Vail ski resort arson.  My
8    understanding is, and the presentence report writer advised,
9    that it could be only property loss and that the amount that
10   was received, the figure that we received from the victims,
11   which was a 24 million-dollar figure, included downtime and
12   business loss.  That explains the variance.

13         THE COURT:  But how is that going to be resolved?

14         MR. ENGDALL:  Well, it has to be resolved by the
15   presentence report writer and by this court to determine the
16   exact amount of damage and what -- or loss and what can be
17   considered loss.

18         THE COURT:  Well, do we have an agreed-upon
19   amount?  Ms. Wood, rightly so, says there's a variance and
20   an amount from 18 million to 30 million that's been used in
21   the courtroom.  I would like to know, if I have to make
22   decisions on that, if we are going to have a submission that
23   addresses the calculations or if we are going to take
24   testimony or if you are going to talk with counsel and agree
25   upon a figure.

1    MR. ENGDALL: Maybe we should talk with counsel.
2    We have advised the victims that if there is an issue with
3    regard to the exact amount of restitution, that they need to
4    be present and prepared to advise this court as to the basis
5    for their figures.

6    THE COURT: The next was the slide you used that
7    indicated that he coauthored the manual. Is that within the
8    fact --

9    MR. ENGDALL: That is, Your Honor.

10    THE COURT: Okay.

11    MR. ENGDALL: He, in fact, coauthored the manual.

12    THE COURT: Any response to the fact that the last
13    interaction that Mr. Meyerhoff had with Mr. Dibee was --
14    occurred only after that trip to Southern Oregon, and that
15    thereafter, they disentangled and that that was represented
16    to be a comment about -- in response to your representation
17    that Mr. Meyerhoff's behavior escalated, his violent
18    behavior escalated?

19    MR. ENGDALL: Yes, Your Honor. That information
20    actually -- that his -- his violence escalated towards the
21    end of the conspiracy, it is true that that was the last
22    contact that he had with Mr. Dibee. However, I took the
23    opportunity last evening to go back and review the FBI 302,
24    which is in the police report, that was taken during the
25    interview of Ms. Phillabaum regarding the event that

1  included Mr. Dibee and Mr. Meyerhoff traveling to contact
2  Mr. Paul.

3          And if I may, it's a paragraph, but I would read
4  this into the record carefully.  It may be helpful for the
5  court.

6          Incidentally, this admission by Mr. Meyerhoff was
7  only provided to the investigators after the investigators
8  had spoken to Ms. Phillabaum and then confronted
9  Mr. Meyerhoff with Ms. Phillabaum's statement.

10         The 302 reads as follows:

11         "Ms. Phillabaum advised that after
12     September 11th, 2001, she told Meyerhoff it had to
13     stop.  She said they moved to Bend, Oregon,
14     towards the end of 2001.  She said Meyerhoff went
15     to Seattle, Washington, and worked on Dibee's,
16     that would be Joseph Dibee's truck.  She said
17     Meyerhoff received money from Dibee.
18     Specifically, she said that he received 6,000 to
19     $10,000.  She thought this money was either for
20     services rendered or to stay involved with the
21     movement.  She pressured Meyerhoff to return the
22     money.  At some point, Meyerhoff returned the
23     money.  She said she thought the money was
24     involved with a plan to rob a bank.  She said, in
25     January 2005, while at Cannon Beach along the

1   Oregon coast, she asked Meyerhoff about the money
2   and what the purpose of it was. Meyerhoff told
3   her that he and Dibee were going to drive to
4   Southern Oregon and shoot Jonathan Paul. It was
5   unbelievable to her, and it seemed unbelievable to
6   him also. She asked him why, but he did not give
7   any reasons other than just general negativity
8   about Paul."

9       I think that clearly indicates that toward the
10  end, he was, in fact, escalating in his violent thoughts and
11  acts.

12      THE COURT: I guess the -- I would say the
13  drive-by comments and the assassination comments, Ms. Wood
14  made a First Amendment argument. I understood her argument.

15      The increasing sophistication, I believe that's
16  just argument with regard to how to evaluate the timing
17  devices and the changes and the adding a third bucket.

18      The next was the representations that she
19  represents were not backed up with fact, and that is, one,
20  regarding the code of silence and the serial arson, and I
21  guess that's, in many respects, argument. And then the
22  spokesman comment you address.

23      She -- I guess in terms of argument, it's the
24  intended use of the device behind the propane tank to create
25  a torch as opposed to an explosion, shorthanding my notes.

1    And I guess all the other points that were raised

2    were more argument as opposed to fact based.

3         MR. ENGDALL:  Your Honor, the code of silence is

4    fact based.  It came from our initial informant,

5    Mr. Ferguson.  He advised us the nature and circumstances of

6    The Family and how they practiced their work, so.

7         THE COURT:  And the code of nonviolence.  I think

8    you have addressed that.

9         MR. ENGDALL:  Correct, Your Honor.

10        THE COURT:  Right.

11        MR. ENGDALL:  Thank you.

12        MS. WOOD:  Your Honor, just briefly, in terms of

13   the stipulation of facts attached to the plea agreement that

14   the government says supports its argument for leadership

15   role on Jefferson Poplar, Paragraph 3 on Page 2 of the plea

16   agreement says, "The factual basis for each count is

17   attached hereto and, by this reference, incorporated herein

18   as Attachment 1.  And the defendant agrees the U.S.

19   Attorney's Office can prove those facts beyond a reasonable

20   doubt."

21        And I don't -- I don't dispute that, and I also

22   mentioned that in my PSR objection letter.  However, I don't

23   think that saying the government can prove facts beyond a

24   reasonable doubt for purposes of establishing guilt on those

25   counts is a waiver of a claim that Mr. Meyerhoff's

1   debriefing statements can't be used under 1B1.8 to establish
2   his advisory guideline range, because I think, as
3   Mr. Blackman commented during the terrorism argument, the
4   court hears many things, and it has to separate out what it
5   can use for guideline purposes and what it can't based on
6   1. -- 1B1.8. And for example, if the government had gone to
7   trial in this case and Mr. Meyerhoff had testified, the
8   government -- again, to the facts, they would have argued
9   they proved those facts beyond a reasonable doubt. But that
10  would not -- obviously not by the guidelines, intended to
11  then say that those debriefing statements, which a person
12  later testified to in court as a government witness, can
13  then be taken out of the protection of 1B1.8 for guideline
14  purposes, and by helping the government further, we can now
15  up your guideline range.

16          So I don't think that -- that agreeing that those
17  facts could be proven beyond a reasonable doubt eliminates
18  the protection afforded by 1B1.8, which, in fact, presumes
19  that the defendant is providing truthful and complete
20  information in order to make a proffer to the government.

21          MR. ENGDALL: Counsel is simply incorrect. 1B1.8
22  information cannot be used unless otherwise provided for in
23  the plea agreement or by the plea agreement. And it's the
24  government's position in this particular case that the plea
25  agreement clearly allows Attachment No. 1 to be utilized for

1    whatever purposes the government desires, to include
2    sentencing enhancements, discussions about facts pertinent
3    to the guilt of the defendant, and the conduct of the
4    defendant.

5         MS. WOOD:  Your Honor, we just submit that the
6    government drafted the plea agreement, the government
7    drafted the stipulation of facts, and the law in this
8    circuit is that those agreements are to be strictly
9    construed against the drafter in favor of the defendant.
10   And the government, if it wanted it to be that broad, could
11   have stated it in the plea agreement and did not.

12        Your Honor, the only other points I want to make,
13   one is factual, and it, again, involves the government
14   relying on the noncooperating defendants' debriefings to try
15   and establish that Mr. Meyerhoff did anything in particular
16   in these cases because, as the court noted, those people did
17   not name names, which, under the court's opinion, wouldn't
18   entitle them to 1B1.8 protection.

19        But Mr. Block, talking about Jefferson Poplar Farm
20   on Page 15 of his 302, says that one or two males from
21   Eugene came to Olympia and talked about planning two arsons.
22   He said that there were two males from Eugene who were major
23   players.

24        And so I don't see anything in Mr. Block's
25   statements that would rule out some other person other than

1   Mr. Meyerhoff, because there was at least one or -- at least
2   one other male, if not more, living in Eugene who were
3   affiliated -- or in the Eugene area that were affiliated
4   with this group.

5          And Your Honor, finally, in terms of relying on
6   hearsay statements post-arrest offered for obtaining a
7   benefit of codefendants in this case in order to find facts
8   against Mr. Meyerhoff, I just want to object, for the
9   record, based on the authority cited on Page 6 of my
10  response to the government's sentencing memorandum.  The
11  objection is one of due process that requires such
12  statements to be corroborated by extrinsic evidence
13  sufficient to establish some minimal indicia of reliability.

14         Unless the court wants me to cite all those cases
15  and read that, I don't think I need to.  I think I have made
16  enough of a record.  But I think the law is clear, under the
17  Ninth Circuit, that, for example, Ms. Phillabaum's statement
18  to an agent, which may or may not be accurately recorded in
19  a 302, cannot serve as the basis of evidence for the court
20  to make material sentencing decisions on.

21         THE COURT:  Give me your examples of what you are
22  asking the court to include or exclude.

23         MS. WOOD:  Your Honor, I'm just saying that I
24  believe that Ms. Phillabaum's statement, as read into the
25  record by the government, is inadmissible evidence.  I'm not

1  saying that because the rules of sentencing don't -- the
2  Rules of Evidence don't apply at sentencing, but still the
3  due process clause does. And the Ninth Circuit has
4  recognized that when you talk about the post-arrest
5  statements of alleged accomplices or cooperating witnesses,
6  that it requires independent, extrinsic corroboration under
7  the due process clause in order for that to be used to
8  affect the defendant's sentence.

9       So the court -- I'm not saying the government
10 can't tell the court this is what the 302 says. I'm saying,
11 if the court wants to rely on that in arriving at a sentence
12 independent of the guidelines, if the court wants to rely on
13 it in arriving at a sentence, that there's an objection that
14 it's not sufficiently reliable under the due process clause.

15      THE COURT: I understood that. I'm just looking,
16 what are the -- do you have other examples that you want the
17 court to take into account, other statements or other
18 particular facts that --

19      MS. WOOD: Your Honor, because the due process
20 clause, of course, protects Mr. Meyerhoff from the
21 government, basically, 302 statements that the government
22 wants to use to counter arguments and facts offered by the
23 defense, we would submit, I have to have -- make an
24 objection as to that. I haven't heard anything else,
25 though, that I haven't basically countered.

1          THE COURT:  Thank you.

2          MS. WOOD:  So far.

3          Judge, the difficulty is that the government's

4   presentation, as well as its sentencing memorandum, they

5   don't cite the basis for the facts.  And so it's hard for

6   me, there are thousands of pages of reports in this case, to

7   try to go back and see what document they may have taken,

8   what they represent as the facts to be.  And you know, I'm

9   just saying I can't be more specific because of that.

10         Do you want me to continue with more argument on

11  other issues as opposed to these issues?

12         THE COURT:  I think it's just easier to do them --

13         MS. WOOD:  Right.

14         THE COURT:  -- have them in, you know, blocks.

15         So Mr. Engdall, do you want to respond?

16         MR. ENGDALL:  Well, Your Honor, the government can

17  use hearsay statements.  This is a sentencing proceeding,

18  not a trial.  It can use hearsay statements.  These

19  documents -- or these police reports and the statements that

20  were derived or made by individuals involved in the

21  conspiracy that are reflected in those reports can be

22  communicated to the court.

23         Part of the plea agreement was, and the defendants

24  understood, that we would communicate this information both

25  to the presentence investigator writer -- investigative --

1   presentence report writer, excuse me, and the court. And so
2   we have done that. And then we have made our own argument
3   based upon what we believe that information reveals.

4           As far as corroborating, it's corroborated by
5   other independent testimony and the physical evidence of the
6   investigation of the arson itself.

7           As the court is aware, this investigation lasted
8   more than ten years. We knew how the arsons occurred.  We
9   knew when they occurred. We knew the devices that were
10  involved in most of the arsons, and when we had that
11  information and we tested the information that was given to
12  us by the other cooperating witnesses, it corroborated their
13  statements with regard to what the government physically had
14  in its possession and knew about the arsons.

15          So it's -- it's clear, I think, that -- and this
16  is the first I have heard this particular argument at a
17  sentencing proceeding, but it's -- I think it's -- it's
18  clear, from our perspective, that this information can be,
19  should be submitted to the court for its consideration, and
20  it is appropriate for the court to consider it for whatever
21  the court deems it's worth.

22          MS. WOOD:  I have nothing further on that, Your
23  Honor.

24          MR. WEINERMAN:  Judge, can I just -- a couple of
25  things have come up that's going to affect our case, and

1    once the court decides it, I probably won't be able to
2    influence the court.
3              THE COURT:  Just state your name, for the record.
4              MR. WEINERMAN:  Thank you, Judge.
5              THE COURT:  And please state who you are
6    representing.
7              MR. WEINERMAN:  Craig Weinerman appearing for
8    Chelsea Gerlach.
9              The restitution argument that has been made, that
10   the government, I believe, is suggesting that the loss of
11   income at the Vail ski resort is a proper restitution issue,
12   it's not.  If you look at 36 --
13             THE COURT:  I think I understood just the
14   opposite.
15             Is that correct, Mr. Engdall?
16             MR. WEINERMAN:  All right.  I understood the
17   government to say that they were seeking, in the restitution
18   order, a loss of income of the business, and if I'm
19   incorrect, then I will withdraw my concern.
20             MR. ENGDALL:  No, we are not seeking that.  The
21   purpose of that slide was to show that this was the impact
22   on the corporation at Vail, as well as the impact on all the
23   other victims.  This figure was taken from the victims'
24   perspective as to the losses.  It has nothing to do with the
25   actual amount that's going to be required of each of these

1  particular defendants as a restitution figure.

2          THE COURT:  That's what I understood you to say.

3          MR. WEINERMAN:  All right.

4          THE COURT:  But I also understood that we don't

5  have a restitution figure agreed to or calculated so that

6  the court can make that mathematical determination.

7          MR. ENGDALL:  And we will supply that to the court

8  at the appropriate time.

9          THE COURT:  Okay.

10          MR. WEINERMAN:  I just have one other thing I want

11  to say, and it been said, but I'd like to emphasize it.

12          My Paragraph 3 of our plea agreement is the same,

13  and it does talk about the government can prove the facts

14  beyond a reasonable doubt.  But it -- it -- if the intent of

15  this agreement, if the intent of the parties was that we

16  were waiving the protections of 1B1.8, it would seem to me

17  that the drafter of the agreement, the government, should

18  have clearly stated that in the plea agreement that that's

19  what we were doing.  That was not our intent in signing this

20  agreement.  I think, at best, this agreement is ambiguous,

21  and the Ninth Circuit law is clear that any ambiguity in a

22  plea agreement is held against the drafter of the plea

23  agreement, and that would be the government.

24          Thank you.

25          MS. WOOD:  Your Honor, the next topic that I

1  wanted to move to were objections to the presentence report.

2           Your Honor, without waiving any of the objections

3  made in writing, which deal primarily with the guideline

4  calculations -- deal primarily with guideline calculations

5  and the terrorism enhancement, which I would address

6  separately, I have identified just six paragraphs in the

7  presentence report that I want to make objection to and ask

8  the court to make findings on and, if the court agrees with

9  the defense, to require that information either be redacted

10  or, if it needs to be added, an amended presentence report

11  done.

12           And I ask that based on what we have heard in

13  court from an expert witness from the BOP and what we all

14  probably know, which is that the presentence report is the

15  bible to the Bureau of Prisons and will affect

16  Mr. Meyerhoff's designation and eligibility for programs and

17  other matters.

18           The first paragraph that I have that type of

19  specific objection to is Paragraph 45 that appears on Page 8

20  of the final presentence report. It's addressed on Page 3

21  of my objection letter, and it deals with the Childers, or

22  Childers, I apologize for mispronouncing the name of the

23  company, but their belief that the potential for damage and

24  injury had the gas line been ignited is reason to impose

25  long prison sentences.

1          And I understand that they had that concern, and
2  I'm not disputing that. But I am asking that that paragraph
3  be modified to make clear that there was not a risk of
4  explosion from that gas line if it had ruptured. And that's
5  based on both the ATF certified fire investigator's report
6  of the incident which, under Hazards, lists no special
7  hazards were identified, and that report is in the Childers
8  discovery disk on Page 470, and as well as the expert
9  testimony that the court has heard that if the gas line on
10 the outside of the building had been damaged by fire so that
11 it leaked, it, just like the line for the propane at
12 Jefferson Poplar, would not have exploded, but would have
13 been a gas torch.

14         So I -- again, just because -- I don't want the --
15 the Bureau of Prisons to read that and assume that there was
16 evidence to show that that building could have exploded
17 based on Mr. Meyerhoff's conduct and that it posed a greater
18 risk.

19         The next objection that I have regards Paragraph
20 52 of the presentence report. That's found on Page 10. The
21 objection is raised on Page 4 of my objection letter, and I
22 have requested that that paragraph be corrected to state the
23 amount of actual damage to the tower, which I believe is
24 what should be used for restitution purposes, was about
25 32,800 for tower and line repairs, and that the balance of

1    the 126,000-dollar figure is based on lost revenue. And
2    that that information is taken from news accounts of quoting
3    spokesmens for the BPA, and I have not seen anything in the
4    discovery or received anything from the government or the
5    presentence report writer that disputes that information.

6           So I think, while it might seem like a pittance
7    compared to 18 million, if there should be about $100,000
8    less of Mr. Meyerhoff's restitution amount, I would like
9    that to happen, and so I make that objection.

10          Your Honor, on Paragraph 55 of the presentence
11   report, which is found on Paragraph 10 -- I'm sorry. Let me
12   back up. I'm not speaking right.

13          Paragraph 55, Page 10. The presentence report has
14   stated that Mr. Meyerhoff created a new timing device. And
15   we have objected because Mr. Meyerhoff, in fact, did not
16   create any timing devices. He built devices based on design
17   plans furnished by codefendant Dibee and Rodgers, and we
18   have provided further factual basis for that objection under
19   our objection to Paragraph 76.

20          But I'm not sure that the government has even
21   claimed that Mr. Meyerhoff created devices. And I, again,
22   think that that is a distinction that has some significance
23   in terms of the BOP reading this overall and trying to
24   determine how dangerous a person do they think Mr. Meyerhoff
25   is.

1    Your Honor, the next objection I had was to
2  Paragraph 76 found on Page 15 of the presentence report.
3  And my objection to that starts on Page 4 of my objection
4  letter and goes on for several pages. And this is basically
5  Mr. Purdue or the presentence report writer's explanation of
6  the facts that he thinks supports a leadership role for
7  Mr. Meyerhoff in the offense, and I think specifically as to
8  Romania and Jefferson Poplar.

9    So it -- it may be that the government's
10  concession that the Romania leadership role is based on
11  1B1.8, which is one of the objections we made, would take
12  care of -- or at least that should be considered in respect
13  to that paragraph of the presentence report, and I guess we
14  are in dispute as to what evidence is available to support
15  his leadership role for guideline purposes under Jefferson
16  Poplar.

17    But Your Honor, again, and it's the information
18  that we have tried to convey to the court, that
19  Mr. Meyerhoff basically was the technical guy in this
20  conspiracy. He didn't pick targets, didn't have contacts in
21  the movement outside the group. I mean, even when he
22  traveled to meet up with Mr. Wallace in Minnesota, that was
23  something arranged through another codefendant in this case
24  who had contacts. He did what he was most able to do out of
25  the group, and that was to build devices based on plans and

1  make some small improvements.

2      And we have objected specifically to the facts
3  stated in the presentence report under that paragraph that
4  Meyerhoff built devices for all of the arsons he was
5  involved in, with the exception of the Vail arson, because
6  he did not build devices for the arson at Childers Meat
7  Company, and that is attested to, and I'm on Page 5 of my
8  letter, it's attested to by statements from Mr. Ferguson as
9  well as Mr. Meyerhoff and Ms. Gerlach.

10      For the other arsons, he did build the devices.
11  But, again, most of those arsons other people also helped in
12  building the devices and gathering the parts for the
13  devices.

14      And he did teach people, Judge, how to build
15  devices, but the discovery in the case, the facts show that
16  Ms. Gerlach, Mr. Rodgers, Mr. Thurston, Mr. Ferguson, and
17  other people besides Mr. Meyerhoff taught people how to
18  build devices, and that almost everybody in this group, at
19  one time or another, actually helped build devices.

20      So it may seem to the court that I'm nitpicking,
21  but the problem is when you -- when you take an
22  oversweeping, broad view, and you just look at this case as
23  Mr. Meyerhoff taught people without recognizing others did,
24  that Mr. Meyerhoff coauthored the manual with Rodgers
25  without seeing that other people did, that Mr. Meyerhoff,

1 you know, told people where to place devices at arsons and

2 other people did, that when it's singled out and we don't

3 look at all the facts and all the details, then it does make

4 the picture that the government's tried to paint of

5 Mr. Meyerhoff as being the most culpable, the most involved,

6 and the most deserving of the greatest punishment in this

7 case. So that's why -- and I apologize to the court for

8 maybe belaboring these points, but that's why I'm doing it.

9 Finally, Your Honor, Paragraph 90 of the

10 presentence report, that's on Page 18, that is addressed on

11 Page 7 of my objection letter, and the objection that I have

12 there, Your Honor, is a couplefold. One, we have objected

13 to combining his ownership of guns in the same paragraph

14 that has him mentioning that Mr. Rodgers talked about

15 assassinations using guns because those things are totally

16 unrelated, and it invites the reader to draw the conclusion

17 that firearms were somehow involved in the ELF/ALF actions

18 or crimes of conviction, and they were not. There's no

19 evidence, there's no proof of that.

20 There is, in fact, statements in debriefings where

21 people said specifically that firearms were never carried to

22 any of these actions. That they -- there were some people

23 in the group that did target practice with guns, which is

24 perfectly legal. There was nothing saying that these

25 weapons were stolen or that they weren't legally possessed

1 | or legally used.

2 | But the inference is there that there was some
3 | connection between owning firearms and talk later on about
4 | assassination attempts. And I have made more factual
5 | arguments about that in my second sentencing memorandum
6 | because the government has basically invited the same type
7 | of link.

8 | And I think it's unduly prejudicial, it's not
9 | supported by the facts, and the presentence report, to
10 | compound that, actually has Mr. Meyerhoff going back with
11 | Ms. Gerlach and digging up the AK-47s and reburying them.
12 | And, in fact, I'm sure the government will acknowledge that
13 | it wasn't Mr. Meyerhoff. That was Mr. Thurston and
14 | Ms. Gerlach who went back and did that.

15 | So --

16 | THE COURT: Is that accurate?

17 | MR. ENGDALL: That is accurate, Your Honor.

18 | THE COURT: Okay.

19 | MS. WOOD: So, I mean, if it's important enough of
20 | a fact to include in the presentence report --

21 | THE COURT: That will be -- it will be rewritten.

22 | MS. WOOD: Okay.

23 | Your Honor, and again, without waiving the
24 | objections we have made as to the guideline calculations and
25 | the terrorism, those are the specific facts that I wanted to

1 address that we'd have objection to.

2 MR. ENGDALL: I'd like to respond.

3 With regard to the CFI report, the ATF certified
4 fire investigation report that Ms. Wood referenced, she
5 talks about the hazards or the reference to no hazards at
6 that time. That comment was made in the report and
7 references the hazards to the investigators at the time of
8 the investigation, not any hazard during the course of the
9 actual arson itself.

10 The cost of repair for the tower, there was no
11 electrical loss. The $126,000, from our understanding, is
12 the cost of the repair to the tower and reerecting the tower
13 and the time and the manpower it took to make that repair
14 possible.

15 With regard to creating a new -- in Paragraph 55,
16 creating a new timing device, it was a new modification to a
17 timing device. Of course, as I mentioned before, the
18 evolution of the devices and Mr. Meyerhoff's work on those
19 devices was ongoing throughout the conspiracy, and he kept
20 trying to improve the devices, and that was what was
21 occurring during that particular period of time.

22 With regard to his leadership role at Romania, we
23 still know, notwithstanding the 1B1.8 information, we still
24 know that he certainly was actively involved in recruiting
25 individuals to join in that, specifically Mr. Tubbs and

1  Ms. Zacher, and that comes from their 302s.

2  The ownership of the firearms by the defendant,

3  his ownership was separate and apart from -- let's put it

4  this way:  There were no firearms that we are aware of that

5  were taken to the scenes of the arsons or other destruction.

6  I think that's a fair characterization.  But the target

7  practicing of the individuals at the Book Club during the

8  course -- and this occurred towards the end of the

9  conspiracy, towards the last few Book Club meetings and

10  around that time, not necessarily at the Book Club meetings,

11  but participants of the Book Club did that, and that was

12  during the time when Mr. Meyerhoff was discussing the

13  possibilities of his escalation in violence and focusing on

14  human beings in lieu of simple arsons.

15            THE COURT:  Next issues.

16            MS. WOOD:  Pardon me, Your Honor?

17            THE COURT:  Next issues.

18            MS. WOOD:  Okay.  Your Honor, the next area I

19  wanted to move to are objections to the terrorism

20  enhancement as it applies to Mr. Meyerhoff.

21            Your Honor, as I read the court's opinion, and I

22  have only had time to read it once, and so please, if I have

23  misconstrued it, correct me, the court has ruled that the

24  government has to prove the application of that enhancement

25  to each defendant in the individual case by clear and

1  convincing evidence. As to that, Your Honor, I would submit
2  that the only uncontested information of motivation
3  regarding Mr. Meyerhoff's participation in these events that
4  is not also protected under 1B1.8 are the communiques when
5  there were communiques issued.

6         Let me -- I want to make that as a first argument,
7  but I have -- I have some sequential arguments to make, and
8  I think it will tie together.

9         The court made rulings as to what would constitute
10 a federal crime of terrorism, and the court ruled against
11 arguments made by Mr. Meyerhoff that "government" meant only
12 federal government. And so that leaves us with two
13 substantive offenses of conviction in Mr. Meyerhoff's case,
14 the BPA tower and the EPD Substation, that are arsons of
15 what the court has said, government property that comes
16 within the scope of the terrorism enhancement. We have no
17 communiques for either of those arsons.

18         The defense submits that under 1B1.8, the only
19 evidence of motivation for those arsons comes from
20 Mr. Meyerhoff's statements and that there is no clear and
21 convincing evidence of motivation to retaliate against the
22 government or to influence the government through
23 intimidation or coercion as to those due to lack of
24 evidence.  The -- well, I'll leave it at that.

25         Your Honor, the other substantive crimes of

1   conviction in Mr. Meyerhoff's case are all crimes against
2   private industry or commerce, all 844(i) offenses. Again, I
3   submit that the only uncontested evidence of motivation are
4   the communiques regarding those arsons. We haven't disputed
5   that the presentence report has accurately set forth the
6   communiques. The government hasn't objected, and so I think
7   that's the source the court can look to.

8          And my argument is this, Your Honor:  That
9   basically none of those communiques establish, by clear and
10  convincing evidence, a motivation to retaliate against
11  government or to influence or affect government by
12  intimidation or coercion.  And I say that, Judge, because
13  what happened here is they picked and researched -- they
14  researched and they picked specific businesses involved in
15  environment -- what they thought was acts of environmental
16  destruction or what they thought was profiting at the
17  expense of the environment.

18         And they -- they committed arsons and genetic
19  engineering actions, for that matter, but arsons are the
20  only ones that fall under this enhancement.  They committed
21  arsons of those both to retaliate against those particular
22  businesses, but also, probably with the greater objective,
23  to try and influence and affect the conduct of others in the
24  same industry.  And that's -- that's clear both by the way
25  they targeted those businesses and by the communiques.

1     Now, the government says, well, there are portions
2   of the communiques -- I think maybe -- maybe Mr. Fredericks
3   can find the Romania slide.  There's portions of some of
4   these communiques where they make some kind of reference to,
5   oh, pending legislation or the state is persecuting people
6   in connection with a crime.  Your Honor, again, I -- I don't
7   see those statements as being sufficient to -- to negate the
8   fact that the motivation was to torch gas-guzzling SUVs who
9   are sucking the land dry.  I mean, you see the few number of
10  words there and that are devoted to them making some
11  comments about they don't like what's going on with the
12  government.

13     But this action didn't harm the government.  It
14  would be one thing if they set fire to cars in the county
15  parking lot where perhaps courthouse personnel would be --
16  have vehicles located.  They didn't do that.  And there's no
17  reason to think that they believed that this would somehow
18  influence or affect government by intimidation or coercion
19  by setting fires to vehicles at Romania.  It's just -- it's
20  not an adequate link.  It's not only just a mixed motive,
21  but those are expressions of defiance to government, sort of
22  like, you can't stop us.  We are going to continue no matter
23  what you do with the laws, no matter how hard you punish us.
24  Those are statements of defiance, of snubbing their nose at
25  authority.  That is not retaliation.  If we are going to use

1  the plain language, then let's use the plain language, and
2  to retaliate means to inflict punishment in kind. It means
3  an eye for an eye.

4          And Romania had not -- they are not the ones that
5  were persecuting or prosecuting Mr. Luers. They were the
6  ones that were profiting from selling SUVs that this group
7  saw as wreaking harm on the environment.

8          So this is one example. The same types of
9  arguments can be made -- I mean, the Vail arson communique
10 doesn't even mention this federal lawsuit that the
11 government says shows that Vail was motivated to retaliate
12 against government.

13         So Your Honor, basically our argument is that
14 being defiant of government and expressing that as a
15 sideline in a communique is not retaliating and not using
16 intimidation or coercion designed and calculated to
17 influence government.

18         Your Honor, as to the other crimes where the
19 government would have a stronger argument based on the
20 communiques that there was a clear motivation to retaliate
21 against government, those are, from Mr. Meyerhoff, the BLM
22 Rock Springs, Wyoming arson and the BLM Litchfield arson.

23         I think what is significant there as to
24 Mr. Meyerhoff is that his culpability for those offenses is
25 within the scope of the conspiratorial liability, and, as I

1  read the court's opinion, when the offense is simply within

2  the conspiratorial -- conspiratorial liability for a given

3  defendant, then the guidelines -- the court -- the court

4  found that the subdivision of arson (f)(1) that is charged

5  in those two crimes, that at the time the conspiracy ended,

6  those crimes were no longer federal crimes of terrorism.

7  And so on a conspirator liability theory, those crimes,

8  regardless of motivation, don't qualify as predicates.

9           So those --

10          (Counsel conferred.)

11          MS. WOOD:  They are just confirming what I was

12  kind of stumbling over.  That your ruling excluded 844(f)(1)

13  for conspiratorial liability purposes.

14          So those are my primary arguments, Your Honor.  I

15  make them without waiving, and in fact renewing, all of the

16  objections to application of the terrorism enhancement that

17  have been submitted to the court in writing and joined in

18  and done orally.

19          And Your Honor, just to conclude on this topic, we

20  submit that if the court finds that the enhancement applies

21  to, for example, the two government-type arsons that were

22  substantive crimes of conviction for Mr. Meyerhoff, the BPA

23  and the EPD, that the BPA tower, the damage done there, by

24  pulling that over out in the middle of the wilderness, that

25  that was not the type of terrorist activity that falls

1  within the heartland of what that enhancement was designed
2  to catch.

3          The same thing with the EPD Substation where you
4  had about a two-gallon container of gasoline on a bicycle at
5  a police station. That it's just not the type of offense
6  that is within the heartland of terrorist activity
7  contemplated by that guideline, and so that the court could
8  depart downward in terms of the number of the 12 levels up
9  on the offense level based on those two being outside the
10 heartland, and that the court could, as to any offense that
11 the court may find that the terrorism enhancement applies to
12 in Mr. Meyerhoff's case, that the court can and should
13 depart downward on the criminal history category from a VI
14 to a I. That argument has been recognized in the case law
15 cited to the court, and that's based on it overstating his
16 criminal history, he has zero criminal history points, and
17 his risk of recidivism that the court has heard plenty of
18 testimony, expert testimony to support.

19         Those are my arguments today on the terrorism
20 enhancement, Your Honor.

21         MR. ENGDALL: Thank you, Your Honor.

22         The communiques are powerful, powerful evidence
23 that indicate the intent of these particular defendants,
24 Mr. Meyerhoff included, to influence or affect the conduct
25 of government. The Romania arson communique is especially

1   insightful for us because it is a direct attack on the
2   state, the Lane County Circuit Court, with -- as it did its
3   business with Mr. Luers.

4           There's other information with regard to the
5   terrorism enhancement, Your Honor.  I call the court's
6   attention, again, to the plea agreement.  It's the
7   government's position, of course, that Attachment 1, the
8   facts that were -- that the defendant agreed that the
9   government could prove beyond a reasonable doubt, they are
10  very compelling in support of the terrorism enhancement or
11  the facts that would justify the terrorism enhancement.

12          Also, I call the court's attention to the guilty
13  plea petition that certainly Mr. Meyerhoff signed.
14  Paragraph 24 of that petition reads:

15          "I know that the judge must be satisfied that
16      a crime occurred and that I committed the crime
17      before my plea of guilty can be accepted.  With
18      respect to the charges to which I am pleading
19      guilty, I acknowledge that the government can
20      prove beyond a reasonable doubt the statement of
21      facts set forth in Attachment Number 1 to the plea
22      letter in my case and request that the court
23      accept that statement of facts as a factual basis
24      for my guilty plea."

25          So he clearly was cognizant of the fact that this

1   attachment was significant with regard to his guilty plea.

2          The government is going to reference some of the

3   facts that were listed in that attachment in support of its

4   argument that the terrorism enhancement applies.

5   Specifically with regard to the conspiracy itself, a

6   relevant portion of Attachment Number 1, with reference to

7   Count 1, Paragraph 3 in that particular document, states

8   that:

9          "The primary purpose of the conspiracy" --

10         "purposes of the conspiracy were to influence and

11         affect the conduct of government, commerce,

12         private business, and others in the civilian

13         population by means of force, violence, sabotage,

14         destruction of property, intimidation and

15         coercion, and by similar means to retaliate

16         against the conduct of the government, commerce,

17         and private business."

18         The defendant urged the court to accept that as a

19  factual basis for his plea, and we urge the court to accept

20  that as a factual basis for the terrorism enhancement.

21         Moving to the attachment referencing Count No. 4,

22  the destruction of the Bonneville Power Administration high

23  voltage tower, the fact that the defendant urged the court

24  to accept included this statement:

25         "Prior to December 30th, 1999, Mr. Gregory

1        Meyerhoff performed research on power lines and
2        selected a high voltage electrical transmission
3        line to destroy.  Meyerhoff wanted to destroy an
4        electrical transmission line to start Y2K troubles
5        and to destabilize the United States because of
6        its perceived unjust matters involving graft,
7        political corruption, and other injustices
8        committed by the United States government."

9        With regard to the terrorism enhancement of the --
10   excuse me -- the Romania Truck Center, I would reference
11   back again to the communique.  It's clear in bold on its
12   face that it was intended to retaliate against the Lane
13   County Circuit Court and in support of Jeffrey Luers.  The
14   Lane County Circuit Court is certainly a part of the
15   government of the State of Oregon.

16        With regard to the Romania -- excuse me -- with
17   the Jefferson Poplar Farm, again, in that attachment,
18   Attachment Number 1, that portion of the plea agreement,
19   when it references Counts 42 through 54, it states that:

20        "The arson at the Jefferson Poplar Farm was
21        coordinated to occur the same day as the arson at
22        the University of Washington.  Mr. Meyerhoff and
23        others referred to these actions as the 'double
24        whammy.'"

25        Clearly those two arsons are connected, and in the

1   communique, it references in Part 1 of the University of
2   Washington communique that, "We attacked the office of
3   Mr. Bradshaw at the University of Washington while at the
4   same time another group set fire to a related target in
5   Clatskanie, Oregon, 150 miles away." And it talks about the
6   university's continuing to pursue reckless science and a
7   threat that they will run the risk of suffering severe
8   losses. That is a threat to a government entity. The
9   university, state universities are certainly part of the
10  State of Washington.

11          More significant is the communique that was issued
12  after the -- referencing the Jefferson Poplar Farm, it was
13  described as Part 2, wherein which the Jefferson Poplar Farm
14  arson was described in that communique. And at the end of
15  that particular communique, it references, "Pending
16  legislation in Oregon and Washington further criminalizing
17  direct action in defense of the wild will not stop us."

18          That is, I believe, Your Honor, a clear indication
19  of their motive and their attempt to calculate and influence
20  the conduct of government, or, in a worst-case scenario, to
21  retaliate against that government.

22          So based upon those specific references and the
23  argument that the government has made, that we made
24  yesterday, it's our position, Your Honor, that the terrorism
25  enhancement in this particular case clearly applies on all

1    fours to Mr. Meyerhoff and should be imposed.

2            MS. WOOD:  Your Honor, just briefly, I want to

3    make clear, and if the government disagrees, I will find the

4    302s for Mr. Meyerhoff over lunch, but the statement of

5    motivation in the fact -- statement of facts attached to the

6    plea agreement regarding the BPA tower that Mr. Meyerhoff

7    wanted to destroy, an electrical transmission line, to start

8    Y2K troubles and destabilize the United States because of

9    its perceived unjust matters, the line that Mr. Engdall

10   read, that is a direct quote from Mr. Meyerhoff's

11   debriefings.  It doesn't come from other witnesses in the

12   case.  And the same as to the Romania being selected as a

13   target to show support for Jeffrey Luers and a statement of

14   defiance.  Those are directly from Mr. Meyerhoff's 302

15   debriefings.

16           THE COURT:  How do you respond?

17           MR. ENGDALL:  That is correct, Your Honor.  She is

18   correct.  But we are not saying that that should be

19   disallowed or not considered by the court.  We are saying

20   that because of the plea agreement and the guilty plea

21   petition, that the government certainly can utilize those

22   facts in its presentation and argument to the court.

23           THE COURT:  On the BPA, on the motivational

24   factor, do you have anything else beyond what was in the

25   statement of facts at the time of the change of plea or the

1   debriefing? Do you have anything else?

2         MR. ENGDALL: No, Your Honor. That is it in its

3   entirety. Thank you.

4         MR. WEINERMAN: Judge, can I just add a few

5   things, because, again, what the court is going to decide is

6   going to affect us.

7         THE COURT: Again, state your name, for the

8   record, and the position that you are -- and the person you

9   are representing.

10        MR. WEINERMAN: Craig Weinerman appearing with

11   Chelsea Gerlach. She's present, by the way. My first

12   concern is the -- this argument that we basically -- we all

13   agreed to this in the plea agreement. That's essentially

14   what the government is saying. And, again, it seems to me

15   that the government, which authored this plea agreement, did

16   it in a very circuitous way. If you look at Paragraph 6,

17   and I assume Mr. Meyerhoff's agreement is the same, it says

18   that, "The government will recommend the terrorism guideline

19   enhancement because the felony offenses involved or intended

20   to promote a federal crime of terrorism."

21        It's been my experience that when the government

22   is seeking and insisting that we agree on something, the

23   government writes the agreement the following way: The

24   government and the defense agree that this guideline

25   enhancement apply.

1  The government didn't write it this way. It
2  simply says the government will recommend the enhancement,
3  and it seems to me they are implicitly saying that it's
4  understood that the defense is going to oppose it and
5  contest it.

6  So if the government wanted us to agree to the
7  terrorism enhancement, they should have stated that in the
8  agreement and should have said we agreed with it.

9  The factual basis, the Attachment 1 that the
10  government now is insisting constitutes a concession, an
11  admission, a stipulation, what have you, that the terrorism
12  enhancement applies, you know, again, I think it's
13  overstated. It talks about the primary purpose of the
14  conspiracy as if the government -- the court is sentencing a
15  conspiracy as opposed to individuals.

16  We were talking last week that we are going to
17  have individual sentencing. And I assume the court still
18  means that. The court is not sentencing a conspiracy. It's
19  sentencing individuals. And each individual's motivation,
20  in our view, has to be determined. And I think the court
21  needs to look at each individual offense and those who
22  participated in those individual actions, like Vail and BPA
23  and the rest, and determine what were the motivation of
24  those individuals.

25  You know, I would say the court should look at

1  that individually, but at worst, the court looks at the
2  motivation of all those in that particular offense, that
3  particular arson, and determines whether any of those
4  persons had the particular motivation.

5      But to say, for example, that every member of this
6  conspiracy is subject to the terrorism enhancement because
7  that may have been one individual's motivation in one
8  particular action to me stretches what this is all about and
9  certainly turns this into a collective endeavor, a
10 collective sentencing rather than individual sentencing.

11     Just very briefly about the individual actions
12 that are going to affect Ms. Gerlach the court is going to
13 decide today. Assuming the court is going to engage in
14 individual sentencing and look at the individual
15 motivations, again, as to Vail, and I'm -- the court, I'm
16 sure, is familiar with the language of the communique, and I
17 would agree that the communique is the best evidence of what
18 the motivation was of those individuals who participated in
19 that offense. As to Vail, it never mentions the government.
20 It rants and raves about the motivation of the Vail company,
21 the ski resort.

22     The government's contention that because the U.S.
23 Forest Service was involved in the process of permitting the
24 Vail ski resort to expand and rejected the arguments of
25 environmental groups that the expansion interfered with the

1  habitat of the lynx to me does not turn this into an attempt
2  to retaliate or influence government when there's nothing in
3  the communique about that.

4  This group has shown that if they want to take
5  action or retaliation against the U.S. Forest Service, they
6  know how to do it. Some of the offenses in this case
7  involve arson of U.S. Forest Service buildings. I believe
8  Detroit Ranger Station and Oakridge. So when this group
9  wanted to take action against the government, they knew how
10 to do it.

11 Now, had they mentioned in this communique that
12 they were taking action or trying to influence the
13 government's decision to grant the permit, I think they
14 would have said that. Clearly -- the clear language, and,
15 again, the clear and convincing standard, would seem to me
16 to demonstrate that that was not the motivation, to take any
17 action against the government.

18 The same thing with the Boise Cascade communique.
19 Says nothing about the government whatsoever. It talks
20 about the practices of the Boise Cascade, their logging
21 practices, both in the Northwest and in Chile. Says nothing
22 at all about the government. The fact that the
23 Boise Cascade company logs on government land and gets
24 permits is not mentioned in here, and, again, if the
25 standard is clear and convincing, the government has not met

1　that burden by saying, oh, by the way, they log on
2　government land.

3　　　　The last -- the last arson I would like to talk
4　about today, just in a general sense, and I'd like to
5　reserve all my other arguments when Ms. Gerlach is sentenced
6　later this week, is the arson at the Jefferson Poplar Farm.
7　And I -- I pretty much agree with what Ms. Wood has said
8　about that this is really more or less an act of defiance in
9　saying the legislation in Washington and Oregon or pending
10　legislation. We really don't even know what that is. The
11　government has not presented any evidence that there even
12　was pending legislation.

13　　　　But be that as it may, you know, again, I think if
14　you read this, if you look at the plain language of the
15　communique, it's pretty much saying whatever Oregon and
16　Washington may do is irrelevant. We are going to continue
17　to take action against private entities like Jefferson
18　Poplar that are engaging in activities that we believe are
19　detrimental to the environment.

20　　　　So, again, I'd ask the court to look at the plain
21　language of these communiques in deciding whether the
22　enhancement applies, and if the court does, I believe the
23　court will find that it does not.

24　　　　THE COURT: Ms. Wood.

25　　　　MS. WOOD: Your Honor, that -- that was all I had

291

1  on that.  Do you want me to move on into other --

2  MR. ENGDALL:  Your Honor, may I have a moment just

3  to respond to that?

4  THE COURT:  Yes.  Go ahead.

5  MR. ENGDALL:  Thank you.  It's the intent of the

6  conspirators that is significant with regard to the

7  application of the terrorism enhancement, not whether or

8  not -- it's whether they believe there was legislation

9  pending, not whether indeed there was.

10  With regard to the plea agreement, it is indeed

11  correct, Mr. Weinerman's correct, there was an agreement

12  that the government would be arguing for the terrorism

13  enhancement, and the defendants could argue against it.

14  There wasn't an agreement, however, that they could deny the

15  facts that they had agreed to.  The agreement between the

16  government and the defendant was that each side could argue

17  the facts as given and as agreed to in any way they deemed

18  appropriate to try to convince this court that the terrorism

19  enhancement would apply, not that the facts should be

20  discarded during that discussion.

21  And finally, Mr. Weinerman made a comment that if

22  these conspirators wanted to attack the government, coerce

23  the government, or retaliate against the government, they

24  could attack the United States Forest Service.  Well, as we

25  well know, prior to the Vail arson, they had attacked the

1 United States Forest Service on at least two occasions, and
2 they attacked the Bureau of Land Management as well. And so
3 they realized, perhaps, that that wasn't an effective
4 approach, so they decided to attack a private entity. But
5 the private entity, the Vail ski resort, was indeed involved
6 with the United States Forest Service, the attempt to expand
7 that facility's operation into federal property. And so
8 therefore they are closely intertwined, and clearly the
9 attack on Vail, Colorado, and the ski resort there was a
10 retaliatory attack, not only against the Vail ski
11 operations, but also the United States Forest Service.

12 Thank you.

13 THE COURT: Ms. Wood.

14 MS. WOOD: Your Honor, the -- what I want to do
15 now is basically make some arguments that go to the
16 mitigation evidence and to the defendant's sentencing
17 recommendation for Mr. Meyerhoff.

18 Your Honor, I want to come back to Rule 32 of the
19 federal criminal rules of procedure that deals with
20 sentencing and the process that we have for trying to keep
21 litigation of facts at the sentencing hearing down to a
22 minimum. And that, of course, is the presentence report and
23 the requirement that parties state in writing their
24 objections to that report, including objections to material
25 information, sentencing guideline ranges, and policy

1  statements contained in or omitted from the report.

2  So basically, parties are told if there's

3  information omitted that you think is important or incorrect

4  information stated, you should make objections. The defense

5  did that in this case. To my knowledge, the government made

6  only one oral objection, and that had to do, I believe, with

7  leadership role. It's mentioned in Mr. -- in the addendum

8  to the presentence report.

9  Your Honor, I -- I keep coming back to the request

10  that the court decide the sentence based on the facts of

11  what Mr. Meyerhoff actually did. And I would say that those

12  facts are what's in the presentence report that haven't been

13  disputed by the parties in terms of the facts of the crimes.

14  The presentence report is also required to

15  include, under Paragraph 2b., verified information stated in

16  a nonargumentative style that assesses the financial,

17  social, psychological, and medical impact on any individual

18  against whom the offense has been committed.

19  My understanding is that the presentence report

20  provided that information to the extent that victims

21  responded, and that they received essentially one response

22  from Childers Meat Company, which is in the presentence

23  report. The court heard testimony from Mr. Rice, if I am

24  remembering his name.

25  MR. ENGDALL: Correct.

1    MS. WOOD: Mr. Rice regarding Jefferson Poplar,
2  and I'm not disputing that.

3         And I'm also not disputing, Your Honor, that the
4  arsons that Mr. Meyerhoff engaged in caused genuine harm to
5  people. I'm only asking the court to consider that we don't
6  know the specifics of that. We don't know that information.
7  And so while we certainly concede it, I don't know to what
8  extent -- to the extent the government argues grievous harm
9  to people, psychological trauma, those kind of things, I
10  would expect that that information would be included in the
11  presentence report or offered as facts through the testimony
12  or statements of victims.

13         So, again, I'm just asking the court when it
14  decides sentence to look at what Mr. Meyerhoff did, which
15  was play a role in committing arsons against nonoccupied
16  structures in this case. He did property damage. The
17  presentence report itself states -- let me find it here.  I
18  believe it is Paragraph 80 or so. Bear with me just a
19  second here, Judge. I read it, and then I don't think I
20  made note of it.

21         The presentence report states on Paragraph 88 on
22  Page 17, "Mr. Meyerhoff said he was trained to commit arsons
23  without injuring people. The arsons were not about hurting
24  or harming people. He said he always checked out the
25  building thoroughly, and they spent months on investigating

1  the target. Mr. Meyerhoff said some targets proposed by
2  others were rejected because of the likelihood that injury
3  would occur."

4          Those are the facts in the final presentence
5  report that the government did not object to. And I ask the
6  court, when it decides the seriousness of the offense in
7  this case and Mr. Meyerhoff's role in those offenses, to
8  keep that undisputed statement of facts in the presentence
9  report in mind.

10         Your Honor, I think the court knows that I have
11 practiced long enough where the last thing I want to do is
12 stir up a hornet's nest by attacking the -- by talking a lot
13 about the offenses and trying to come in and paint offenses
14 as being not as bad as what the government says. And it's
15 not like we don't have plenty of mitigating information and
16 facts to talk to the government -- to talk to the court
17 about in Mr. Meyerhoff's behalf.

18         So I want the court to understand that we have
19 spent the time and called the experts to give the court
20 information about the risk of explosion of propane tanks,
21 the risk of explosion of natural gas meters, the statistics
22 on injury in arson fires that have been gathered on a
23 nationwide basis, that we have done that to make sure that
24 the court had some facts before it and did not simply base
25 its decision on the seriousness of the offense by thinking

1     fire, danger, injury, death, because, as we know from the

2     Gheen Irrigation factory fire, they don't always follow.

3     It's not always fire, danger, injury, death, and, in fact,

4     deaths of firefighters are, thankfully, very rare, and

5     injuries to civilians and firefighters are not that great.

6           The statistics in Dr. Ziegler's report, I want to

7     just make brief mention of that. I want to use the

8     statistics for arson fires. These were the only statistics

9     by the National Fire Protection Association that actually

10    kept track of injuries and deaths to fire responders. The

11    statistics that she had to use for the nonhome structure

12    fires, the other two charts, those were based on the rate of

13    injuries and deaths to fire responders in all types of

14    fires. Occupied, unoccupied, residential, nonresidential.

15    And the court should note that the nonhome structure fires

16    over that period make up only about eight percent of the

17    fires.

18          So it's those statistics which have a higher rate

19    of injuries and deaths, the first two tables in her

20    materials, that is taking the rate for fire responders for

21    injuries and death out of the entire 100 percent, because

22    that's the only way they are kept by that agency, and not

23    just the eight percent of nonhome structure fires.

24          So the arson statistics, and I know with

25    everything the court's had to look at that it probably

1  hasn't spent a lot of time poring over these, but the -- the
2  number of injuries and deaths to civilians and fire
3  responders are lower under this arson table than they are
4  under her first two tables. And you know, again, what it
5  shows for a large period of time in many, many incidents,
6  that in arson fires, all types of structures, homes,
7  businesses, occupied, unoccupied, and vehicles, that you
8  have about 11 fire responder injuries out of 1200 incidents.
9  And so that's less than one out of a 100. And you have less
10 than 0 deaths in that amount.

11       And then it's kind of interesting, because you
12 will notice that the odds -- as the number of injuries and
13 deaths decrease, the odds of getting none in -- in -- as the
14 number of incidents decrease, those odds go up.

15       So for example, out of 300 incidents of arson, you
16 would expect five civilian injuries. Well, two civilian
17 deaths. So your chances of getting 0 in 300 are one in
18 four, meaning you have a pretty good chance of not getting
19 any civilian deaths in a small number of arsons.

20       And, again, I want to say that not only do the
21 facts in the case from the presentence report show that
22 Mr. Meyerhoff took precautions to avoid harm and had no
23 intent to cause harm, that the presentence report, in
24 assessing points under the arson guideline, did not use the
25 guidelines that were based on a higher base offense level

1  for arsons involving knowingly creating a serious risk of
2  injury or death, and those -- that -- that base offense
3  level would be higher on a number of the arsons. I don't
4  think it made a difference on Vail because the amount of
5  loss was so high under Subsection (b).

6      But it would come into play on a number of them.
7  And there's no findings made by the presentence report,
8  there's no objections by the government that would support
9  finding that Mr. Meyerhoff knowingly created a serious risk
10  or substantial risk of serious bodily injury or death to any
11  person. So we just ask the court to consider those facts
12  when it looks at the seriousness of the offense.

13      Your Honor, the -- the -- there's those four
14  factors the court's supposed to consider for purposes of
15  sentencing in arriving at a sentence that is sufficient but
16  not greater than necessary to serve those goals of
17  punishment.

18      I have covered seriousness of the offense.
19  Another factor the court is to consider is the need for
20  incarceration to protect the public, which essentially is a
21  look at whether this individual defendant needs to be
22  incapacitated so that he does not commit further crimes.

23      I -- I have not really heard much out of the
24  government that would take issue with the defense
25  representations and the evidence the court heard that

1 Mr. Meyerhoff, as he sits here today, and as he's proven for

2 the last four years before he was incarcerated, plus the

3 time he's been incarcerated, is not an individual who needs

4 to go to prison to protect the public from him committing

5 crimes. It's not to say that there aren't other reasons why

6 he needs to go to prison, but that's not one of them.

7 Your Honor, the court is supposed to consider, in

8 arriving at sentence, the deterrent effect that -- the need

9 to impose prison time as a deterrent against others. And

10 there's case law that comments that there's only so much

11 that a court should do in putting punishment on an

12 individual in terms of hoping for a deterrent effect. That

13 there's no scientific way to ever determine if it has one.

14 I want to submit in this case that when Mr. Luers

15 was given his 22-year sentence, it didn't have a deterrent

16 effect. It had, in fact, people going out and committing

17 actions in his honor. There at least is -- that information

18 is in the 302s in this case. And Your Honor, for

19 Mr. Meyerhoff to receive the highest sentence of any

20 defendant in this case will simply be an example to the

21 movement of what happens when you turn sides, when you turn

22 your back on the movement, when you place your faith in

23 government. You get hit with the biggest hammer. You go to

24 prison for the longest. And I cannot imagine in any way

25 that that's going to deter somebody from committing arson on

1   behalf of the ELF.

2           I think that it could deter people who want to get
3   out of the movement but say, gee, you know, what do I do?
4   Look what happened to Mr. Meyerhoff.

5           Your Honor, the statutes recognize that prison
6   does not serve the purposes of rehabilitation and that
7   that's not a reason to send someone to prison unless there
8   happens to be some programming that the person can get there
9   that they can't get elsewhere.  So we ask the court, again,
10  to -- to see both from the evidence before it that
11  Mr. Meyerhoff has largely self-reformed and rehabilitated
12  himself.  That his needs for rehabilitation include his
13  ability to work through the remorse that he feels for his
14  past and his crimes by trying to make a positive
15  contribution to society.  And that is rehabilitation for
16  him, and his ability to -- to either get gainful employment
17  or employment that allows him to make contributions to
18  biomechanical devices that will repay society at large for
19  his crimes.  That is the type of rehabilitation that he
20  needs, not the type of programs that may be available to him
21  in prison.

22          Your Honor, the court can, both under the
23  guidelines and in mitigation under 3553, excuse me, properly
24  consider the harshness of conditions of confinement on a
25  particular individual defendant and use that as a reason for

1   a sentence below the advisory guideline range or for a
2   sentence under 5 -- 3553 that is not a departure from the
3   guidelines but is a sentence that is less than the advisory
4   range.

5           I'm not going to repeat what the court heard
6   yesterday.  I'm sure the court has all of that in mind.  I
7   am going to make an anticipatory comment as to what the
8   government may say, which is, well, gosh, Judge, if
9   Mr. Meyerhoff is in such grave danger for being a snitch,
10  why hasn't he come to us and said, can I get into the WITSEC
11  program, the witness protection program.

12          This is what I can tell the court about that:  We
13  have spoken with the government about that program.  We have
14  tried to get information, as much information as possible,
15  about how isolating that program is on an individual.  And
16  we haven't been able to get a lot of questions answered.
17  It's such a secret program that apparently the -- at least
18  the local U.S. attorney's office can't even get information.

19          What -- the collective information we have from
20  Mr. Cox and Mr. Engdall is that these operate as little mini
21  prisons within prisons, but they are kind of secret prisons
22  within the prison, and you can't even -- if you are a staff
23  at the -- at the host prison, you are not even allowed into
24  the little mini WITSEC, witness protection prison.  So not
25  even BOP staff can flow between one prison or the other.

1            That your ability to have contact with the outside
2   world is all screened through Washington, D.C., the
3   Department of Justice, and is very, very limited and very,
4   very restrictive. So you can't exchange letters with people
5   and you can't have much phone contact and you can't have
6   much in the way of visitation.

7            And so the -- while you may be supposedly safe
8   from physical assault from being a snitch if you are in that
9   program, the fact of the matter remains that you are
10   isolated from your friends, your family, and from society at
11   large, and you then spend your time becoming acculturated to
12   the society that's in that prison with you.

13            And those prisons house people from every security
14   designation, low, medium, and high. They don't have
15   separate witness protection prisons that are based on
16   security status.

17            And so we have the problem of isolation from those
18   types of facilities. We have the problem of it still
19   doesn't do anything about being vulnerable to sexual
20   assault. It doesn't address that issue. And the court's
21   heard plenty of testimony to show that Mr. Meyerhoff is at
22   high risk for sexual assault.

23            And there's no guarantee, even if Mr. Engdall or
24   the U.S. Attorney's Office in Oregon recommended that
25   Mr. Meyerhoff be accepted into that prison, that he'd get

1　into that program. It's up to Washington, D.C.

2　　　　　Your Honor, the court's expressed frustration that
3　there's no -- nothing the court can do to get the BOP to
4　protect people. And I can tell the court from firsthand
5　experience in another defendant's case who provided
6　testimony at a trial that when he went back to federal
7　prison, he was at a high security prison, and he was
8　stabbed. And I tried to get information about that because
9　I wanted to go to the government and say please do another
10　Rule 35. That that particular defendant only had a couple
11　years -- about a year left to serve on his sentence, and I
12　wanted to try to come in and get him out of that prison and
13　into a community corrections house.

14　　　　　And, of course, the government, quite, you know,
15　reasonably, said, well, we don't know that the stabbing was
16　related to his testimony. So get us some information, and
17　if it is, we'll consider that. And so I tried to get that
18　information, and I had the inmates sign releases. And I
19　couldn't be given the information because it was a security
20　matter for the institution.

21　　　　　And so then I enlisted the prosecutor's help.
22　And -- because I -- and I went to the regional counsel for
23　the BOP, and I said, if you get the information, will you
24　share it with the prosecutor.

25　　　　　And Judge, the bottom line is I tried for two or

1   three months, and we never got the information. I couldn't
2   get the BOP to give it to the regional counsel -- the BOP
3   regional counsel couldn't get it, couldn't get it to the
4   prosecutor.

5           And so there is no way, basically, for the court
6   to help protect Mr. Meyerhoff once he gets sent to prison or
7   probably for counsel to have much of any impact on
8   protecting him if he is harmed.

9           And so the only thing the court can do that I can
10  think of is to -- to take that into account and to lessen
11  his risk by lessening the amount of time that he spends in
12  prison, because every day he spends there, he will live in
13  fear of these types of attacks. That makes the conditions
14  of confinement harsher. Or he will be in lockdown, and that
15  will make the conditions of confinement harder. And that is
16  a recognized reason for the court to give a lesser sentence
17  that affects an individual.

18          Your Honor, I'm just about -- just about through
19  here.

20          So we have recommended that the court impose the
21  minimum five-year penitentiary sentence. That's as low as
22  the court can go, absent a motion by the government, and the
23  government, under its plea agreement, is not under any
24  obligation to make a recommendation for a substantial
25  assistance reduction if the guideline range ends up being

1   less than a 188 months.

2        We propose that the court, if it believes that
3   additional time of incarceration is necessary because of the
4   seriousness of the offense, which we submit is the only one
5   of those four factors that warrants a prison sentence in
6   Mr. Meyerhoff's case, not that it's a negligible factor, but
7   it's the only one, that the court impose an extended period
8   of time either in a community corrections center or under
9   house arrest.  The rules allow the court to impose a lot of
10  restrictions on house arrest.  You can say no television, no
11  this, no that.  It doesn't have to be that the person
12  essentially just lives at home and goes about their business
13  but maybe can't go to the movies.  So the court has the
14  authority to do that and impose that for up to the full
15  amount of time that he would be on supervised release.

16       And the government has come in with its
17  recommendation for 188 months.  And it said, we want you to
18  know, Judge, that this is not just the recommendation of the
19  Eugene branch of the district attorney's office -- U.S.
20  attorney's office.  It is a recommendation that has been
21  agreed to by the U.S. attorney for the District of Oregon
22  and the U.S. attorneys in six or seven other districts, and
23  it is a recommendation joined in by all federal law
24  enforcement agencies involved in this case, and we all stand
25  here behind this recommendation.  And that's got to carry

1  some weight, Your Honor. We realize that.

2  And we are here, Mr. Fredericks, myself,
3  Mr. Meyerhoff, and a few other people that were members of
4  the defense team, and we come and we ask the court for a
5  five-year prison sentence and some additional time on house
6  arrest or community corrections.

7  And Your Honor, I just want to say that we
8  recognize that this is the most solemn duty this court has
9  as a separate and equal branch of government, and that is to
10 protect an individual defendant from overreaching by the
11 government and to protect him where the government can't in
12 terms of what may happen to him in prison.

13 And the court's heard me make argument already on
14 overreaching, and I just want to make one more graphic
15 statement about that. I'd ask if your courtroom deputy
16 could hand this up to the court. It's a chart, Your Honor,
17 that I have done, and I have given it to the government, and
18 I have given it to Mr. Purdue long before this date. And I
19 don't -- it's as accurate, Your Honor, as I am able to make
20 it. And what it tries to show is crimes that individuals
21 were involved in that are basically the arsons and the
22 genetic engineering crimes in a chronological order.

23 And the main argument I want to make,
24 Mr. Meyerhoff is here (indicated). His crimes are in a
25 discrete period of time. His recommendation is 188 months.

1   Mr. Ferguson is farther over on the scale. His crimes start
2   much earlier than Mr. Meyerhoff. They include more arsons
3   than Mr. Meyerhoff was involved in. His recommendation is
4   for no prison time, according to what's in the discovery,
5   Your Honor. It's for a one-count arson deal for a
6   probationary sentence.

7          Your Honor, we just submit that that type of
8   disparity, in terms of cooperating individuals, is
9   overreaching by the government in its recommendation for
10  Mr. Meyerhoff.

11         He stands here before the court with some unique
12  aspects that the court should consider in sentencing him as
13  an individual. He has self-reformed. He accepted
14  responsibility long before arrest. He carried that debt.
15  He made efforts to start repaying his debt to society. And
16  he's continued those efforts to the best of his ability
17  post-arrest.

18         He immediately cooperated. He waived counsel, and
19  he had impact both on the arrest of others in this case and
20  on others' decisions to cooperate.

21         He, along with Mr. Ferguson, are the only two --
22  well, they are the two that are most notorious in the media
23  for being the snitches in this case. That exposes him to
24  extreme danger but, in the alternative, for protection,
25  harsh conditions of confinement. He is extremely vulnerable

1  to sexual abuse, and he has a huge penalty in the form of at
2  least $18 million of restitution to repay when he gets out.

3          And it's not -- it's not that he has much
4  realistic chance of repaying that amount, Judge. It's the
5  impact of that amount as a penalty. And that's in the
6  letter that was submitted through Mr. Fredericks of the
7  attorney that does bankruptcy-type law. And it's a judgment
8  that will go down against him and affect his ability to ever
9  own a home or get loans or maybe even engage in certain
10  professions. And that's a heavy penalty that will follow
11  him and that the court has to impose in addition to whatever
12  term of imprisonment it imposes.

13          So your Honor, those are the reasons why we ask
14  the court to follow the defense recommendation in this case.
15  We ask specifically as to restitution that the court -- the
16  court make a finding that the economic circumstances of
17  Mr. Meyerhoff do not allow for payment of the full amount of
18  restitution in the foreseeable future under any reasonable
19  payment plan. That it make that finding under 18 U.S. Code
20  3664(f)(1)(B); therefore, waive the interest accrual based
21  on the court's determination of his inability to pay
22  under -- I'm sorry. I don't have the full cite for this
23  from Mr. Fredericks, but -- 18 U.S.C. (f)(3)?
24          MR. FREDERICKS: Yes.
25          MS. WOOD: Okay. Well, (f)(3) is what we have,

1  Your Honor. We'll get you a better cite if we need it.
2  That the court consider -- well, we request the court to
3  write a letter to the individuals suggested by Mr. Cox, the
4  details, the reasons, if the court agrees with the defense,
5  that Mr. Meyerhoff is not now a violent person, has a low
6  risk of recidivism, is not a member of a disruptive group,
7  is not a security risk, and also hopefully that the court
8  will change the criminal history category down to I based on
9  overstatement if it applies the terrorism enhancement.

10  We would request that the court at least invite
11  the government to author a similar letter to the extent,
12  after he is sentenced, it's able to endorse any of those
13  findings. And those -- Judge, and as to designation, I
14  would ask the court to allow us to talk with Mr. Meyerhoff
15  after the sentence and provide a recommended designation in
16  writing to the court shortly after sentencing.

17  That's all I have, Your Honor.

18  THE COURT: We will recess for lunch, and we'll
19  reconvene at, how about quarter to two? Actually, let's
20  just -- two o'clock. Our new location makes it very
21  difficult for people to move about, so two o'clock.

22  Thank you.

23  THE CLERK: Court is in recess until two o'clock.

24  *(Recess.)*

25  THE COURT: Please be seated.

1     Before I call on the defendant, Mr. Engdall, do
2  you have any additional evidence you can point to in the
3  record regarding role enhancement for Mr. Meyerhoff related
4  to the Eugene Police Department Substation incident and the
5  poplar farm incident regarding role enhancement?  What can
6  you point to beyond his statements?

7     MR. ENGDALL:  His statements?

8     THE COURT:  Beyond his statements.

9     MR. ENGDALL:  The statements of Chelsea Gerlach,
10  who advised the government that he had asked her to go with
11  him to join in this effort and travel to Salem.  This is the
12  Eugene Police Public Safety Station.  So her comment on
13  that.

14     With regard to his role in the Jefferson Poplar
15  Farm, that information was gained from our interviews not
16  only with him, of course, but with the other participants in
17  that particular arson, which would have been Ms. Zacher and
18  Mr. Block and Mr. McGowan.

19     THE COURT:  Thank you.

20     Anything else, Ms. Wood, you need to --

21     MS. WOOD:  Your Honor, I don't know what report by
22  Ms. Gerlach the government's referring to.  The only thing I
23  could find handily was I have in my objection letter on
24  Page 7, "Meyerhoff and Gerlach jointly selected the EPD
25  arson."  That's Gerlach's 302 at Page 73.  So I'm not -- I

1  don't recollect that she made statements that he was the

2  leader of that particular arson.

3         That's all I have, Your Honor.

4         THE COURT: Anything else?

5         MR. ENGDALL: Just a final comment to the court,

6  if I may.

7         THE COURT: All right.

8         MR. ENGDALL: The government explained to the

9  court at some length yesterday the effort it took to arrive

10  at its sentencing recommendation. I don't intend to go

11  through that again.

12        But I would like to comment on counsel's

13  contention that the sentence recommendation given by -- to

14  the court by the government today is tantamount to

15  overreaching. It is not. If the government had asked for

16  what it could have asked for in this case, which was a

17  230-year mandatory minimum sentence or life sentences or

18  even 20-year sentences, that contention may have had some

19  merit.

20        But in fact, Mr. Meyerhoff is a man who was

21  involved in a multitude of violent crimes affecting many

22  victims and was successful at striking fear in the hearts of

23  many communities in our district as well as others. This

24  defendant is deserving of a lengthy sentence notwithstanding

25  where he may or may not serve that sentence.

1     As I said, the government has gone to

2 extraordinary measures in its effort to recommend a sentence

3 which is both meaningful to the defendant and to the public

4 and ensures accountability for the defendant and justice for

5 the victims.

6     The government's recommended sentence of 180

7 months -- excuse me -- 188 months in this case accomplishes

8 this obligation, and we urge the court to follow that

9 recommendation.

10     Thank you.

11     THE COURT:  Mr. Meyerhoff, you have been present

12 for the sentencing hearing, correct?

13     THE DEFENDANT:  Yes.

14     THE COURT:  And you have had a chance to hear

15 everything that's been stated?

16     THE DEFENDANT:  Yes, Your Honor.

17     THE COURT:  And as well, you have had a chance to

18 read the presentence report?

19     THE DEFENDANT:  Yes, Your Honor.

20     THE COURT:  And you have had a chance to talk it

21 over with your lawyer; is that correct?

22     THE DEFENDANT:  That's correct.

23     THE COURT:  Do you have any additions or

24 corrections you want to call the court's attention to?

25     THE DEFENDANT:  I've got an allocution, but I

```
 1  don't have any addendums or comments about what's been said.
 2              THE COURT:  And the presentence report is accurate
 3  and you don't have any specific corrections today other than
 4  what's been stated on the record and highlighted by Ms. Wood
 5  and --
 6              THE DEFENDANT:  Yes.
 7              THE COURT:  -- preserved in the record for the
 8  appellate review?
 9              THE DEFENDANT:  No, I do not have any addendums.
10              THE COURT:  I'd be happy to hear anything you wish
11  to tell me before I impose the sentence in this case.
12              THE DEFENDANT:  I appreciate that opportunity,
13  Your Honor.  I'm fine.
14              THE COURT:  You are not going to say anything?
15              THE DEFENDANT:  I don't have anything to add.
16              THE COURT:  All right.  Then we'll take a
17  ten-minute recess and I will come in and impose the
18  sentence.
19              THE DEFENDANT:  I have got an allocation I would
20  like to say.  I'm sorry.
21              THE COURT:  Oh, well, this would be the time to do
22  that.
23              THE DEFENDANT:  I'm sorry.  I misunderstood.
24              THE COURT:  No.  And if you want to be seated and
25  state it or read it, I don't have any problem if it's
```

1   easier. You are closer to the microphone, which would make
2   it easier for the court reporter. So you can stand or you
3   can sit. I don't --

4               THE DEFENDANT: Whatever is easiest for you.

5               THE COURT: I'm fine. So whatever is easiest for
6   you. The court reporter might prefer that you are seated
7   because you will speak directly into the microphone.

8               THE DEFENDANT: I will do that, then.

9               Thank you for the opportunity to speak.

10              Your Honor, I apologize to you, the victims, and
11  fellow citizens for three years of extremist barbarity.
12  There is no excuse for violence. I understand that my
13  immature and overreactive behavior hurt people. I was
14  ignorant of history and economy and acted from a faulty and
15  narrow vision as an ordinary bigot. My choice to adopt a
16  morally contradictory paradigm was my fault. I was stupid.

17              It was my mistaken understanding that the ELF's
18  ostensible aim was to initiate public discussion of issues
19  highlighted by the dramatic occasion of crimes. The crimes
20  were absolutely counterproductive to this goal. They cut
21  off discussion. Meaningful discourse cannot be forced, and
22  fear cannot replace discussion. Transformative solutions
23  will never be comprised of transgressions.

24              I deeply regret my squandered years with the
25  thuggish ELF. I am disgusted by youth's weakness of will

1  and uncertainty in adopting others' visions and scruples as
2  my own, and I am ashamed at the belligerence with which I
3  acted in those beliefs.

4         I fully recognize that my actions caused victims
5  shock at the destruction, anger at the insensibility, and
6  frustration at the years long irresolutions to the crimes.
7  My actions were a betrayal of the trust citizens place in
8  one another.

9         I offer to victims who are here or not -- I offer
10  to victims, members of the public, and to you, Your Honor,
11  my most profound apologies for these, my offenses. I am
12  sorry in every sense of the word for the hurt that I caused.
13  I lacked imagination, discernment, and self-determination.
14  I am guilty of all these: Cowardice, injustice, arrogance,
15  stupidity, anger, naivety, assumption, and cruelty.

16         My reasoning was indeed mutable, but my motive
17  wasn't, really. Throughout my youth, I sought to create for
18  myself a sense of laudable and viral personhood through
19  service. I failed.

20         I acknowledge that in every case, my acts were
21  selfish and egotistical. I accept full responsibility for
22  my choices. I regret them, and I apologize infinitely for
23  my lack of consideration in making them.

24         The ELF's activities are self-referencing,
25  self-abasing violence for the sake of false pride, the

1    original hope of its supposed ideals being burnt to cinders
2    by the reality of its attacks.  I accept full responsibility
3    for my part in these actions, and I am living with their
4    consequences.

5          To be alive today is to wish to make a turning
6    point of one's life, not just for one's self, but for that
7    portion of humanity which one can affect and, through that,
8    all of humanity.

9          I have reflected at length -- I have reflected at
10   length on my experiences.  I have integrated those
11   reflections in a synthesis that helps me make sense --

12                    (Reporter interrupted.)

13         THE DEFENDANT:  I have reflected at length on my
14   experiences, and I have integrated these reflections in a
15   synthesis that helps me make sense of my life and reconciles
16   my past actions with whom I know myself to be.

17         I have grown tremendously since I quit that group
18   of acquaintances, and I have continued to grow since my
19   arrest.  Indeed, this is arguably one of the best growth
20   experiences of my life, certainly one of the most
21   significant.

22         Honesty and good intent do not redeem stupidity,
23   nor does stupidity excuse arson.  But it is curable.  I am
24   doing what I humanly can with the information that I have
25   and with greater discernment, I promise.

1               I feel no pride. Rationalizations explain why but

2  do not repair the damage, restore the trust, or amend the

3  wrongs.

4               By what service can my astonishing social debt be

5  repaid? First, a million times over, I apologize completely

6  to you, Mr. Rice, I don't know if he came, to all of you

7  hardworking business owners, employees, researchers,

8  firemen, investigators, attorneys, and all citizens whose

9  property was destroyed, whose holidays were ruined, whose

10  work was lost, whose welfare was thwarted, and whose sleep

11  was troubled. To you who cry enraged, my shame and regret

12  are total. For you I serve my years in prison with the hope

13  that in time your hurts will heal, and perhaps later, you

14  might forgive me.

15               Forgiveness is relinquishing one's right to

16  revenge, and a gifting of more forgiveness than is deserved

17  is mercy. Far be it from this undeserving student to give

18  lessons. I only wish to indicate my understanding that to

19  whom much is given, much is required. Please have mercy.

20  Please allow me the opportunity to repay my debts with some

21  more useful contribution than as an increasingly damaged tax

22  burden. I am sorry.

23               Thank you, Your Honor.

24               THE COURT: It had been my intent to recess and

25  figure -- I have the calculations as best I can walk through

1   and cover all the details, but I want to thank you for

2   taking the opportunity to write a thoughtful and heartfelt

3   statement.  That's just the beginning.

4         But I want to read to all of you who came, and for

5   those of you who are in the field of education, I want to

6   read to you about another choice of another 15-year old or a

7   young adult and where we are today and where you could be

8   today instead of here in court.

9         And this is a story that will be given tomorrow

10  morning at 7:30 at a breakfast where people are fighting to

11  get mentors for young people, trying to provide thoughtful,

12  caring adults to help people who are not able to make

13  informed, good decisions, not able to understand when they

14  trade off early decision making, how that forecloses so many

15  options down the road.

16        So this is a story that will be told by a young

17  man who is in a situation very different than yours because

18  other people made choices as well as the choices that he

19  made took him down a different path.  So I'm going to read

20  what he wrote.

21            "In the winter of 2004, when I was a 15-year

22        old and living in Bend, my mother busted me and my

23        17-year-old brother growing and selling pot.  She

24        kicked us both out of the house during Christmas

25        break, and we both had to spend Christmas Eve in a

1    car. At this point, I had to make a choice.

2    Either continue on a road of an unhealthy

3    lifestyle or move in with an aunt and uncle in

4    Eugene. I chose to move in with my aunt and my

5    uncle, and they mentored me for two years.

6    "Under my aunt's guidance, I was able to

7    achieve a 3.5 GPA in high school. However, during

8    this time I struggled with drugs and alcohol.

9    "I eventually decided to drop out of high

10   school and move to Bend and get a job washing

11   dishes. I worked my way up the ladder from

12   dishwashing to pantry cook to seafood cook and

13   managed to save $5,000 that summer.

14   "However, I was still doing drugs and alcohol

15   with my brother. That's when my friend, Sherman,

16   came to me with a message that her friends Katie

17   and Adele from in Eugene were interested in my

18   moving in with them. The very next day I took a

19   bus to Eugene to meet Katie and Adele and to find

20   out more about what they were offering me.

21   "They said they'd give me a safe place to

22   live, healthy food, and support if I enrolled back

23   in school and stopped using drugs and alcohol.

24   Wow. Total strangers offering to feed and shelter

25   me. It was almost too good to be true. Enrolling

1   in school was the easy part.  Quitting drugs and

2   alcohol was not.  After a month, I became heavily

3   depressed.  Each day was more awful than the next.

4   My parents were not here for me, and I am an

5   orphan in a stranger's home.

6   "Katie saw the depression and gave me the

7   book *Simple Abundance*, a day of comforting and joy

8   day by day.  In this book, I could flip through

9   the pages that corresponded with the day.  The

10  entries were about how to make comfort and joy a

11  part of my life.

12  "On October 29th, I opened the book to

13  Affirming Abundance.  I read about tithing and all

14  the ways to share abundance and receive abundance.

15  The author talked about the mechanics of tithing

16  and how to take 10% of your assets and donate them

17  to a nonprofit that would do good things in the

18  community.  I immediately thought of the $5,000 I

19  had earned over the summer, and I asked Katie who

20  was doing the things in our community to help kids

21  who were having similar struggles to mine, and she

22  recommended Committed Partners For Youth and put

23  me in touch with Caroline Cummings to work at CPY

24  and to make a difference.

25  "I scheduled a meeting.  I rode my bike to

1    her office, and I walked in sweaty with one leg of

2    my pants rolled up. I remember her office being

3    so clean, and it smelled good. I was afraid to

4    sit on her chair because I would get it dirty.

5    But she welcomed me with a warm smile and hello,

6    and I told her I wanted to make a donation.

7        "She said that before I" -- that before she

8    would accept that donation, she wanted to talk to

9    me about mentoring and the programs offered at

10   CPY. The one program that stood out in my mind is

11   one that gives a mentor to kids who have parents

12   in prison. Even though neither of my parents were

13   in prison, this affected me heavily because it was

14   hard for me to imagine how hard it might be for a

15   kid in this tragic, tragic situation.

16       "After she was done, I knew I was giving my

17   money to the right cause. So I stood up, reached

18   deep down into my sweaty pocket, and pulled out a

19   big pile of crumbly, stinky $20 bills. Caroline

20   put them into neat piles and counted it. $300. I

21   remember her staring at the pile of money and

22   looking shocked that a 17-year-old kid wanted to

23   donate so much money. She asked me if I was sure

24   because $300 is a lot of money, and I told her

25   yes. I told her I believed it's important to

1  given abundance in order to receive abundance.

2    "And I later told her my donation -- "I was

3  later told by her my donation touched a lot of

4  people. All I know is I felt really proud of

5  knowing my $300 was going towards CPY training, a

6  mentor for a kid in our community who really

7  needed a positive role model. Even though my

8  donation was not exactly 10% of what I had earned,

9  I felt I was giving away what was important to

10  me."

11    So that's really what I'd like to share with you

12  today. Today he's in community college and going on with an

13  education. And he's made a commitment to do this for the

14  rest of his life, because when you give, you get back.

15    So for every person in this room who came here and

16  stood up and spoke to give something to this young man, he

17  is but one of millions that we are in need of service to

18  change the direction of their life and to provide a

19  positive, supportive, caring adult at a time when you are

20  making decisions that foreclose all your options for the

21  future. So that's the story of a very different young man

22  who went a different path and chose different people for his

23  life.

24    Now, I want to start on what I think is a very

25  hard analysis and one that I take very seriously, and that

1  has to do with the criminal activities that bring you before
2  me.

3      But I want to tell another story, because this
4  really sets the stage of -- for many of you in this room and
5  beyond who need to hear these words, and it's a Native
6  American folktale.

7      "A wise man told his grandson, A terrible
8      fight is going on inside of me. A fight between
9      two wolves. One is evil and represents hate,
10     anger, arrogance, intolerance, and superiority."
11          You know this story.

12          THE DEFENDANT: I know this story.

13          THE COURT: "The other is good and represents
14     joy, peace, love, tolerance, understanding,
15     humility, kindness, empathy, generosity, and
16     compassion. The same fight is going on inside of
17     you and inside of every person as well.

18          "The grandson asked the wise man, which wolf
19     will win? And the answer is, the one you feed."

20          Now, I respect that you have chosen to feed a
21  different wolf in your statement today, but for a very long
22  time you fed a very evil wolf.

23          THE DEFENDANT: I had to learn that.

24          THE COURT: So I want to make it very, very clear,
25  you and your conspirators should thank your lucky stars that

1  the government offered you a deal in light of the breadth
2  and dangerousness of your actions and the uncharged relevant
3  conduct. And it is only dumb luck that no one was hurt or
4  even killed, and not because of any, quote, careful
5  planning.

6  You didn't know what was in all those buildings or
7  what could potentially cause a greater danger to responders
8  once the fire was set. And as the government has pointed
9  out, once you left the scene, you had no control over the
10  fire or whether it became uncontrollable.

11  You and others emphasized that you didn't intend
12  to harm people, and, in fact, no one was hurt in any of the
13  numerous arsons. However, the people who were targets of
14  the arsons didn't know that. Given the warnings and the
15  threats of future action, they could have reasonably
16  believed that they could be harmed.

17  Further, it was your intent to scare, frighten,
18  and intimidate people through a very dangerous and
19  psychologically powerful act, arson. Fire is dangerous, and
20  most people are rightfully afraid of fire. Why is it that
21  when you yell fire in a crowded room or public area, it's
22  unlawful? Because people will panic. Fire is dangerous,
23  and it frightens and almost terrifies.

24  And while I cannot say that you are a terrorist in
25  the traditional sense of the word, your actions included

1   elements of terrorism to achieve your goal. One definition
2   of terrorism is "the systematic use of terror, violence, and
3   intimidation to achieve an end." A definition of
4   "terrorize" is "to coerce by intimidation or fear." You
5   conspired and committed acts of arson to intimidate and
6   frighten people into changing their conduct, their lawful
7   conduct.

8           Certainly your actions were systematic, and you
9   used fear and intimidation to coerce others into changing
10  their behavior to achieve your goal. Whether under the
11  terrorism enhancement or an upward departure within my
12  discretion, you must be held accountable for attempting to
13  intimidate and retaliate against the lawful conduct of
14  government or private individuals.

15          The fact that your methods, logic, and reasoning
16  were completely irrational does not mitigate this, nor does
17  the fact that no one was hurt. The Romania Chevrolet and
18  the Jefferson Poplar Farm fires were particularly dangerous
19  and created a substantial risk of harm. Romania Chevrolet
20  is located in a busy, mixed-use area not far from the
21  University of Oregon campus, with homes and apartments in
22  close proximity, not to mention a grocery store and a
23  veterinarian office.

24          Jefferson Poplar also created a risk of harm. The
25  incendiary device that did not ignite when Mr. Rice entered

1  the office area, had they ignited, he would have been

2  harmed.  But regardless, he must have been terrified when he

3  sighted the buckets and the timing device as he walked in.

4  I give little credence to the testimony of the

5  expert, to the extent she can be considered one, given her

6  bias, that placement of the incendiary devices next to a gas

7  regulator or propane tanks is not inherently dangerous.  It

8  must be noted that the defendant presented no evidence that

9  they possessed such knowledge at the time of the offenses.

10 In fact, the only conclusion that can be drawn from the

11 specific placement of the incendiary devices is that the

12 defendant and his coconspirators intended to cause as much

13 damage as possible.

14 Outrageously, you meant to cause damage and hoped

15 that the fires would cause as much damage as possible.  And

16 your actions had other consequences, such as the loss of

17 jobs at Jefferson Poplar Farm.  How do you think that

18 affected families?  And to add insult to injury, you used

19 your intelligence to ensure that others would know how to

20 cause just as much harm by using your specialized knowledge

21 to contribute to the manual and, in effect, instructing

22 others how to construct an incendiary device.  By

23 encouraging and providing the means to others to engage in

24 similar dangerous, criminal actions, your behavior extends

25 beyond the scope of this particular conspiracy.

1  Granted, I recognize that you have mostly removed
2  yourself from this lifestyle and have become a productive
3  member of society. I also recognize you have experienced
4  hardship in your childhood and felt a desperate need to fit
5  in, and that you committed these offenses as a young and
6  immature adult. However, those mitigating factors only go
7  so far. You knew your actions were criminal, you knew they
8  were wrong, as evidenced by the great lengths to which you
9  took to conceal your identities, and you all knew, if
10  caught, you would be incarcerated.

11  Moreover, I completely reject the notion that your
12  actions were not based on personal gain but to improve the
13  planet. You committed these crimes to fit in with a group
14  and be accepted. Others likely had other motivations, such
15  as asserting power, control, and influence over people. And
16  I cannot believe that any person with the intelligence you
17  have would really believe that setting fires to an SUV lot
18  in Eugene, Oregon, or a lumber company in Glendale, Oregon,
19  would effect real change.

20  To the contrary, your actions and those of your
21  coconspirators branded the environmental community as
22  dangerous and radical, thus disrespecting the lawful and
23  more effective and productive efforts of the true
24  environmental activists who are really motivated by a desire
25  to protect the environment for future generations.

1      And I just have to say as an aside, *An*

2 *Inconvenient Truth*, Al Gore, a remarkable film highlighting

3 the incredible impact a university professor in the field of

4 science had on a college student who would eventually become

5 the vice president. Hold up those two acts, all the acts

6 you committed and the ability to film information, and see

7 which one makes a difference in the world.

8      Additionally, other hardworking community

9 activists work for change by persuading people through facts

10 and information and by modeling good behavior that

11 governments and individuals must change their behavior and

12 their policies if our environment is to remain sustainable.

13 When you model good behavior, people will listen. When you

14 promise violence and intimidation, you create fear,

15 disrespect, and intolerance.

16      I also understand and appreciate your concern for

17 those of -- your counsel about your prison placement. And I

18 will write any letter I can that will help ensure your

19 safety. But under the law, I cannot and will not reduce

20 your sentence for this reason. That is a separate issue,

21 and I encourage every single person in this room and beyond

22 to help remedy this problem. Let's fix prisons. But the

23 state of the prison does not affect your criminal

24 culpability.

25      Just as the environment is entrusted to us for

1    future generations, so are the people who reenter into
2    society following a prison sentence.  We can't ignore the
3    issues within prisons and the transition out of prison to
4    ensure the community is safe from revictimization, and those
5    who have paid their debt to society must be given an
6    opportunity to become a contributing member of society.

7          And here's where I want to tell you another story.
8    In your presentence report, there's a great deal of
9    discussion about the potential threats or thoughts of
10   suicide.  Do not be a coward.  Take the opportunity to go
11   into prison and make a difference for other people.  And if
12   you do, it will be rewarded.

13         I have a letter.  I have been in correspondence
14   for a number of years with a young man in a very similar
15   situation, and I'm going to read you part of his letter.

16         "I left your courtroom on the day of my
17         sentencing with a disparate mix of emotions.  On
18         the one hand, I was greatly relieved for the sense
19         of closure that I had received, for the previous
20         year of waiting and uncertainty had extracted a
21         large toll on me.  At the same time, though, I was
22         confronted by my misgivings for the ominous role
23         which lay ahead of me.  However, as my parents
24         were with me, constantly shooting worried glances
25         at my direction, I remained positive and upbeat,

1  for I knew that any sign of despair on my part
2  would only worsen their already troubled states.
3  I did my best to reassure them that all would turn
4  out fine, continually interjecting statements such
5  as, this will all be over before we know it.
6      "I am both pleased and proud to report to
7  Your Honor that I -- that the time I spent in
8  confinement was the most focused and productive of
9  my life.  I began serving my sentence
10 January 10th, 2005, at FPC Allenwood in White
11 Deer, Pennsylvania.  Immediately upon my arrival,
12 I commenced the rigorous reading regimen that I
13 had been planning for months prior to my" --
14 months prior."
15     And he lists all the books that he read.
16     "I was assigned the job as a unit orderly.
17 It was my responsibility to clean three unit rest
18 rooms every morning with another inmate.
19 Afterwards, I was left with the remainder of my
20 day to myself, which I initially committed
21 invariably to my studies.  After a short time,
22 though, I noticed an urgent need for assistance in
23 the education department.  It was comprised of
24 only one teacher and two tutors, and their efforts
25 seemed uninspired and ineffective.  Believing I

might be able to breathe some new energy into the
system, I volunteered my services as a tutor in
the GED preparation class. Every morning after
finishing my bathroom duties, I headed over to the
library where I would work with the other inmates
on everything from math to science to English. In
the evenings three nights a week I had another
pupil whom I worked with solely on mathematics.

"Your Honor, I cannot put into words how
rewarding an experience it was. Helping others
truly in need, inspiring confidence in men who had
throughout their lives been put down and made to
doubt their intelligence filled me with a sense of
purpose and meaning I had never before
experienced. It also inspired in me a newfound
appreciation for the values of my own education.
For many years, I took my schooling for granted,
having come from a good town from which all my
friends had gone off and graduated from top
universities. Very few others at FPC Allenwood
had ever attended college, and many had not even
finished high school. Your Honor, for the first
time in my life, I physically encountered the
realities of how precious and valuable and rare a
good education is."

1               And we have corresponded for years. There's your

2   new mission. Don't be a coward. Don't hide. Step up. And

3   if there's a way in the system and through the process where

4   your value can be put to work on the behalf of other

5   individuals because of your educational gifts, we should

6   make that happen, and I will write a letter to that effect.

7               Your efforts to change your life and your

8   considerable cooperation with the government must be

9   considered, particularly in fact -- in light of the fact

10   that your cooperation was significant and instrumental, to

11   the detriment of your safety.

12              You have demonstrated true courage, true courage

13   by stepping up and telling the truth, because before you

14   behaved as a coward acting in the dead of night.

15             However you want to say it, fear and intimidation

16   can play no part in changing the hearts and minds of people

17   in a democracy. And I'm only sorry you didn't understand

18   those lessons so many years ago, because, like many of the

19   people we see in prisons and many of the people that I have

20   had to sentence or who I have walked in and met in prisons,

21   what a waste of a talent, what a waste of a mind.

22             So accordingly, I must go through the guidelines

23   calculation, and I'm going to do that now.

24             So Ms. Wood and Mr. Engdall, pull out your pens.

25   Case No. CR 06-60078-01, Count 1, conspiracy.

1          Pursuant to the U.S.S.C. -- the guidelines 3A1.2,
2     conspiracy is grouped with the underlying substantive
3     offense.  Accordingly, the conspiracy count is grouped with
4     those substantive offenses below.

5          Count 2, arson of Childers Meat Company.

6          The government agrees that this offense cannot be
7     considered as a federal crime of terrorism.  Therefore, I
8     find that the base offense level is a 6, with an upward
9     adjustment of 13 levels for the amount of loss, and two
10    levels for more than minimal planning, resulting in an
11    offense level of 21.

12         Count 3, Boise Cascade.

13         Similarly, the base offense level for this offense
14    is 6, with an upward adjustment of 14 levels for amount of
15    loss under 2B1.3(b)(1), and two levels for more than minimal
16    planning under 2B1.3(b)(3).

17         The government contends that this offense
18    qualifies for the terrorism enhancement because
19    Boise Cascade harvested timber from federal lands.  However,
20    the communique issued after this offense referenced Boise
21    Cascade's intent to ravage the virgin forests of Chile and
22    did not mention any conduct of the government.  Therefore, I
23    find that the government has not established that the
24    offense was calculated to influence or affect the conduct of
25    government by intimidation or coercion, or to retaliate

1  against government conduct, resulting in an offense level of
2  22.

3  Count 4, destruction of an energy facility.

4  The base offense level for this offense is 6, with
5  a ten-level increase based on the amount of loss. Although
6  18 U.S.C. § 1366(a) is enumerated under § 2332b(g)(5)(B) as
7  a crime of terrorism, and the only evidence of motivation is
8  defendant's debriefing statement. Although defendant
9  admitted this fact could be proved beyond a reasonable
10  doubt, it would be because he admitted this fact in his
11  debriefing. However, 1B1.8 precludes the use of debriefing
12  statements for purposes of sentencing, regardless of whether
13  they could be proved beyond a reasonable doubt. Therefore,
14  a 12-level enhancement will not apply, and I decline to
15  depart upward for the same reason, along with the facts
16  that -- that -- the fact that toppling over a tower did not
17  pose the risk of harm as the arson offenses. Therefore, the
18  offense level is 16.

19  Count 5, arson of Eugene Police Department Public
20  Safety Station.

21  Pursuant to 2K1.4(a)(2), the base offense level is
22  20, with a two-level increase for role in the offense, based
23  on the defendant's recruitment of coconspirators Tubbs and
24  preparation with defendant Gerlach. Further, 18 U.S.C.
25  § 844(i) is enumerated under 2332b(g)(5)(B), and based on

1  the totality of the evidence, the only possible conclusion I
2  can reach is the defendant intended to retaliate against the
3  conduct of government. Even this -- even if this offense
4  does not qualify as a terrorism enhancement, I would
5  exercise my discretion to depart upward under 5K2.0.
6  Therefore, the offense level is 34.

7            Count 6, arson of Superior Lumber.

8            The base offense level for this offense is 6, with
9  an upward adjustment of 13 levels for amount of loss under
10 2B1.3(b)(1), and two levels for more than minimal planning
11 under 2B1.3(b)(3).

12           The government contends that this offense
13 qualifies for the terrorism enhancement because Superior
14 Lumber harvested timber from federal lands. However, the
15 communique issued after this offense referenced Superior
16 Lumber as, quote, a typical earth raper contributing to the
17 ecological destruction of the Northwest, and that the
18 defendants hoped to see, quote, an escalation in tactics
19 against capitalism and industry, unquote. It did not,
20 however, mention any conduct of the government. Therefore,
21 I find that the government has not established that the
22 offense was calculated to influence or affect the conduct of
23 government by intimidation or coercion, or to retaliate
24 against government conduct, resulting in a base level
25 offense of 21.

1     Counts 7 through 41, arson of Romania Chevrolet.

2     The base offense level for this offense is 6, with

3   a 13-level upward adjustment for amount of loss, and a

4   two-level upward departure for more than minimal planning.

5     Further, 844(i) is enumerated as a federal crime

6   of violence, and I find that the evidence clearly

7   establishes this offense was calculated to retaliate against

8   government conduct; specifically, the arrest and prosecution

9   of Jeffrey Luers for arson at the very same location.

10  Therefore, a 12-level enhancement will apply.

11    However, I decline to impose a two-level

12  enhancement for role offense, because I cannot determine,

13  based on the evidence presented to the court, whether this

14  information was gleaned from defendant's debriefing.

15  Therefore, the offense level is 33.

16    Counts 42 through 54, the arson of Jefferson

17  Poplar Farm.

18    The base level for this offense is 6, with a

19  13-level upward adjustment for amount of loss, and a

20  two-level upward adjustment for more than minimal planning.

21    Additionally, I find the statements of other

22  conspirators establishes, as set forth in the presentence

23  report, that defendant played a role as an organizer, at

24  least, in the offense to support a two-level upward

25  adjustment.

1            Further, I recognize that the statements in the

2   communique regarding pending legislation could be

3   interpreted as defiance. However, what is the purpose of

4   defiance? To send a message to the government that

5   legislation is ineffectual, so why bother. Thus, I find

6   that the purpose of this offense was to send a message to

7   government, thus influencing or affecting the conduct of

8   government. Because 18 U.S.C. § 844(i) is identified as a

9   crime -- a federal crime of terrorism, a 12-level upward

10   departure applies.

11            Regardless, even if this is not a, quote, federal

12   crime of terrorism, unquote, I would exercise my discretion

13   under the sentencing guideline 5K2.0 because the guidelines

14   do not adequately take into account the offense conduct,

15   such as defendant's intent to frighten, intimidate, and

16   coerce private individuals, and by coinciding with the arson

17   at the University of Washington, to destroy university

18   research and a professor's body of work. Therefore, the

19   base offense level is 35.

20            Finally, I decline to impose the terrorism

21   enhancement under the conspiracy count, given that I have

22   imposed the enhancement or imposed an upward departure based

23   on grouped offenses.

24            Case No. CR 06-60122-02. Counts 1 through 8,

25   arson of the Vail ski resort.

1    The base offense level is 6, with a 17-level

2    increase for amount of harm [sic], and a two-level increase

3    for the amount of loss [sic].

4    The government contends that this offense

5    qualifies for the terrorism enhancement because it was

6    intended to retaliate against the government for granting

7    Vail Associates a permit for the resort expansion. However,

8    the communique issued after this offense referenced Vail

9    Associates and did not mention any conduct of the

10   government.

11   Therefore, I find that the government has not

12   established that the offense was calculated to affect the

13   conduct of government by intimidation or coercion, or to

14   retaliate against government conduct, resulting in a base

15   offense level of 25.

16   A multiple count adjustment.

17   Pursuant to 3D1.4, the combined offense level for

18   multiple counts is determined by taking the offense level

19   applicable to the group with the highest offense level and

20   increasing that offense level by a specified amount. In

21   this case, the group with the highest offense level is 35.

22   The offense level of the remaining groups total three units,

23   and the court must increase the offense level by three,

24   resulting in a combined offense level of 38.

25   Upward departure.

1    Under the sentencing guidelines 5K2.0, I have the
2  discretion to depart where the guidelines do not adequately
3  take into account aggravating circumstances of the offense
4  conduct. Here, § 3A1.4 does not adequately take into
5  account the defendant's intent to frighten, intimidate, and
6  coerce private individuals through his actions. The
7  communique associated with the Vail arson threatened future
8  actions and the patrons of the ski resort.

9          "This action is just a warning. We will be
10      back if this greedy corporation continues to
11      trespass into wild and unroaded areas. For your
12      safety and convenience, we strongly advise skiers
13      to choose other destinations until Vail cancels
14      its unexcusable plans for expansion."

15         Likewise, with respect to the Superior Lumber and
16  the Boise Cascade arsons, the conspirators warned, "Let this
17  be a lesson to all greedy, multinational corporations who
18  don't respect their ecosystems." And, "This year we hope to
19  see an escalation in tactics against capitalism and
20  industry." And finally, "Choose an earth raper and destroy
21  them."

22         After the Childers Meat arson, the communique
23  warned that conspirators will, quote, continue to target
24  these operations and their insurance companies until they
25  are out of business.

1    These are the powerful statements intended to
2 coerce, frighten, and intimidate the owners of such
3 businesses and the people who work there.

4    Therefore, I exercise my discretion under 5K2.0 to
5 depart upward by four levels, resulting, then, in a base
6 offense level of 42, which is what the offense level would
7 have been if the enhancements had applied to these offenses.

8    Acceptance of responsibility.

9    The defendant is entitled to a three-level
10 downward adjustment for his acceptance of responsibility,
11 resulting in an adjusted offense level of 39.

12    Criminal history category.

13    The defendant has 0 criminal history points,
14 resulting in a criminal history category of I.  However,
15 under 3A1.4, the defendant's criminal history category is
16 established at a VI.

17    Therefore, the resulting guidelines range on all
18 the calculations provides the following:

19    The base offense level is a 39.  Criminal history
20 score of VI.  The range is 360 months to life.

21    And on behalf of the government, do you have a
22 motion?

23    MR. ENGDALL:  Yes, Your Honor.  We would move for
24 a downward departure at this particular point in time for
25 substantial assistance by this defendant.  I think to arrive

1   at that level, Your Honor, it's a ten-level downward

2   departure. Excuse me. One moment, Your Honor.

3                     (Counsel conferred.)

4           MR. ENGDALL: One moment, Your Honor, if I may.

5           THE COURT: For those of you in the courtroom, I

6   want you to appreciate how difficult this is, because when

7   we have the hearing, I have the time allotted between the

8   time the lawyers stop talking and to come back and pronounce

9   sentence.

10           So what I will tell you is the government did not

11   know, nor did the defense, where my calculations would be at

12   the conclusion of my statement. Mr. Engdall has a motion he

13   needs to make.

14           I want you to take the time you need to make the

15   appropriate motion, and I will take a few moments to do the

16   calculations --

17           MR. ENGDALL: Thank you, Your Honor.

18           THE COURT: -- I need to finish to impose the

19   sentence.

20           MR. ENGDALL: Thank you.

21           THE COURT: Because I won't be done until you give

22   me your motion.

23           MR. ENGDALL: Thank you very much.

24           Your Honor, the government --

25           THE COURT: Before you speak, I think I misspoke

1  or I -- on Count 1 through 8 in the arson at the Vail ski

2  resort, Case 06-60122, the base offense level is 6, with a

3  17-level increase for amount of loss, and a two-level

4  increase for more than minimal planning.  I think I switched

5  that.

6          MR. ENGDALL:  Thank you, Your Honor.

7          The government is prepared to make its

8  recommendation on the motion for a downward departure at

9  this time.  And the government would recommend an

10 eight-level downward departure, which would result, Your

11 Honor, with a -- an offense level of 31, criminal history

12 category of VI, with a range of 188 to 235 months.  And we

13 would recommend the low end of that range.

14          THE COURT:  Eight-level downward departure.

15          MR. ENGDALL:  Correct, Your Honor.

16          THE COURT:  And the range -- and that is -- the

17 number is what?  I'm sorry.

18          MR. ENGDALL:  The range --

19          THE COURT:  Which means it's a --

20          MR. ENGDALL:  It would be a criminal offense

21 level --

22          THE COURT:  31.

23          MR. ENGDALL:  31, with a criminal history

24 category --

25          THE COURT:  VI.

1    MR. ENGDALL:   -- of VI, Your Honor, with a range

2    of 188 to 235.   Our recommendation would be 188.

3    THE COURT:   Okay.   We'll take a brief recess and I

4    will be back.

5    MR. ENGDALL:   Thank you.

6    *(Recess.)*

7    THE COURT:   Under the 2000 version of 5K1.1, the

8    court then is given the opportunity to depart downward for

9    substantial assistance, more than what was recommended by

10   the government's eight levels.   And I'm going to give my

11   reasons for my further reduction.

12   When I talked earlier about thanking your lucky

13   stars with regard to the government's approach to this case,

14   my comments are not directed just at you.   They are directed

15   at every single person in the community and beyond who, from

16   this day forward, thinks they can affect public policy for

17   whatever topic is out there by using violence, intimidation,

18   coercion, because next time I suspect no one will be given

19   these opportunities to come into court and eventually walk

20   back into the community out of a prison sentence.

21   So the message to be received by the community is

22   we will not tolerate acts of violence to affect public

23   debate.

24   What I am taking into account in further granting

25   you two levels for your substantial assistance is what I

1    don't think the government has fully acknowledged. You

2    spoke to them without a lawyer, you waived your privileges,

3    and you told the truth. And you cleared your conscience and

4    you stepped up and you told what you did and you did name

5    names. That comes at a price both positive and negative.

6    Number one, you can look in the mirror. Number two, you

7    have to look behind your back. You will have to do that.

8    But at the same time, courage isn't always about getting a

9    pat on the back for doing the right thing. Courage is doing

10    it because it simply is the right thing to do. That needs

11    to be respected. And for many people who either want out of

12    a gang or out of a group or who are called upon to do the

13    right thing, I want the message out there that in this

14    courtroom, that matters. When you do the right thing, even

15    at your own peril, it will be acknowledged.

16            So I will give you those two points.

17            Therefore, your offense level --

18            THE DEFENDANT: Thank you.

19            THE COURT: -- then is a 28. The range for the --

20    what would be, then, the -- a 28 over a criminal history

21    category of a VI is 151 months -- 29? Is that right? Let

22    me ask. Is that right? 29, not 28?

23            MR. PURDUE: Yes.

24            THE COURT: 29. Thank you.

25            Is 151 to 188 months.

1    THE DEFENDANT: Thank you, Your Honor.

2    THE COURT: I haven't told you which number it is.

3    I want to make sure -- 06-60078-1, you are committed to the

4    Bureau of Prisons for confinement for a period of 60 months.

5    And by the way, if it hasn't been obvious, just

6    for the record, I have taken a look at the advisory

7    guidelines range, I have taken a look at the nature and

8    circumstances of this offense, your own criminal history and

9    characterizations throughout this proceeding, the goals of

10   sentencing, punishment, deterrence, rehabilitation,

11   community safety, as well as other factors, including your

12   coming forward and telling the truth. And I balance that

13   off against the numbers of offenses that you have committed

14   in weighing those two very critical factors to come up with

15   what I believe is a reasonable but not greater than

16   necessary sentence in this instance.

17   With regard to 06-60078, Counts 2 through 54, you

18   are committed to the Bureau of Prisons for confinement for a

19   period of 156 months, to be served concurrently with the

20   sentence imposed on Count 1 and each other.

21   With regard to Case 06-60122, Counts 1 through 8,

22   you are committed to the Bureau of Prisons for confinement

23   for a period of 156 months, to be served concurrent with the

24   sentence imposed in Case 06-60078-1 and with each other.

25   Now, I am concerned about the restitution figure

1   that has been noted today, and I would like to understand if

2   there has been a discussion between counsel at the recess

3   about an agreed-upon restitution figure or if I will need to

4   hold a restitution hearing.

5           MR. ENGDALL:   There has not been a discussion with

6   counsel, and I'm not convinced that the court will need a

7   restitution hearing, but we can set a restitution hearing

8   and at that time advise the court if there has been an

9   agreement among the parties.

10          MS. WOOD:   I expect we'd be able to work it out,

11  Judge.   It's just lack of information.   So if the court

12  wants to set a restitution hearing at a time convenient for

13  Mr. Engdall, because he's more booked than I am these days,

14  we'll try and get it worked out.

15          THE COURT:   Do we think we'll have a number

16  reached by the last of the sentencings?

17          MR. ENGDALL:   Yes, Your Honor.   I think that's

18  fair and appropriate.

19          THE COURT:   Could we just set this on the last day

20  of the last sentencing?   And I will reserve the restitution

21  portion of the order.

22          THE CLERK:   June 5th is the last day.

23          THE COURT:   Okay.

24          Upon release from confinement -- so the -- there

25  will be a restitution placeholder in an amount that we will

1 discuss, and we'll address how that restitution is to be
2 paid. It will be joint and several with the other
3 codefendants, and I will waive interest. I will give you
4 that information at this point.

5 Upon release from confinement, you will serve a
6 three-year term of supervised release subject to the
7 standard conditions of supervision adopted by this court and
8 upon the following special conditions:

9 First, you shall cooperate with the collection of
10 DNA if required by the probation office and required by law.

11 There's a placeholder for restitution, which will
12 be, again, a figure to be either agreed upon or we will hold
13 a restitution hearing and there will be an amount regarding
14 your repayment, and it will be joint and several with the
15 other codefendants.

16 Next, you are prohibited from incurring new credit
17 card charges or opening additional lines of credit without
18 the approval of your probation officer.

19 Next, you shall authorize release to U.S.
20 probation office any and all financial information by
21 executing a release of financial information form or by any
22 other appropriate means as directed by your probation
23 office.

24 Next, you shall participate in a mental health
25 treatment program as approved by your probation officer if,

1  after an evaluation, it's deemed that it would be
2  appropriate.

3       As directed by your probation officer, you shall
4  take psychotropic medication, if recommended and approved,
5  for the treatment of a mental or an emotional disorder.

6       Next, you shall have your employment subject to
7  the approval of your probation officer. If you take a job
8  and you are underemployed or a combination of schooling and
9  whatever, work, combinations, and paying your restitution,
10  the court will certainly take a look at those options.

11       Next, you shall disclose all assets and
12  liabilities to your probation officer, and you shall not
13  transfer, sell, give away, or otherwise convey any asset
14  with fair a market value in excess of $500 without the
15  approval of your probation officer.

16       Next, you shall have no contact with the
17  individuals known to be involved or having been involved in
18  any environmental or animal rights activism, and if there is
19  some person that you wish to be involved with and when you
20  are on release, that name and that individual will have to
21  be subject to the approval of the probation officer and the
22  court.

23       Next, you shall not participate in an
24  environmental -- environmental or animal rights activism or
25  belong to any groups or organization where the primary

1    purpose is environmental or animal rights unless you are
2    given written permission and approval from the court.

3         I'm not ordering a fine.  I'm making the finding
4    that you don't have financial resources nor an appreciable
5    earning ability to pay anything beyond what what will be an
6    extremely onerous and high and required restitution amount.

7         You are required to pay the fee assessment in the
8    amount of $6,200 as required by statute.

9         Ms. Wood has requested that she have an
10   opportunity to consult with Bureau of Prison individuals and
11   others regarding your placement, and so I'm hoping maybe by
12   the 5th you will be able to give me a recommendation.

13        MS. WOOD:  Thank you, Your Honor.

14        THE COURT:  You entered into a plea agreement that
15   waives all or a part of your appeal rights.  You are
16   certainly entitled to file your notice.  You have ten days
17   in which to do so.  If you cannot afford to do so, contact
18   the clerk's office.  It will be done for you and done for
19   free.

20        Have I missed anything, Mr. Purdue?

21        MR. PURDUE:  I think you have covered it all, Your
22   Honor.

23        THE COURT:  Anything for the government?

24        MR. ENGDALL:  No, Your Honor.  Thank you.

25        THE COURT:  Ms. Wood, anything --

1    MS. WOOD: Your Honor, just for the record, we
2    would continue and renew our objections to the court
3    imposing the terrorism enhancement or an upward departure to
4    achieve the equivalent of the terrorism enhancement for
5    purposes of appeal.

6        THE COURT: Noted.

7        And finally, Mr. Meyerhoff, this is a long
8    sentence. You have the rest of your life to make amends.
9    And you can make amends. And I really do hope you will show
10   courage and you will give back some of the incredible
11   knowledge that you have and do things to help people and
12   give them the guidance and give them the tools so that when
13   they come out of prison, they understand that there's a
14   whole world open to them if they use their intellectual
15   abilities and their good works to make a difference for
16   people, not against people.

17       THE DEFENDANT: I am trying.

18       THE COURT: And to the extent I want to further
19   understand how we can be helpful as a system, I would like,
20   as a condition while you are in prison, that I receive a
21   letter every six months that outlines what you are doing,
22   what you have accomplished, or what you have been -- what
23   your limitations are. Because to the extent that we can
24   make a difference in your returning to this community to do
25   things that will be positive and to pay back, and you come

1  out with an ability to do that because you were not further
2  damaged in the institution, it behooves all of us to make
3  certain that happens.

4      So I hope your family and all the academics who
5  spoke on your behalf, including the professor who has served
6  time and come out and obviously been very successful at
7  reintegration, and Mr. Solomon, who does incredible work at
8  Sponsors, you too can help other people.  You too can make a
9  difference in people's lives.

10     But you have to show the courage now to stay with
11 convictions that lead you down a path very different from
12 where you were headed and very, very much a better way to
13 feel about yourself, a much better feeling when you are
14 doing something extending yourself to help people, not hurt
15 them.

16     THE DEFENDANT:  Thank you for the invitation.  I'm
17 honored.

18     THE COURT:  Good luck.  That's all.
19     MR. ENGDALL:  Thank you, Your Honor.
20     THE CLERK:  Court is in recess.
21     *(The proceedings were concluded this*
22     *23rd day of May, 2007.)*
23
24
25

352

1    I hereby certify that the foregoing is a true and
2    correct transcript of the oral proceedings had in the
3    above-entitled matter, to the best of my skill and ability,
4    dated this 17TH day of August, 2007.
5
6
7
     Kristi L. Anderson, Certified Realtime Reporter
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25